IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| CERTUSVIEW TECHNOLOGIES, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:13-cv-346 (MSD) (TEM) |
| | § | |
| S&N LOCATING SERVICES, LLC and | § | |
| S&N COMMUNICATIONS, INC. | § | |
| | § | Jury Trial Demanded |
| Defendants. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON
<u>FAILURE TO CLAIM PATENT-ELIGIBLE SUBJECT MATTER</u>**

Defendants, S&N Communications, Inc., and S&N Locating Services, LLC (collectively "S&N" or "Defendants"), hereby file this Brief in Support of Defendants' Motion for Judgment on the Pleadings Based on Failure to Claim Patent-Eligible Subject Matter, and respectfully show the Court as follows:

**I.    STATEMENT OF FACTS**

CertusView has asserted five patents in this litigation, all of which are directed to the same unpatentable abstract idea: recording a locate operation. Four of the asserted patents, including U.S. Patent Nos. 8,290,204 (the '204 Patent), 8,340,359 (the '359 Patent), 8,265,344 (the '344 Patent), and 8,532,341 (the '341 Patent) (collectively, the "eSketch Patents"), are related and share very similar specifications. The fifth asserted patent, U.S. Patent No. 8,407,001 (the '001 Patent), does not share the same specification as the eSketch Patents. But, as the Court explained in its claim construction Order, "[a]ll five of the Patents-in-Suit relate to the electronic documentation of a 'locate operation' executed in a geographic location where ground that will soon be excavated or otherwise disturbed is marked with 'paint, flags, or some other

marking object or material to indicate the presence of an underground facility.'" (Ct.'s Cl. Constr. Order at 1–2, ECF No. 121.) CertusView recently reduced the number of asserted claims from 68 to 15 across the five Patents-in-Suit, including 14 claims from the eSketch Patents, and 1 claim from the '001 Patent.[1] The asserted claims include both method and apparatus claims, which are discussed further below.

### A. The eSketch Patents

The specifications of the eSketch Patents make clear that performing a "locate operation," i.e., "the application of paint, flags, or some other marking object or material to indicate the presence of an underground facility" is a longstanding practice in the utility industry. (*See e.g.*, '204 Patent col.1 l.48–52; '001 Patent col.1 l.20–47.) In fact, the eSketch Patents state that, "[e]xcavators are *required* to notify underground facility owners/operators in advance of their excavation activities to describe and communicate the geographic area of those activities to underground facility owners/operators." (*E.g.*, '204 Patent col.1 l.26–29 (emphasis added).) And, "[i]n turn, facility owners/operators are *required* to determine if they own or operate any underground facilities at an identified dig area." (*E.g.*, '204 Patent col.1 l.31–33 (emphasis added).) Further, the eSketch Patents explain that detection of underground facilities in a dig area has long been done using a "locate wand." (*E.g.*, '204 Patent col.1 l.33–37.) Following detection, "[t]he location of . . . underground facilities, if any, which exist within a dig area, is marked using paint or some other physical marking system, such as flags." (*E.g.*, '204 Patent col.1 l.35–39 (emphasis added).) In fact, the eSketch Patents admit that:

> Paint is generally applied as a sequence of dashes or dots on the surface (grass, dirt, asphalt, concrete, etc.) directly above the underground facility and is color-coded to indicate to the excavator the type (e.g., gas, water, sewer, power, telephone, cable television, etc.) of the underground facility present. Flags, which may also identify the

---

[1] The currently-asserted claims are: '204 Patent, claims 1, 2, 19, 21; '344 Patent, claims 1, 4, 13, 17; '341 Patent, claims 1, 7, 16, 17, 28; '359 Patent, claim 1, and '001 Patent, claim 1.

> underground facility via color-coding, can be placed in the ground directly above the underground facility being marked.

(*E.g.*, '204 Patent col.1 l.39–47.)

Significantly, the eSketch Patents also make clear that recording a locate operation is nothing new. (*E.g.*, '204 Patent col.1 l.17–41.) The eSketch Patents admit that: "[c]urrently, locate marks are generally documented using a sketching process which results in the creation of a paper manifest." (*E.g.*, '204 Patent col.2 l.39–41.) These prior art sketches or manifests are "stored manually or in some jurisdictions are digitally scanned/photographed and the image stored electronically." (*E.g.*, '204 Patent col.2 l.43–45.) In other words, it has long been known that locate operations are "documented using a sketching process which results in the creation of a paper manifest." (Ct.'s Cl. Constr. Order at 2, ECF No. 121.) The eSketch Patents explain that the prior art sketches are "stored manually or in some jurisdictions are digitally scanned/photographed and the image stored electronically." (*E.g.*, '204 Patent col.2 l.43–45.) According to the eSketch Patents, these prior art sketches or manifests "are produced by hand, are not to scale, prone to human error, and costly in drafting time spent by the locate technician," and "[b]ecause the manifests are stored as paper or digital images, they are not easily interrogated for data in any mechanized way." (*E.g.*, '204 Patent col.2 l.41–47.)

In the table below, the conventional method of recording a locate operation is described in the left-hand column, and the steps in an exemplary asserted method claim are listed in the right-hand column:

| Conventional Method of Recording a Locate Operation | Claim Limitations in '204 Patent, Claim 1 (Allegedly "Novel" Portions Underlined) |
|---|---|
| A locate technician receives a map of a geographic area where he is scheduled to perform a locate operation for a particular dig area within the geographic area. | <u>electronically</u> receiving source data representing at least one input image of a geographic area comprising the dig area; |

| Conventional Method of Recording a Locate Operation | Claim Limitations in '204 Patent, Claim 1 (Allegedly "Novel" Portions Underlined) |
|---|---|
| The locate technician delineates the particular dig area on the map by perhaps drawing a box around that area on the map with a pencil and/or by making a photocopy of that area. | processing the source data so as to display at least a portion of the at least one input image on a <u>display device</u>; |
| The locate technician performs a locate operation by applying paint, flags, or some other markings to indicate the presence of an underground facility, and then makes a record of the locate operation by drawing marks on the delineated dig area with a pencil to represent the marks he made on the ground. | adding to the displayed at least one input image at least one <u>digital representation</u> of at least one physical locate mark so as to generate a marked-up image including at least one <u>digital representation</u> of the at least one physical locate mark, the at least one physical locate mark applied to the ground in the dig area by the locate technician during a locate operation comprising identifying, using the at least one physical locate mark, a presence or an absence of at least one underground facility within the dig area;  and |
| The locate technician brings the paper map together of the locate operation back to the office.  The map is then stored in either a paper file or saved as a digital image, together with other information about the locate operation (such as relevant address, owner, utilities sought, etc.) | <u>electronically</u> transmitting and/or <u>electronically</u> storing information relating to the marked-up image so as to generate the searchable <u>electronic record</u> of the locate operation. |

As is evident from this table, claim 1 of the '204 Patent does nothing more than add computerized terms, such as "electronically," "display device," "digital representation," and "electronic record," to the conventional practice of recording a locate operation.  The same is true of the other asserted claims in the eSketch Patents.  (*See, e.g.*, '204 Patent, claims 2, 19, 21; '344 Patent, claims 1, 4, 13, 17; '341 Patent, claims 1, 7, 16, 17, 28; '359 Patent, claim 1.)

Indeed, the eSketch Patents disclose nothing more than the use of generic computer components to process sketches or manifests traditionally written on paper by simply electronically viewing, transmitting and storing them as electronic records and digital representations.  For example, claim 21 of the '204 Patent, which is an exemplary asserted apparatus claim, discloses only generic computer components, as highlighted below:

> 21. An apparatus for facilitating generation of a searchable electronic record of a locate operation performed by a locate technician in a dig area, wherein at least a portion of the dig area is planned to be excavated or disturbed during excavation activities, the apparatus comprising:
>
> a <u>communication interface</u>;
>
> a <u>display device</u>;
>
> a <u>memory</u> to store processor-executable instructions; and
>
> a <u>processing unit</u> coupled to the communication interface, the display device, and the memory, wherein upon execution of the processor-executable instructions by the processing unit, the processing unit:
>
> controls the communication interface to electronically receive source data representing at least one input image of a geographic area including the dig area;
>
> processes the source data and controls the display device so as to display at least a portion of the at least one input image;
>
> adds to the displayed at least one input image at least one digital representation of at least one physical locate mark so as to generate a marked-up image including the at least one digital representation of the at least one physical locate mark, the at least one physical locate mark applied to ground in the dig area by the locate technician during a locate operation comprising identifying, using the at least one physical locate mark, a presence or an absence of at least one underground facility within the dig area; and
>
> further controls the communication interface and/or the memory to electronically transmit and/or electronically store information relating to the marked-up image so as to generate the searchable electronic record of the locate operation.

('204 Patent, claim 21 (emphasis added).)

The recited limitations highlighted above, i.e., "communication interface," "display device," "memory," and "processing unit," are simply the standard components of a generic computer as illustrated and discussed with respect to Figure 1 of the eSketch patents. For example, the eSketch Patents make clear that "[t]he communication interface 370 may include ***any*** transceiver-like mechanism that enables user device 210 to communicate with other devices and/or systems." (*E.g.*, '204 Patent col.18 l.15–17 (emphasis added); *see also, e.g.,* '204 Patent

col.19 l.6–8.) Additionally, "[t]he memory 330 may include a random access memory (RAM), a read only memory (ROM), a memory card, a magnetic and/or optical recording medium and its corresponding drive, or another type of memory device." (*E.g.*, '204 Patent col.17 l.37–40; *see also, e.g.,* '204 Patent col.18 l.55–58.) CertusView does not claim to have invented such generic components, and the asserted claims do no more than recite the use of these generic computer components to perform the well-known and abstract idea of recording a locate operation.

> B.     The '001 Patent

The '001 Patent also makes clear that performing a locate operation is a longstanding practice in the utility industry. ('001 Patent col.1 l.18–47.) The '001 Patent expressly admits that, "[l]ocal and federal regulations require that notification be given to owners of underground utility lines in an area to be excavated before any excavation takes place," and "[t]he owners of the utility lines typically must locate and mark the location of any underground utility lines." ('001 Patent col.1 l.20–24.) The '001 Patent further states that the well-known tasks of "locating and marking underground utilities can be performed by either the utility line owner or by third party contractors." ('001 Patent col.1 l.25–27.) The '001 Patent also admits that, in the prior art, "the ground, pavement, or other surfaces" were marked using a marking tool "in order to provide a visual indication of the location of underground utilities." ('001 Patent col.1 l.27–29.) "Paint is commonly the marker," and "[t]he color of the paint is typically chosen based on the type of utility being marked (e.g., red for an electrical line)." ('001 Patent col.1 l.27–31.) According to the '001 Patent, "[p]roving whether the utility line was properly marked can be difficult after the excavation, because in many cases the paint line used to mark the utility line will have been disturbed or destroyed during the excavation process." ('001 Patent col.1 l.43–47.)

The only asserted claim of the '001 Patent, claim 1, discloses nothing more than a generic computer implementation of the well-known and abstract idea of recording a locate operation. Claim 1 recites:

> 1. A system for electronically displaying information relating to use of a marking system or a marking tool configured to dispense one or more markers to mark, on ground, pavement, or other surface, a location of an underground utility, the system comprising:
>
> a <u>processor</u> to receive location data relating to the use of the marking system or the marking tool; and
>
> a <u>display device</u> communicatively coupled to the processor,
>
> wherein the processor uses the location data to control the display device so as to visually display a dispensing of the one or more markers that mark the location of the underground utility on an electronic representation of an area that is marked and includes the location of the underground utility.

('001 Patent, claim 1 (emphasis added).) Claim 1 recites a system with a "processor" and a "display device." However, the specification explains that "the processors 500 and 1340 can be general purpose computers." ('001 Patent col.7 l.42–43.) Additionally, the specification states that "[a]lthough a touch-screen display is one form of the display 1330, ***any other type of display or interface may be used*** such as, for example, a display for displaying information and a keypad for entering information." ('001 Patent col.5 l.47–50 (emphasis added).) As a result, it is clear from the specification that the system of claim 1 amounts to nothing more than a generic computer with a generic "processor" and "display device."

With respect to the preamble phase, "marking system or a marketing tool configured to dispense one or more markers," the Court agreed with CertusView's arguments that "the '001 Patent does not require that the marking system be 'incorporated into a marking tool,'" and "the '001 Patent does not require that the marking tool itself 'physically dispenses the one or more markers.'" (Ct.'s Claim Construction Order at 70, ECF No. 121.) The Court also made clear that "although a marking system or a marking tool may be '<u>configured</u> to dispense one or more

markers,' the physical dispensing of the marker is actually performed by a 'marker dispenser.'" (Ct.'s Claim Construction Order at 71, ECF No. 121.)  Thus, at CertusView's urging, the claimed "marking system or a marking tool" has not been interpreted to require structure for physical dispensing markers.  As a result, like the asserted claims of the eSketch Patents, claim 1 of the '001 Patent discloses nothing more than the implementation of the abstract idea of recording a locate operation on a generic computer.  Accordingly, for the reasons set forth above and below, CertusView's asserted claims are not patent-eligible under 35 U.S.C. § 101 and judgment on the pleadings is appropriate.

## II.    ARGUMENT

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  When ruling on a motion for judgment on the pleadings pursuant to Rule 12(c), courts apply the same standard that applies to motions to dismiss under Rule 12(b)(6).  *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002).  Under this standard, judgment on the pleadings is appropriate when the pleadings, viewed in the light most favorable to the non-moving party, indicate that the dispute can be decided as a matter of law.  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).  The instant Motion involves whether CertusView's asserted patent claims are directed to patent-eligible subject matter under 35 U.S.C. § 101, which is a pure question of law.  *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011).  Patent-eligibility is a threshold inquiry under the Patent Act.  *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (U.S. 2010).  As such, it is appropriate for the Court to decide this case-dispositive legal issue under Rule 12(c).  *See, e.g.*, *McRO, Inc. v. Namco Bandai Games Am., Inc.*, No. CV 12-10322-GW (FFMx), 2014 U.S. Dist. LEXIS 135212 (C.D. Cal. Sept. 22, 2014) (granting

Rule 12(c) motion invalidating claims under § 101); *cf. I/P Engine, Inc. v. AOL Inc.*, Nos. 2013-1307, 2013-1313, 2014 U.S. App. 15667, at *26 (Fed. Cir. Aug. 15, 2014) (Mayer, J. concurring) ("[I]f [the patent-ineligibility] determination had been made in the first instance as directed by the Supreme Court, unnecessary litigation, and nearly two weeks of trial and imposition on citizen jurors, could have been avoided.").

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." *Id.* Although § 101 broadly defines four categories of patent-eligible subject matter, the Supreme Court has recognized "three specific exceptions to § 101's broad patent-eligibility principles: laws of nature, natural phenomena, and abstract ideas." *Bilski*, 130 S. Ct. at 3225 (internal citation and quotation marks omitted). These judicially-created exceptions "are consistent with the notion that a patentable process must be 'new and useful.'" *Id.*

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court clarified that courts should analyze patent-eligibility using the two-part framework set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012). Under the *Mayo* framework, a court must first determine whether claims are drawn to a patent-ineligible concept, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 134 S. Ct. at 2355. If the answer is "yes," a court must then look to see whether the claim elements, both individually and as an ordered combination, nonetheless "transform the nature of the claim[s]" into a patent-eligible application. *Id.* Importantly, the Supreme Court made clear that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible application." *Id.* at 2358; *see also Gottschalk v. Benson*, 409 U.S. 63, 65–67 (1972)

(explaining that a "general-purpose computer" performing generic computer functions simply cannot render a claim patentable). Applying this framework, the Supreme Court held that the claims in *Alice* were not patent-eligible since they were drawn to the abstract idea of intermediated settlement, and "merely requiring generic computer implementation fail[ed] to transform that abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2352, 2356–60.

Since the Supreme Court issued its landmark opinion in *Alice* in June, courts across the country have invalidated patent claims under § 101 in over 13 cases.[2] Like the claims in those

---

[2] *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, No. 2013-1575, 2014 U.S. App. LEXIS 16987 (Fed. Cir. Sept. 3, 2014) (holding that claims directed to creating contractual arrangements using generic computers were invalid under § 101); *Planet Bingo, LLC v. VKGS LLC*, No. 2013-1663, 2014 U.S. App. LEXIS 16412 (Fed. Cir. Aug. 26, 2014) (holding that claims directed to electronically managing a game of bingo were invalid under § 101); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, Nos. 2013-1600 *et al.*, 2014 U.S. App. LEXIS 13149 (Fed. Cir. July 11, 2014) (holding that claims directed to the abstract idea of gathering and combining data were invalid under § 101); *DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*, 2-12-cv-00764, 2014 U.S. Dist. LEXIS 140715 (E.D. Tex. Oct. 3, 2014) (holding that claims directed to a generic computer-implementation of the abstract idea of meal planning to meet a person's nutritional goals were invalid under § 101); *Cogent Medicine, Inc. v. Elsevier Inc.*, Nos. C-13-4479-RMW et al., 2014 U.S. Dist. LEXIS 139856 (N.D. Cal. Sept. 30, 2014) (holding that claims directed to a generic computer-implementation of the abstract idea of maintaining and searching a library of information were invalid under § 101); *McRO, Inc. v. Namco Bandai Games Am., Inc.*, No. CV 12-10322-GW (FFMx), 2014 U.S. Dist. LEXIS 135212 (C.D. Cal. Sept. 22, 2014) (holding that claims directed to a generic computer-implementation of the abstract idea of using rules to automate the process of generating keyframes were invalid under § 101); *Eclipse IP LLC v. McKinley Equip. Corp.*, No. CV 14-154-GW (AJWx), 2014 U.S. Dist. LEXIS 125395 (C.D. Cal. Sept. 4, 2014) (holding that claims directed to a generic computer-implementation of the abstract ideas of asking someone whether they want to perform a task and, if they do, waiting for them to complete it, and if they do not, asking someone else, and asking people, based on their location, to go places, were invalid under § 101); *Walker Digital, LLC v. Google, Inc.*, No. 11-318-LPS, 2014 U.S. Dist. LEXIS 122448 (D. Del. Sept. 3, 2014) (holding that claims directed to a generic computer-implementation of the abstract idea of making a generic headhunting or matchmaking request were invalid under § 101); *Tuxis Techs. v. Amazon.com, Inc.*, No. 13-1771-RGA, 2014 U.S. Dist. LEXIS 122457 (D. Del. Sept. 3, 2014) (holding that claims directed to a generic computer-implementation of the abstract idea of upselling were invalid under § 101); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, No. 2:13-CV-655, 2014 U.S. Dist. LEXIS 122244 (E.D. Tex. Sept. 2, 2014) (holding that claims directed to computer-implementation of the general concept of currency exchange were invalid under § 101); *Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, No. 12-1736-LPS-CJB, 2014

cases, and as explained further below, all asserted claims of the Patents-in-Suit are directed to the abstract idea of recording a locate operation, and the claim elements do "no more than require a generic computer to perform generic computer functions." *Alice*, 134 S. Ct. at 2359. Accordingly, CertusView's asserted claims are invalid as a matter of law under 35 U.S.C. § 101, and judgment on the pleadings is warranted.

### A. The asserted claims in CertusView's patents do not pass muster under § 101 because they are directed to the patent-ineligible abstract idea of recording a locate operation.

CertusView's asserted claims are directed to the patent-ineligible abstract idea of recording a locate operation. Although the Supreme Court did "not labor to delimit the precise contours of the 'abstract ideas' category" in *Alice*, courts, including the Supreme Court, have consistently held that claims are directed to an abstract idea when they merely recite a method of organizing information that is grounded in a longstanding, fundamental practice. *See, e.g.*, *Alice*, 134 S. Ct. at 2356–57 (holding that intermediated settlement, "*i.e.*, the use of a third party to mitigate settlement risk," is "a fundamental economic practice long prevalent in our system of commerce"); *Bilski*, 130 S. Ct. at 3231 (holding that risk hedging is a fundamental economic practice); *see also Benson*, 409 U.S. at 63; *Parker v. Flook*, 437 U.S. 584 (1978). Additionally, claims are directed to an unpatentable process when they could "be performed in the human mind, or by a human using pen and paper." *CyberSource*, 654 F.3d at 1372 (citing *In re Grams*, 888 F.2d 835, 839–40 (Fed. Cir. 1989)). The Federal Circuit has also explained that, "even if

---

U.S. Dist. LEXIS 122780 (D. Del. Sept. 3, 2014) (holding that claims directed to a method of predicting human performance based on genetic testing were invalid under § 101 as a law of nature); *Comcast IP Holdings I, LLC v. Sprint Commc'ns. Co. L.P.*, No. 12-205-RGA, 2014 U.S. Dist. LEXIS 96289, at *10 (D. Del. July 16, 2014) (holding that claims directed to a generic computer-implementation of the abstract idea of making a decision were invalid under § 101); *DietGoal Innovations LLC v. Bravo Media LLC* (PAE), No. 13 Civ. 8391 (PAE), 2014 U.S. Dist. LEXIS 92484 (S.D.N.Y. July 8, 2014).

some physical steps are required . . . (e.g., entering a query via a keyboard, clicking a mouse), such data-gathering steps alone cannot confer patentability." *Id.*

For example, in one recent case, *McRO*, a patentee sued multiple defendants for infringing two patents, both of which were entitled "Method for Automatically Animating Lip Synchronization and Facial Expression of Animated Characters." *McRO*, 2014 U.S. Dist. LEXIS 135212, at *9. According to the patents, the prior art practiced a manual technique for three-dimensional computer generated speech animation using a "morph target" approach, which was "tedious, time consuming, and inaccurate." *Id.* at *9–11. Thus, "an object of the invention [was] to provide 'an extremely rapid and cost effective means to automatically create lip synchronization and facial expression in three dimensional animated characters.'" *Id.* at *11. The defendants filed a motion for judgment on the pleadings based on § 101, arguing that the claims were directed to a patent-ineligible abstract idea. *Id.* at *1. The court agreed and, in granting the defendants' motion, explained that the claims "must be evaluated in the context of the prior art," and "where a claim recites tangible steps, but the only new part of the claim is an abstract idea, that may constitute a claim to an abstract idea." *Id.* at *30. Applying this reasoning, the court determined that the point of novelty in the claims was "the idea of using rules, including timing rules, to automate the process of generating keyframes," and "what the claim[s] add[] to the prior art is the use of rules, rather than artists, to set the morph weights and transitions between phenomes." *Id.* at *34. Accordingly, since the claims recited no more than the mere implementation of this idea using a computer rather than a person as was done in the prior art, the court held that the claims did not pass muster under § 101. *Id.* at *36.

In another recent case, *Cogent Medicine*, a patentee sued several defendants for infringing a patent entitled "Personalized Library Interface for Providing Data to a User," which

included claims directed to cataloguing information from a database and setting aside relevant information based on particular users. Nos. C-13-4479-RMW, -4438, -4486, slip op. at 2, 6 (N.D. Cal. Sept. 30, 2014). In granting the defendants' motion to dismiss based on § 101, the court held that the patent impermissibly claimed "the abstract idea of maintaining and searching a library of information." *Id.* at 6. According to the court, "[t]his idea is little different than the basic concept of organizing a physical library so that an individual can search for information by going to the relevant portion of the library and picking a book." *Id.* The court reasoned that the invention was "akin to the longstanding practice of keeping an updated set of folders for supplying doctors with the latest medical knowledge," and since the claims merely described "a computerized method of performing the same task," this was insufficient under § 101. *Id.* at 6–7.

As with the claims in the cases discussed above, CertusView's asserted claims impermissibly claim a patent-ineligible abstract idea: recording a locate operation. Similar to the claims in *McRO*, CertusView's claims, when viewed in the context of the prior art, are directed to an unpatentable abstract idea. Indeed, the only thing CertusView's claims purport to add to the prior art is the use of computers, rather than pens and paper, to record locate operations. *Cf. McRO*, 2014 U.S. Dist. LEXIS 135212, at \*36. Additionally, like the claims in *CyberSource*, and as admitted by CertusView, the asserted claims are actually "performed in the human mind, or by a human using pen and paper." That is, the abstract idea in CertusView's claims is "little different than the basic concept of" organizing a physical record of a locate operation, and it is "akin to the longstanding practice of" keeping a searchable record of a locate operation. *Cf. Cogent Medicine*, slip op. at 2, 6. Also, the mere fact that some physical steps may be required by the claims, e.g., a locate technician drawing a line on an electronic map, any physical steps are nothing more than data-gathering steps, which "alone cannot confer

patentability." *CyberSource*, 654 F.3d at 1372. Indeed, as illustrated by the table in Section I.A. above, CertusView's claims do nothing more than attempt to "computerize" a longstanding practice, which is simply insufficient under § 101.

While CertusView's claims may have been drafted in a way to make them appear tangible, the Supreme Court has "long warn[ed] . . . against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art." *Alice*, 134 S. Ct. at 2351 (internal citation omitted). At bottom, CertusView's claims are directed to nothing more than the abstract idea of recording a locate operation, which is something that humans can do, and have done for years using pen and paper. Accordingly, CertusView should not be permitted to preempt the use of this fundamental concept by merely reciting its performance on a generic computer. *Id.* at 2354; *Bilski*, 130 S. Ct. at 3231.

### B. The generic hardware components recited in CertusView's claims do not transform the unpatentable abstract idea of recording a locate operation into an "innovative concept."

In addition, the claim elements, both individually and as a whole, do not transform this abstract idea into an "innovative concept" because the only recited structures in CertusView's claims are generic hardware components. *Alice*, 134 S. Ct. at 2358. As the Supreme Court made clear in *Alice*, "the mere recitation of a generic computer cannot transform a patent-ineligible concept into a patent-eligible invention." *Id.* To confer patent-eligibility, the computer "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly . . . ." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010).

For example, the Supreme Court held that the claims in *Alice* were patent-ineligible because they merely recited the implementation of the abstract idea of intermediated settlement

on a generic computer. *Id*. at 2358-60. In reaching this conclusion, the Court first analyzed the method claims, which recited the following steps:

- "creating shadow records for each counterparty to a transaction;"
- "obtaining start-of-day-balances based on the parties' real-world accounts at exchange institutions;"
- "adjusting the shadow records as transactions are entered, allowing only those transactions for which the parties have sufficient resources;" and
- "issuing irrevocable end-of-day instructions to the exchange institutions to carry out the permitted transactions."

*Id.* at 2359 (internal quotation marks omitted). When the Court analyzed each claim element separately, it determined that "the function performed by the computer at each step of the process is '[p]urely conventional.'" *Id.* (internal citation omitted). The Court explained that "[u]sing a computer to create and maintain 'shadow' accounts amounts to electronic recordkeeping—one of the most basic functions of a computer," and "[t]he same is true with respect to using a computer to obtain data, adjust account balances, and issue automated instructions." *Id.* These computer functions were "well-understood, routine, conventional activit[ies] previously known to the industry," and did "no more than require a generic computer to perform generic computer functions." *Id.* (internal citation and quotation marks omitted).

Similarly, the Court concluded that, when viewed as a whole, the method claims recited nothing more than an abstract concept performed by a generic computer, reasoning that the claims did not "purport to improve the functioning of the computer itself," and "[n]or do they effect an improvement in any other technology or technical field." *Id.* The Court also held that the system claims were "no different from the method claims in substance" since they merely recited hardware elements that were "purely functional and generic." *Id.* at 2360. According to the Court, "[n]early every computer will include" the recited hardware, and, as such, "none of

the hardware recited by the system claims 'offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment, that is, implementation via computers.'" *Id.* (internal citation and quotation marks omitted).

Like in *Alice*, in this case, the asserted method claims recite an "abstract idea implemented on a generic computer," and the asserted system claims "recite a handful of generic components configured to implement the same idea." *Id.* There is no dispute that components such as a "communication interface," "display device," "memory," and "processing unit" are generic. And the asserted method claims are simply implemented on such a generic computer. Further, using a computer to create and maintain electronic manifests amounts to electronic recordkeeping, which the Supreme Court described as "one of the most basic functions of a computer." *Alice*, 134 S. Ct. at 2359.

In sum, CertusView's claims "add nothing specific to [the abstract idea] other than what is well understood, routine, conventional activity, previously engaged in by those in the field." *Mayo*, 132 S. Ct. at 1299; *see also SiRF Tech.*, 601 F.3d at 1333 ("[F]or the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations."). It is clear from the specifications of the Patents-in-Suit that the generic computer recited in the claims merely functions as "an obvious mechanism for permitting a solution to be achieved more quickly[.]" (*E.g.*, '204 Patent col.2 l.39–47;) *cf. SiRF Tech*, 601 F.3d at 1333. And as previously explained in the table in Section I.A. above, the asserted method claims from the eSketch Patents add nothing more than words like "electronically," "display device," "digital representation," "input image," and "electronic

record," to the conventional practice of recording a locate operation. Similarly, the asserted apparatus claims from the eSketch Patents and the '001 Patent do nothing more than recite the performance of the conventional practice of recording a locate operation on a generic computer with generic hardware components. Indeed, CertusView does not claim to have invented a "processor," "display device," "communication interface," or any of the other generic computer components disclosed in the asserted claims. Accordingly, all asserted claims of the Patents-in-Suit are invalid as a matter of law under 35 U.S.C. § 101, and judgment on the pleadings is appropriate.

### III. CONCLUSION

Like the claims in the Supreme Court's recent decision in *Alice*, and in the many subsequent cases invalidating claims based on patent-ineligibility, the asserted claims in CertusView's patents are invalid under 35 U.S.C. § 101. CertusView's claims recite nothing more than the abstract idea of recording a locate operation implemented on a generic computer. As explained above, the idea of recording a locate operation is something that CertusView's own patents admit is a longstanding practice in the utility industry that has long been done by a human simply using pen and paper. CertusView's claims "add nothing specific to [the abstract idea] other than what is well understood, routine, conventional activity, previously engaged in by those in the field." *Mayo*, 132 S. Ct. at 1299. The generic computer-implementation of such an abstract idea is exactly what the Supreme Court held to be unpatentable in *Alice*, and the Court should reach the same conclusion here. Accordingly, for the reasons set forth above and in Defendants' accompanying Motion, the Court should grant Defendants' Motion for Judgment on the Pleadings Based on Failure to Claim Patent-Eligible Subject Matter.

WHEREFORE, S&N respectfully requests that the Court grant its Motion for Judgment on the Pleadings Based on Failure to Claim Patent-Eligible Subject Matter in its entirety, and grant S&N all other relief to which it is entitled.

Dated:  October 28, 2014               Respectfully submitted,

/s/ Brian L. Whisler
Brian L. Whisler (Lead Counsel)
Virginia Bar No. 30435
E-mail: brian.whisler@bakermckenzie.com
BAKER & MCKENZIE LLP
815 Connecticut Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 452-7019
Facsimile:  (202) 416-6937

Michael A. Duffy
E-mail: michael.duffy@bakermckenzie.com
BAKER & MCKENZIE LLP
300 East Randolph Street, Suite 5000
Chicago, Illinois 60601
Telephone:  (312) 861-8000
Facsimile:  (312) 861-2899

John G. Flaim
E-mail: john.flaim@bakermckenzie.com
W. Bart Rankin
E-mail: bart.rankin@bakermckenzie.com
Mackenzie DeWerff
E-mail: mackenzie.dewerff@bakermckenzie.com
BAKER & MCKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201
Telephone:  (214) 978-3000
Facsimile:  (214) 978-3099

ATTORNEYS FOR DEFENDANTS,
S&N LOCATING SERVICES LLC AND
S&N COMMUNICATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October 2014, a true and correct copy of Defendants' Brief in Support of Defendants' Motion for Judgment on the Pleadings Based on Failure to Claim Patent-Eligible Subject Matter was served on Plaintiff's counsel of record at the following e-mail address: MLockerby@foley.com.

/s/  Brian L. Whisler