**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| CERTUSVIEW TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 2:13-cv-346 (MSD/LRL) |
| | ) | |
| S & N LOCATING | ) | |
| SERVICES, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTUSVIEW'S OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................. 2

        A.      The Inventions of the Asserted Patents ................................................. 2

        B.      S&N Mischaracterizes the Conduct of a Locate Operation .................. 5

III.    LEGAL AUTHORITY ....................................................................................... 9

        A.      Patent Eligibility Is Rarely Amenable to a Motion to Dismiss ............. 9

        B.      Patent Eligible Subject Matter ............................................................. 10

                1.      35 U.S.C. § 101 ........................................................................ 10

                2.      Invalidity Under Section 101 Requires a Claim-by-Claim Analysis ........ 11

                3.      The Test For Patent Eligibility Under *Alice* and *Mayo* ........................... 12

IV.     ARGUMENT ................................................................................................... 15

        A.      S&N's Motion Is A Summary Judgment Motion That Must Be Denied
                Because It Is Devoid Of Factual Support And, If It Had Identified
                Supporting Facts, They Would Be Disputed. ...................................... 15

        B.      S&N Has Not Even Tried to Carry Its Burden to Show Invalidity by Clear
                and Convincing Evidence ................................................................... 18

        C.      The Asserted Claims Are Not Directed To An "Abstract Idea" ........................... 19

                1.      The Claims Are Not Directed To The Purportedly Abstract Idea Of
                        "Recording A Locate Operation." ............................................ 19

                2.      The Claims Involve Inventive Concepts That Transform An
                        Abstract Idea. ........................................................................... 22

                3.      The Cases Cited by S&N Are Inapposite ................................. 24

V.      CONCLUSION ................................................................................................ 27

## I.   <u>INTRODUCTION</u>

Plaintiff CertusView Technologies, LLC ("CertusView") herby opposes the Motion for Judgment on the Pleadings Based on Failure to Claim Patent-Eligible Subject (Dkt. No. 198, the "Motion") of Defendants S & N Locating Services, LLC and S & N Communications, Inc. (collectively, "S&N").

S&N's Motion cannot be for judgment "on the pleadings" because it relies on material outside the pleadings, namely S&N's incorrect description of the state of the locating art (which S&N erroneously claims CertusView simply computerized), as well as S&N's incorrect factual assertion that the CertusView patents preempt the recording of locate operations.

S&N's Motion also cannot be a successful motion for summary judgment because, in an effort to make it look like a motion on the pleadings, S&N failed to offer *any* factual support for its assertions about the state of the art and preemption, which are demonstrably incorrect.  Were it considered a motion for summary judgment, it should also be denied, because S&N's underlying facts are wrong and S&N certainly cannot show that there is no dispute about them. As detailed below, CertusView specifically disputes S&N's description of the state of the locating art and S&N's claim that the patents preempt the field.

In addition to the fatal procedural defects, S&N's motion would have to be denied because S&N fails to offer the claim-by-claim and element-by-element analysis that would be required to invalidate the claims.

Finally, aside from the above failings, S&N's motion should be denied because CertusView's patents are not directed to "abstract ideas."  The patents do not improperly preempt "recording location operations," as S&N vaguely claims, they are firmly grounded in the real world, and they provide specific advantages over prior art methods and systems.

S&N's Motion is also a poorly veiled attempt to circumvent the requirements of the Local Rules, which limit S&N to a single Motion for Summary Judgment limited to 30 pages. (*See* L. R. 56(c) and L. R. 7(F)(3).)  Because Local Rule 56(c) limits S&N to a single Motion for Summary Judgment, any further Motion that S&N files under Fed. R. Civ. P. 56 should be stricken.

## II.  FACTUAL BACKGROUND

S&N's Motion is based on a single, profoundly flawed, premise:  that the asserted patents cover all methods of "recording a locate operation."  (*See* Dkt. 198 at 1 ("CertusView has asserted five patents in this litigation, all of which are directed to the same unpatentable abstract idea: recording a locate operation.").)  In fact, the claims only "relate" to recording a locate operation in the general sense, such as how a patent on a new telephone might "relate" to the abstract idea of point-to-point communication.  The telephone would not be an abstract idea.

The patents do not preempt the general ability to document a locate operation.  Instead, they are narrowly tailored to specific, novel methods and systems for creating electronic records that contain representations of physical locate marks applied to the ground during a (real-world) locate operation, where the representations are placed on an image and/or other representation of a dig area.  This is a far cry from the financial  instruments and business methods found unpatentable to date.

### A.     The Inventions of the Asserted Patents

Prior to the conception of the inventions reflected in the asserted patents, participants in the locating industry (including one-call centers, utility companies, excavators, and locating companies) were focused on technologies that could be used to more accurately identify the location of ***underground utilities*** (electric lines, gas lines, fiber optic lines, etc.).  (*See* Ex. A,

2

Excerpts from the Expert Report of Dr. Randel Dymond[1] ¶¶ 29-33, 61-67, 158-159 and 171-179.)

Little attention was paid to the needs of locating service providers, whose role was to send technicians out into the field to locate underground utilities and then apply paint, flags, or stakes to the ground to show excavators where the utilities were located, so the excavators could avoid (or find) them. (*See id.*) If a locate technician did his job correctly, the excavator would do its job while avoiding damage to any utilities. (*See* Ex. B, Decl. of Dennis Tarosky ¶ 7.) In practice, however, damage occurs, often with significant financial ramifications. (*Id.*)

When an underground facility is damaged, the involved parties must determine whether the cause was (a) that the facility was unknown to the utility company, (b) that the locating company failed to accurately mark the facility (by, for example, applying paint to the ground), or (c) that the excavator failed to observe accurately placed paint markings. (*See* Ex. B ¶ 8.) Of course, after damage occurs, it can be difficult or impossible to verify whether an area was properly marked by visiting the physical site. (*See* Ex. B ¶ 9.) For example, if the excavator has dug a trench that hit a utility line, it may be impossible to determine whether any markings were placed on the ground where the hole now exists. (*See* Ex. B ¶ 10.)

In order to address this concern, the locating industry adopted the practice of having locators hand draw sketches on paper to show where the locator has placed the paint. (*See* Ex. B ¶ 10.) In order to show the location of the marks, the locator would also need to draw roads, structures, driveways, trees, fences, and the like. (*Id.*) Notably, this practice ***would not infringe*** the asserted patents.

---

[1] The full Expert Report of Dr. Randel Dymond includes material designated by both parties and third-parties as Confidential or Highly-Confidential, only non-Confidential excerpts have been included and attached as Exhibit _.

The inventors of the asserted patents, Steve Nielsen, Curtis Chambers, and (with respect to certain claims) Jeffrey Farr, appreciated the limits of the pencil and paper process. For example, because there was no standardization, the sketches would vary significantly depending on the diligence and artistic ability of the locator. (*See, e.g.*, '344 Patent col. 2, lines 28-32.) Additionally, these records, which were generated in very large volumes, were difficult to search for and identify when needed if damage occurred after a locate operation. (*See, e.g.*, '344 Patent col. 2, lines 32-36.)

Most importantly, the inventors appreciated the need for new methods and systems to increase the accuracy and reliability of sketches. They discovered that by relying on an image of a dig area (which could take a variety of forms) to which digital representations of physical locate marks could be applied, and developing technology that could make such an image available to a locate technician on the job site, the accuracy and reliability of a sketching could be significantly improved. This had never been tried before, and it was a significant advance beyond the industry-standard hand sketching.

For example, in embodiments in which the image is an aerial image, the technology allowed a locate technician to begin with a background that already had the houses, streets, and other landmarks from which they could determine the spatial relationship to the physical locate marks applied to the ground and add them to the image.

The enhanced digital sketches provided detail about where a locator actually applied the physical locate markings not previously available, allowing locating service providers to avoid liability where such reliable records might not have otherwise existed. (*See* Ex. B ¶ 20.) These records have resulted in a number of unexpected advantages, including substantial cost-savings

(resulting from a quicker process and reduced damages), greater accuracy, and even better quality locates. (*See* Ex. B ¶¶ 21-24.)

While the claims of the various patents differ significantly in scope, they generally require, among other things:  an input image or representation of a dig area (including, for example, a topographical, satellite, or aerial image) and digital representations of the physical locate marks (*i.e.*, showing the paint that was applied to the ground by the locate technician) that are combined with the input image to create a marked-up image showing the job site and the markings.  (*See, e.g.,* '344 Patent col. 18, lines 11-14, 26-27, 66-67, col. 19, lines 14-17, 30-31; '204 Patent col. 34, line 63 – col. 35, line 5, col. 35, lines 10-14, col.  36, lines 4-6, 21-30; '359 Patent col. 17, line 60 – col. 18 line 3; '341 Patent col. 35, lines 6-11, 46-50, col 36, lines 48-55; '001 Patent col. 8, line 19-28.)  Prior art systems did not use input images of the job site (either paper or electronic) at all.

## B.    S&N Mischaracterizes the Conduct of a Locate Operation

S&N's argument hinges on a chart that purportedly compares claim 1 of the '204 Patent to the "conventional method of recording a locate operation" – S&N's argument being that the patents merely claim a computerized version of a supposed "conventional method."  Notably, however, S&N fails to cite **any** support for its description of a "conventional" locate operation, presumably because citing facts would confirm that this is not a motion for judgment *on the pleadings*.

In fact, what S&N describes is *nothing like the conventional method for performing a locate operation*.  Whether intentional, due to a misunderstanding of the locating process or for some other reason, S&N's description is nonsensical and, to the extent it can be understood, is wrong, as detailed in the accompanying declaration of Dennis Tarosky.  Mr. Tarosky is the

5

President of Utiliquest, LLC., a locating services company based in Atlanta Georgia that competes with S&N, and was deposed in this action on October 8, 2014.  (*See* Ex. B ¶ 1.)

First, and as confirmed by the Court's claim construction order, the claimed "locate operation" involves the "application of paint, flags, or some other marking object or material to indicate the presence of an underground facility."  (*See* Dkt. 121 at 19.)  In a typical locate operation, a locate technician receives one or more tickets issued by a one-call center in response to a call by a property owner or excavator to 8-1-1.  (*See* Ex. B ¶ 4.)  In Virginia, the one-call center is Virginia Utility Protection Services ("VUPS"), also known as "Miss Utility."  (*See* Ex. B ¶ 5.)  The locator will go to the site identified by the ticket, determine the location of underground facilities using specialized devices that detect the presence of those facilities, and "mark" the ground to indicate the location of any underground utilities.  (*See* Ex. B ¶ 6.)  Once the utilities have been located, and markings applied to the ground, the locator may then use a variety of methods to document where he or she applied marks to the ground.  (*See* Ex. B ¶ 11.)  One method, as described above, is to create a sketch on paper showing where the technician applied the locate marks, as well as landmarks (buildings, streets, trees, etc.) that the technician also (arbitrarily) decides to include.  (*Id.*)  A second method is to take photos of the markings.  (*Id.*)

This process is markedly different from the one described in S&N's brief, which does not make sense, and does not even match up with the claim elements to which S&N is comparing its made-up process.

For example, in the first row of the table on pages 3-4, S&N asserts that "[a] locate technician receives a map of a geographic area where he is scheduled to perform a locate operation for a particular dig area within the geographic area."  (Dkt. 198 at 3.)  ***That never***

*happens.*  While a locator might have consulted or received a road map that would allow him to drive to the correct address, those necessarily would be small-scale maps (meaning that the objects shown are small) that would not have been suitable for recording the location of marks at a particular job site.  (*See* Ex. B ¶ 12.)  There is no evidence (*and certainly nothing in the pleadings*) showing that anyone ever recorded locate marks on such a map, or even that they would have been able to do so.  Indeed, even *today* Mr. Tarosky is unaware of anyone conducting a locate operation where a map of a geographic area is provided to a locate technician who then would apply markings to that map.  (*See* Ex. B ¶ 13.)

S&N then asserts that during a "conventional" locate operation "[t]he locate technician delineates the particular dig area on the map by perhaps drawing a box around that area on the map with a pencil and/or by making a photocopy of that area."  (Dkt. 198 at 4.)  (The use of the word "perhaps" in this statement certainly suggests that S&N likely does not have any real support for it.)  *Again, that never happens.*  In fact, the allegation that this box drawing was "conventional" makes no sense when one understands the role of a locate technician, whose job is simply to locate underground utilities and apply markings to the ground in the area so as to indicate the presence of those utilities.  The locate technician's job is *not* to identify a particular area that will be dug up; instead, the identification of a particular dig area is under the purview of the excavator and/or the one-call center and not the locate technician.  (*See* Ex. B ¶ 14.)  Accordingly, the boundary of the dig area is something that would have to be *provided to the locate technician by the excavator,* rather than drawn by the locate technician.  (*Id*.)  S&N also asserts that the locate technician would "make a photocopy of that area."  It is unclear what S&N could conceivably be referring to with the assertion.  Mr. Tarosky is unaware of any typical

7

process, whether present or past, that would have involved locate technicians photocopying a dig area.  (*See* Ex. B ¶ 15.)

The next element of a "conventional" locate operation, according to S&N, is that "[t]he locate technician performs a locate operation by applying paint, flags, or some other markings to indicate the presence of an underground facility, and then makes a record of the locate operation by drawing marks on the delineated dig area with a pencil to represent marks he made on the ground."  Again, S&N cites no support for this contention.  While locate technicians did draw paper sketches that include representations of marks made on the ground, those were ***not drawn on maps***.  (*See* Ex. B ¶¶ 17-19.)  Those sketches required that the locate technician draw not only the markings they applied to the ground, but also landmarks to serve as reference points for where the markings were placed.  (*Id.*)  Not only did locate technicians ***not*** draw markings on physical maps (or photocopies) of a dig area, it would not have made sense for them to do so. Even assuming that a locate technician had a printed road map to draw on, such a map would generally be of too small a scale to provide useful reference points to landmarks from which a locate technician could then draw the markings applied to the ground.  (*See* Ex. B ¶ 12.)

The last purportedly "conventional" element that S&N discusses is that "[t]he locate technician brings the paper map together [*sic.*] of the locate operation back to the office.  The map is then stored in either a paper file or saved as a digital image, together with other information about the locate operation (such as relevant address, owner, utilities sought, etc.)." Again, and as explained above, there was no "paper map" used in a conventional locate operation, nor was there any "digital image."  (*See* Ex. B ¶¶ 13 and 19.)  In fact, tracking and providing paper maps to all locate technicians who would then be expected to draw markings on them and later return them would involve a significant amount of overheard for locating

8

companies given the large number of operations that are performed that would not be desirable. (*See* Ex. B ¶ 13.)

## III.  LEGAL AUTHORITY

### A.      Patent Eligibility Is Rarely Amenable to a Motion to Dismiss

"[I]t will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter.  This is so because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary."  *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338 (*vacated sub. nom WildTangent, Inc. v. Ultramercial, LLC*, __ U.S. __, 134 S. Ct. 2870 (2014) (vacating and remanding in view of *Alice*); *see also CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013) (*en banc*) (concluding that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence"; describing how "it bears remembering that all issued patent claims receive a statutory presumption of validity . . . [a]nd, as with obviousness and enablement, that presumption is applied when § 101 is raised as a basis for invalidity").

Accordingly, in order to dismiss on the pleadings, "the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility."  *Ultramercial*, 722 F.3d at 1339; *see also Data Distrib. Techs., LLC v. BRER Affiliates, Inc.*, Civ. No. 12-4878, 2014 U.S. Dist. LEXIS 115543, at *40 (D.N.J. Aug. 19, 2014) (noting that "to . . . fail[] the Alice test, there must be clear and convincing evidence that every claim is invalidly abstract and contains only generic computer applications")*; Card Verification Solutions, LLC v. Citigroup Inc.*, 13-c-6339, 2014 U.S. Dist. LEXIS 137577, at *6 (N.D. Ill. Sep. 29, 2014) (denying a 12(b)(6) motion[2]

---

[2] As S&N acknowledges, courts apply the same standard to motions under 12(c) as they do 12(b)(6).  (*See* Dkt. 198 at 8.)

where the claims were "plausibly" directed to patent eligible subject matter and acknowledging that it is "rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter").

Additionally, the analysis under § 101 (before and after the Supreme Court's decision in *Alice*, will often involve an intensive factual inquiry because "[a]lmost by definition, analyzing whether something was 'conventional' or 'routine' involves analyzing facts." *Ultramercial*, 722 F.3d at 1339 (citing *CLS Bank*, 717 F.3d at 1275). "[A]ny inquiry into the scope of preemption—how much of the field is "tied up" by the claim—by definition will involve historic facts:  identifying the "field," the available alternatives, and preemptive impact of the claims in the field." *Id.*; *see also Data Distribution Techs.*, 2014 U.S. Dist. LEXIS 115543, at *9-10 (denying 12(b)(6) motion where "factual issues preclude[d] determination of [the asserted patent's] validity.").

**B.      Patent Eligible Subject Matter**

**1.      35 U.S.C. § 101**

The Patent Act broadly defines patent eligible subject matter in 35 U.S.C. § 101:

> Whoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any new and
> useful improvement thereof, may obtain a patent therefor, subject
> to the conditions and requirements of this title.

The Supreme Court has described § 101 as "a dynamic provision designed to encompass new and unforeseen inventions." *J.E.M. Ag. Supply v. Pioneer Hi-Bred Int'l*, 534 U.S. 124, 135 (2001).

"There are three exceptions to § 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" *Helios Software, LLC v. Pearl Software, Inc.*, C.A. No. 12-081-LPS, 2014 U.S. Dist. LEXIS 135379, at *50 (D. Del. Sep. 18, 2014) (citing

*Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)); *see also Alice,* 134 S. Ct. 2347, 2354 (2014).

The Supreme Court has repeatedly cautioned that these exceptions should be narrowly applied, lest they "swallow all patent law." *Alice*, 134 S.Ct. at 2354 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012)). Because "[a]t some level, all inventions embody, use, reflect, rest upon or apply laws of nature, natural phenomena, or abstract ideas . . . an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S.Ct. at 2354 (citing *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)). "[I]n applying the § 101 exception, [courts] must distinguish between patents that claim the 'building blocks' of human ingenuity and those that integrate the building blocks into something more" because "[t]he latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws." *Alice*, 134 S.Ct. at 2354 (citing *Mayo*, 132 S. Ct. 1289 (2012)).

### 2.     Invalidity Under Section 101 Requires a Claim-by-Claim Analysis

The Patent Act requires an alleged infringer to prove patent invalidity under § 101 using claim-by-claim analysis:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

35 U.S.C. § 282(a).

In *Alice*, the Supreme Court reiterated that the invalidity analysis must focus on *individual claims* and *each individual claim elements within each claim*: "First, we determine whether the claims at issue are directed to . . . patent-ineligible concepts. . . . Second, we

11

consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." *Alice*, 134 S. Ct. 2347, 2355 (2014) (citing *Mayo*, 132 S. Ct. at 1289); *see also Ultramercial*, 722 F.3d at 1340 ("[T]he question of eligible subject matter must be determined on a claim-by-claim basis.").

Finally, "it is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. *Diamond v. Diehr*, 450 U.S. 175, 188 (1981). "This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Id.*

### 3. The Test For Patent Eligibility Under *Alice* and *Mayo*.

In *Mayo*, the Supreme Court described a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355.

First, a Court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S. Ct. at 2455. Second, the court "must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application. *Alice*, 134 S. Ct. 2357 (citing *Mayo*, 132 S. Ct. 1289).

### (a) Determining Whether an Abstract Idea is Claimed

"[T]he concern that drives [the exclusion of abstract ideas] is one of pre-emption." *Alice*, 134 S. Ct. at 2354 (citing *Bilski*, 561 U.S. at 611-612). "That is, where a 'patent would preempt use of" basic tools of scientific and technological work, *i.e.*, laws of nature, natural phenomena, and abstract ideas, the patent would 'impede innovation more than it would tend to promote it,

thereby thwarting the primary objective of the laws." *Helios*, 2014 U.S. Dist. LEXIS 135379 at *53 (quoting *Alice*, 134 S. Ct. at 2354).

Thus, while the Supreme Court has declined to "delimit the precise contours of the 'abstract idea' [exception]," *Alice*, 134 S. Ct. at 2357, the key to determining whether a particular patent claim constitutes a patent on an abstract idea is to what extent it might preempt an entire field of innovation. *See Accenture Global Servs, GmBH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) (explaining that "in the case of abstractness, the court must determine whether the claim poses any risk of preempting an abstract idea"); *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013) ("The analysis of subject matter eligibility under section 101 often turns on the extent to which a patentee seeks to preempt future use of a fundamental concept or basic idea.") (citing *Mayo*, 132 S. Ct. at 1294).

### (b)   Determining Whether an Inventive Concept Transforms an Otherwise Abstract Idea.

The second step under *Alice* and *Mayo* "is to look for an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Helios*, 2014 U.S. Dist. LEXIS 135379 at *51.

"In determining if a patent embodies such an inventive concept, courts may consider whether the process 'is tied to a particular machine or apparatus' or 'transforms a particular article into a different state or thing." *Helio*, 2014 U.S. Dist. LEXIS 135379 at * 51-52 (citing *Bilski*, 130 S. Ct. at 3227). "To be a 'meaningful limit on the scope of a claim,' the addition of a machine 'must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more

13

quickly.'" *Id.* at \*51 (quoting *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010)).

### (a)  Courts have upheld the validity of claims post-*Alice*

The situation in *Helios Software, LLC v. Pearl Software, Inc.*, 2014. U.S. Dist. LEXIS 135379 (D. Del. Sep. 18, 20140) is instructive here.  There the Court held that patents "drawn to remotely monitoring data associated with an Internet session and controlling network access" were indeed patent eligible, and that the Defendant had failed "to show that these ideas are fundamental truths or fundamental principles the patenting of which would pre-empt the use of basic tools of scientific and technological work." *Helios*, 2014 U.S. Dist. LEXIS 13579 at \*53-54.  The Court in *Helios* noted that—as here—Defendants maintained that the claims were directed to an abstract idea but "provided no support for that position." *Helios*, 2014 U.S. Dist. LEXIS 13579 at \*54.

In *Autoform Eng'g GmBH v. Eng'g Tech. Assocs.*, No. 10-14141, 2014 U.S. Dist. LEXIS 123684 (S.D. Mich. Sep. 5, 2014), the court similarly refused to hold a patent invalid under 35 U.S.C. § 101 where the Defendant "failed to overcome the presumption of patentability with clear and convincing evidence." *Autoform*, 2014 U.S. Dist LEXIS 123684 at \*8.

In *Cal. Inst. of Tech. v. Hughes Communs., Inc.*, No. 2:13-cv-07245, 2014 U.S. Dist. LEXIS 156763 (C.D. Cal. Nov. 3, 2014), the court concluded that software claims focused on "a particular form of error correction code" were patentable.  *Cal. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 156763 at \*1.  The court in *Cal. Inst. of Tech.* acknowledged that "the Federal Circuit has held that a challenger must prove ineligibility under § 101 by 'clear and convincing evidence and stressed that  "courts should not apply the point-of-novelty approach" rejected in *Diamond v. Diehr*'." *Id.* at \*6 and \*34-35.  The court in *Cal. Inst. of Tech.* also discussed how "computer software and codes remain patentable," and went on to note how:

14

> The Supreme Court approved a patent on computer technology in *Diehr* and suggested that software and code remain patentable in *Alice*. The America Invents Act further demonstrates the continuing eligibility of software. Moreover, *Alice* did not significantly increase the scrutiny that courts must apply to software patents. It held only that an ineligible abstract idea does not become patentable simply because the claim recites a generic computer. Courts must not extend the reach of *Alice* too far, lest they read in § 101 limitations that do not exist.

*Cal. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 156763 at *39.

## IV.  ARGUMENT

S&N's motion should be denied for at least four reasons.

*First*, as it relies on material outside the pleadings (in particular, S&N's incorrect description of "conventional" locate operations and facts about alleged preemption), it cannot be decided on the pleadings.

*Second*, if considered as a summary judgment motion, it is devoid of factual support and fails to show an absence of disputed issues of fact.  CertusView disputes S&N's facts because they are wrong.  What is more, it means that S&N has filed two motions for summary judgment, at the summary judgment deadline, and without leave and in violation of the Court's rules.

*Third*, because it fails to provide a claim-by-claim (much less element-by-element) analysis, S&N cannot establish that any claim (much less all of them) are invalid under the applicable clear and convincing standard.

*Finally*, should the Court reach the merits despite S&N's many procedural missteps, the record shows that CertusView's patents do not preempt the field (which is the primary consideration under § 101 post-*Alice*), that they are tied to concrete, real world activities, and that they provide a specific and important technological advance over the prior art.

**A.    S&N's Motion Is A Summary Judgment Motion That Must Be Denied Because It Is Devoid Of Factual Support And, If It Had Identified Supporting Facts, They Would Be Disputed.**

15

While S&N styled the Motion as one under Fed. R. Civ. P. 12(c), the moving papers themselves make clear that the issue presented cannot be resolved within the bounds of the pleadings. In particular, as discussed above, S&N's core argument is that the claimed methods and systems are simply a computerized version of a "conventional" locate operation. (*See* Section II.B, *supra*.) As explained above, that is not true. (*Id.*) S&N additionally argues, incorrectly, that the patents preempt all methods of creating records of locate operations.

But regardless of whether S&N's description of the facts is true or not, it is evident that the Court would need to look *outside the pleadings*—to whatever (uncited) facts might be available to support S&N's description of conventional locate operations and the preemption situation—to grant S&N's motion. Without these facts, S&N's motion would have to fail, because S&N would not be able to even try to show that CertusView's methods simply computerize the prior art, or that the patents preempt the field. On the pleadings alone, the Motion would have to be denied.

Because S&N relies on material outside the pleadings, the motion must be treated as one for summary judgment under Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")

If the motion were treated as one for summary judgment, the proper question is whether there are undisputed facts that entitle S&N to judgment as a matter of law.

For the former, the Local Rules permit only one summary judgment motion, and propose an aggregate page limit of 30 pages. (*See* L. R. 56(c) and L. R. 7(F)(3).). Filing a motion for "judgment on the pleadings" just before the summary judgment deadline rather than at the

16

pleadings stage, and making arguments that are manifestly beyond the pleadings, is a rather brazed attempt to circumvent the rules.

If the Court reaches summary judgment, S&N cannot (and has not even tried to) show an absence of factual dispute.  S&N cannot avoid a factual dispute because its description of "conventional" locating is factually wrong—at least because there were no locators drawing on maps, and locators do not delineate the dig area.  (*See* Section II.B, *supra*.)

Again, S&N's argument is that the CertusView patents are not eligible under § 101 because they simply computerize conventional locate operations.  In order to consider that argument, one ***must*** determine what were the steps of prior art locate operations, a quintessential disputed issue of fact that forecloses a grant of summary judgment.  *See Ultramercial*, 722 F.3d at 1339 ("Almost by definition, analyzing whether something was 'conventional' or 'routine' involves analyzing facts."); *Data Distribution Techs.*, 2014 U.S. Dist. LEXIS 115543, *9-10 (denying 12(b)(6) motion where "factual issues precluded determination of [the asserted patent's] validity.")

Similarly, as noted, the touchstone of the post-*Alice* § 101 analysis is preemption.  Here, whether the CertusView patents improperly preempt anything is also a question of fact.  S&N asserts that the patents preempt all locating operations.  (Dkt. 198 at 11.)  That is entirely untrue (as explained in more detail below), but at a minimum, it presents another disputed factual issue.  *See Ultramercial*, 722 F.3d at 1339 ("[A]ny inquiry into the scope of preemption—how much of the field is "tied up" by the claim—by definition will involve historic facts:  identifying the "field," the available alternatives, and preemptive impact of the claims in the field.").

17

Because the Motion reaches outside the pleadings, it cannot be decided under Rule 12(c), and because there are underlying disputes of fact, it cannot be granted under Rule 56. S&N's motion must, therefore, be denied.

**B.  S&N Has Not Even Tried to Carry Its Burden to Show Invalidity by Clear and Convincing Evidence**

Even if the Court were to look past the fact that the motion cannot be decided on the pleadings, and that it presents disputed facts that preclude summary judgment, it should deny the motion because S&N made *no* effort carry its burden of proving *each* claim invalid by *clear and convincing evidence*.

As noted above, the § 101 analysis must be directed to the specific claims at issue and, beyond that, to the "elements of each claim both individually and 'as an ordered combination.'" *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1289); *see Ultramercial*, 722 F.3d at 1340 ("[T]he question of eligible subject matter must be determined on a claim-by-claim basis.").

S&N's motion improperly generalizes all of the claims (*e.g.*, "all of which are directed to the same unpatentable abstract idea: recording a locate operation") and then simply says that this is the same as the supposedly conventional locate operation. (Dkt. 198 at 1.) That is a far cry from the level of proof required to invalidate a patent. *See, e.g., Autoform Eng'g GmBH v. Eng'g Tech. Assocs.*, No. 10-14141, 2014 U.S. Dist. LEXIS 123684 (S.D. Mich. Sep. 5, 2014) (refusing to hold a patent invalid under 35 U.S.C. § 101 where the Defendant "failed to overcome the presumption of patentability with clear and convincing evidence"); *Data Distrib. Techs.*, 2014 U.S. Dist. LEXIS 115543, at *40 (requiring "clear and convincing evidence that every claim is invalidly abstract and contains only generic computer applications").

This is no idle issue. S&N's motion utterly fails to address any number of limitations including (among others): an input image or representation of a dig area (including, for example,

18

a topographical, satellite, or aerial image) and digital representations of the physical locate marks (*i.e.*, showing the paint that was applied to the ground by the locate technician) that are combined with the input image to create a marked-up image showing the job site and the markings. These limitations further demonstrate both that the claim is not abstract and that it does not preempt the idea of recording all locate operations.

To the extent S&N attempts to cure the deficiencies in its motion by providing new facts and evidence in reply, such a reply brief would be improper, prejudicial to CertusView, and should be ignored.

## C.   The Asserted Claims Are Not Directed To An "Abstract Idea"

Even if the Court were to look past the judgment on the pleadings problem, the disputed issues of fact, and S&N's failure to specifically address the claims/elements in a way that might meet the clear and convincing standard, S&N's motion should still be denied, because these claims are not directed to unpatentable abstract ideas.

### 1.   The Claims Are Not Directed To The Purportedly Abstract Idea Of "Recording A Locate Operation."

As an initial matter, even assuming for the sake of argument that the claims *were* merely directed to "recording a locate operation," S&N makes no effort to explain how "recording a locate operation"—which is not a "principle in the abstract," a "fundamental truth," an "original cause," a "motive," or a "mathematical formula"—is an abstract idea. *Bilski*, 561 U.S. at 610 (quoting *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853)); *Alice,* 134 S. Ct. at 2355.

Instead, a "locate operation" in these patents was defined, by agreement, to be "[t]he application of paint, flags, or some other marking object or material to indicate the presence of an underground facility," a concrete process performed by a real person, in the real world. The

19

act of recording the results of the real world locate operation is also, necessarily, a real world operation, as the patents do not describe any method for doing that automatically.

S&N had the burden of explaining how each claim[3] is nothing more than "recording a locate operation," and how "recording a locate operation" is merely an abstract idea. The Motion should be denied because S&N made no effort to carry that burden.

### (a)   The Claims Do Not Pre-Empt Recording Locate Operations.

As explained above, the governing precedents make clear that the primary concern underlying the "abstract idea" inquiry is preemption. *See Cal. Inst. of Tech. v. Hughes Communs., Inc.*, No. 2:13-cv-07245, 2014 U.S. Dist. LEXIS 156763, *1 (C.D. Cal. Nov. 3, 2014) (explaining that "the concern underlying § 101 is preemption").

While S&N characterizes the claims as merely directed to "recording locate operations," they are, in fact, narrowly tailored to cover specific methods and systems for generating electronic records that include representations of physical locate marks applied to images or other representations of a dig area.

One can record locate operations in a variety of non-infringing ways, including by taking pictures of locate marks, or by using hand-made paper sketches. (*See* Section II.B, *supra*.) Because these are methods of "recording locate operations" that are ***not*** covered by the claims, there is no preemption of "recording locate operations," which is what S&N asserts that the patents cover, and S&N's argument on *Mayo's* first prong must fail. *See, e.g.*, *Helios Software, LLC v. Pearl Software, Inc.*, 2014 U.S. Dist. LEXIS 135379, *53-54 (D. Del. Sep. 18, 2014) (denying a motion for summary judgment where the defendant failed "to show that these ideas

---

[3] Because the asserted claims necessarily have different scopes, they cannot ***all*** be directed to just one "abstract idea." S&N makes no effort to identify the allegedly abstract ideas on a claim-by-claim basis.

are fundamental truths or fundamental principles the patenting of which would pre-empt the use of basic tools of scientific and technological work").

One could also create a record of  locate operation *without* creating a specific record of where locate marks were applied to the ground.  In fact, in this case, S&N identified a number of locate operation records that did not have sketches or manifests associated with them.  CertusView's damages expert has in turn not relied on those records revising his damages estimate.  Since those records of locate operations are not accused of infringement (since they don't include sketches or manifests) S&N is well aware that the claims wouldn't preempt the recording of locate operations.[4]

### (b)    The Claims Require Real-World Steps.

Unlike many of the cases relied upon by S&N, the claims at issue concern the performance of real-world steps, namely, the conduct of a locate operation that involves the application of markings to the ground in the real world.  For example, in claim 1 of the '204 patent, the digital representation of the *physical* locate mark must be added to the input image by a person, as there is no mechanism for doing that automatically.  Similarly, claim 1 of the '359 patent requires a digital representation of the *physical* locate mark that also must be added to the input image by a person.  Other of the asserted claims have similar limitations.

Because the claims require real-world physical activities in conjunction with the computerized steps, the methods and systems are not ephemeral or purely mental, and, thus, they are not directed to an abstract idea.  (*See*, *e.g.*, Section IV.C.3, *infra*.)

---

[4] Furthermore, S&N's own arguments undercut the notion that the claims "preempt" the field. S&N has maintained that various non-infringing alternatives exist in justifying the opinion of its damages expert.  If such non-infringing alternatives actually existed, there would be little to no preemption.

**2.       The Claims Involve Inventive Concepts That Transform An Abstract Idea.**

Assuming, again for the sake of argument only, that all of the claims are directed simply to "recording a locate operation," and that "recording a locate operation" is an abstract idea, the claims are nonetheless patent eligible because, under the second *Mayo* prong, they include inventive concepts that would transform an otherwise abstract idea into something concrete and patentable.  In fact, the Patent Office expressly determined this to be the case when it allowed the claims over the recording of "conventional" locate operations, of which the Patent Office was well aware.

**(a)       The Use Of An Image Or Representation Of A Dig Area Is Transformative**

Prior to the patented inventions, there was no mechanism (electronic or otherwise) for depicting the locate marks applied to the ground on an image or electronic representation of a dig area, as claimed.  S&N's assertions that locators would record marks on paper maps is untrue and (likely for that reason) without *any* support.

The claims all require, to one degree or another, an image to which representations of physical locate marks are added, or an electronic representation of a dig area on which markers applied to the ground in a dig area would be displayed.  The use of such an image or electronic representation is an inventive concept that would transform the purportedly abstract idea of recording a locate operation into a concrete embodiment eligible for patenting.

This is no idle argument – the Patent Office has expressly found that these concepts are patentable beyond the conventional method.  For example, in allowing the claims of the '204 Patent the examiner described how the prior art did not teach "adding to the displayed at least one input image at least one digital representations of at least one physical locate mark so as to generate a marked-up image." (*See*, *e.g.*, Ex. C, '204 Notice of Allowance of Aug. 21, 2012 at 2-

22

3; *see also* Ex.D, '341 Notice of Allowance of June 6, 2013 (discussing how prior art does not disclose "adding to the displayed digital image at least one electronic colored marker applied to the ground, pavement or other surface in the dig area so as to generate a marked-up image.").) With regards to the '001 Patent, the examiner noted that the prior art failed to disclose "us[ing] location data to control the display so as to visually display a dispensing of the one or more markers."  (*See* Ex. E, '001 Notice of Allowance of Nov. 7, 2012 and February 1, 2012 Response After Final Office Action of October 25, 2012.)

The Patent Office's acknowledgement of the inventive contributions over prior art methods, whether or not those methods were "conventional," is reinforced by the transformative effect the patented technology has had in the industry.  The inventions of the asserted patents, which are embodied in CertusView's e-Sketch product, have reduced the costs of conducting locate operations, reduced the risk of liability for damage, reduces the time necessary to conduct locate operations, and improved the quality of not only the documentation for of a locate operation but also the overall locate operation itself.  (*See, e.g.,* Ex. B ¶ 16-24.)   Notably, these accomplishments resulted from an actual technological change to the processes and systems previously used, and were not a result of mere computerization.  Indeed, if mere computerization were all that were involved one could have simply scanned hand-drawn paper sketches.  That would provide the benefits of mere computerization, and would not infringe the claims.  Instead, even S&N (through its infringement) has recognized the value created by the patented processes and systems which require the use of an image or representation of a dig area to which representations of physical locate marks are added.

The claims at issue are accordingly not directed to a "fundamental practice with a long history" and instead provide something significantly more.  *See*, *e.g. Cal. Inst. of Tech.*, 2014

23

U.S. Dist. LEXIS 156763 at *40.   (citing Bilski, 561 U.S. at 612.) ("§ 101 does not preclude a claim directed to a longstanding practice that adds something more.  The Supreme Court left open the possibility that innovative elements, rather than 'token postsolution components," could make such a claim patent eligible.")

Because the inventions of the asserted patents facilitated a completely new method and system for recording locate operations, the claims are patent eligible under *Mayo's* second prong.

### (b)   The Combination Of All The Elements Of The Claims Creates A New And Useful Process And/Or System.

Even if, as S&N contends, all claim elements were directed to conventional components (which as noted above, is not true), that would not matter, because the ***combination*** of the claim elements provides a new and useful process and/or system.  *See Cal. Int. of Tech.*, 2014 U.S. Dist. LEXIS 156763 at *43-44.   Furthermore, the combination the computerized elements, including those associated with receiving an image or displaying an electronic representation of a dig area, provide a "meaningful limit on the scope of [the] claim." *SiRF Tech.,* 601 F.3d at 1333. These computerized components "play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." *See id.*  As discussed above and as found by the Patent Office, no prior art systems contemplated the inventions of the asserted patents, and in order to complete the invention that would allow locate technicians the ability to rely on an image or other electronic representation of a dig area when preparing a sketch or manifest, it was ***necessary*** to include computerized elements.  The claims could not be accomplished otherwise.

### 3.   The Cases Cited by S&N Are Inapposite

### (a)   Claims Invalidated Post-*Alice* Are Markedly Different from Those At Issue Here

24

S&N attempts to rely on a string of post-*Alice* decisions invalidating claims.  None are controlling here, however, and, more importantly, all concern claims that were directed to extremely broad and high-level concepts that presented a significant risk of preemption—unlike the situation here.  The abstract ideas in the cases relied upon by S&N are described below:

| Abstract Idea (or Natural Law) | Citation |
|---|---|
| "risk hedging" | *Bilski v. Kappos*, 561 U.S. 593, 611-12, 130 S. Ct. 3218, 3231 (2010) |
| "intermediated settlement" | *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) |
| Natural Law: "relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of thiopurine drug will prove ineffective or cause harm" | *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296 (2012) |
| "a third party guarantee of a sales transaction" | *buySAFE, Inc. v. Google, Inc.*, 2014 U.S. App. LEXIS 16987, at *4 (Fed. Cir. Sept. 3, 2014) (*buySAFE, Inc. v. Google, Inc.*, 964 F. Supp. 2d 331, 335-36 (D. Del. 2013)). |
| "managing/playing the game of Bingo" | *Planet Bingo, LLC v. VKGS, LLC*, 2014 U.S. App. LEXIS 16412, at *2 (Fed. Cir. Aug. 26, 2014) (quoting *Planet Bingo, LLC v. VKGS, LLC*, 961 F. Supp. 2d 840, 851 (W.D. Mich. 2013)). |
| "organizing data through mathematical correlations" | *Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014) |
| "maintaining and searching a library of information" | *Cogent Medicine, Inc. v. Elsevier, Inc.*, 2014 U.S. Dist. LEXIS 13856, at *11 (N.D. Cal. Sept. 30, 2014) |
| "automatically animating the lip synchronization and facial expressions of 3D characters" | *McRO, Inc. v. Namco Bandai Games Am., Inc.*, 2014 U.S. Dist. LEXIS 135212, at *6 (C.D. Cal. Sept. 22, 2014) |
| "asking someone whether they want to perform a task, and if they do, waiting for them to complete it, and if they do not, asking someone else" | *Eclipse IP LLC v. McKinley Equip. Corp.*, 2014 U.S. Dist. LEXIS 12395, at *21 (C.D. Cal. Sept. 4, 2014) |

25

| "controlled information exchange between anonymous parties" | *Walker Digital, LLC v. Google, Inc.,* 2014 U.S. Dist. LEXIS 122448, at *34 (D. Del. Sept. 3, 2014) |
|---|---|
| "the fundamental concept of upselling" | *Tuxis Techs. v. Amazon.com, Inc.,* 2014 U.S. Dist. LEXIS 122457, at *7 (D. Del. Sept. 3, 2014) |
| "currency exchange as applied to loyalty award credits such as airline frequent flyer miles or hotel loyalty award points" | *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.,* 2014 U.S. Dist. LEXIS 122244, at *16 (E.D. Tex. Sept. 2, 2014) |
| Natural Law: "that individuals with a particular genetic variation are better sprinters" | *Genetic Techs., Ltd. V. Lab. Corp. of Am. Holdings,* 2014 U.S. Dist. LEXIS 122780, at *9 (D. Del. Sept. 3, 2014). |
| "the simple concept of determining if a decision is required" | *Comcast IP Holdings I, LLC v. Sprint Commc'ns. Co. L.P.*, U.S. Dist. LEXIS 96289, at *10 (D. Del. July 16, 2014) |
| "the abstract concept of selecting meals for the day" | *DietGoal Innovations LLC v. Bravo Media LLC,* 2014 U.S. Dist. LEXIS 92484, at *30-31 (S.D.N.Y. July 8, 2014) |

As can be appreciated from a review of the left column above, none of the cases cited by S&N bear any resemblance to the complicated and novel methods and systems claimed in the asserted patents, which have specific practical, real-world benefit. There is a real-world operation, involving physical tools and a physical process at issue here, unlike any of above-cited cases.

Finally, that these patents are patent eligible under Section 101 is confirmed by the fact that the Patent Office, ***post-Alice***, continues to allow CertusView patent applications with claims that are essentially identical, as far as patent eligibility is concerned, to the claims of the patents-in-suit. (*See, e.g.,* Ex. F, Issue Notification of U.S. Patent App. No. 13/193,337, dated November 10, 2014; and Ex. G, Notice of Allowance of U.S. Patent App. No. 13/741,080, dated November 10, 2014.)

      **(a)**     **The Analysis in *McRO v. Namco* is Fundamentally Flawed**

S&N relies heavily on the Central District of California's decision in *McRO, Inc. v. Namco Bandai Games Am., Inc.*, 2014 U.S. Dist. LEXIS 135212, at \*6 (C.D. Cal. Sept. 22, 2014). While the "abstract idea" at issue in *McRO* (automating the manual process of synching animation and speech) is distinguishable, the Court in *McRO* nonetheless also misapplied Supreme Court Precedent in reaching its conclusion. As explained in *Cal. Inst. of Tech.*, also a Central District of California case:

> *McRO* offers an interesting but problematic interpretation of § 101 as requiring a point-of-novelty approach, in which courts filter out claim elements found in the prior art before evaluating a claim for abstractness. The merit to this approach is that it provides a clear test for determining patentability. But ultimately, *McRO* seems to misread the law. Despite its convenience, courts should not apply the point-of-novelty approach when examining claims under § 101. The Court finds this methodology improper for three reasons. The first reason is that the Supreme Court has held that novelty "is of no relevance" when determining patentability. *See Diehr,* 450 U.S. at 189. In so noting, the Supreme Court rejected *Flook's* point-of-novelty approach. *McRO* applied this abrogated form of § 101 analysis, despite the fact that the Supreme Court did not revive this approach in *Bilski, Mayo,* or *Alice*.

*Cal. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 156763 at \*33-34. As discussed above, the Court must address the claim *as a whole* under *Mayo*. S&N's request that the court strip the claims of purportedly "conventional" limitations *before* conducting the proper inquiry under *Mayo* would be to adopt the point-of-novelty test abrogated in *Diehr*. Accordingly, the analysis in *McRO* should therefore have no bearing on the Court's analysis here.

### V.   <u>CONCLUSION</u>

For the foregoing reasons, CertusView respectfully requests that S&N's Motion be denied.

Dated:  November 13, 2014        Respectfully submitted,


           /s/
Michael J. Lockerby (VSB No. 24003)
Lori A. Rubin (VSB No. 80883)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
mlockerby@foley.com
larubin@foley.com

Matthew B. Lowrie (admitted *pro hac vice*)
Aaron W. Moore (admitted *pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: (617) 342-4000
Facsimile:  (617) 342-4001

*Counsel for Plaintiff CertusView Technologies, LLC*

28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2014, I filed with the Clerk of Court the foregoing

document using the CM/ECF system, which will send a notice of electronic filing to all counsel

of record:

Michael J. Lockerby
Lori A. Rubin
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC 20007-5109
mlockerby@foley.com
larubin@foley.com

Matthew B. Lowrie
Aaron W. Moore
Ruben Jose Rodrigues
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
mlowrie@foley.com
amoore@foley.com
rrodrigues@foley.com

Brian L. Whisler
Baker & McKenzie LLP (DC)
815 Connecticut Ave NW
Washington, DC 20006
Email: brian.whisler@bakermckenzie.com

Daniel Joseph O'Connor
Baker & McKenzie LLP (IL-NA)
300 E. Randolph St
Suite 5000
Chicago, IL 60601
Email: daniel.oconnor@bakermckenzie.co

John Giuseppe Flaim
Baker & McKenzie
2001 Ross Ave
Suite 2300
Dallas, TX 75201
Email: john.flaim@bakermckenzie.com

Mackenzie Marie DeWerff
Baker & Mckenzie
2001 Ross Ave
Suite 2300
Dallas, TX 75201
Email: mackenzie.DeWerff@bakermckenzie.com

Michael Anthony Duffy
Baker & McKenzie
300 East Randolph St
Suite 5000
Chicago, IL 60601
Email: Michael.Duffy@bakermckenzie.com

Weldon Barton Rankin
Baker & Mckenzie
2001 Ross Ave
Suite 2300
Dallas, TX 75201
Email: w.Rankin@bakermckenzie.com


                                        */s/ Lori A. Rubin*_____
                                        Michael J. Lockerby (VSB No. 24003)
                                        Lori A. Rubin (VSB No. 80883)
                                        FOLEY & LARDNER LLP
                                        Washington Harbour
                                        3000 K Street, N.W., Suite 600
                                        Washington, D.C. 20007-5109
                                        Telephone: (202) 672-5300
                                        Facsimile: (202) 672-5399
                                        mlockerby@foley.com
                                        larubin@foley.com

                                        Matthew B. Lowrie (*pro hac vice*)
                                        Aaron W. Moore (*pro hac vice*)
                                        Ruben J. Rodrigues (*pro hac vice*)
                                        FOLEY & LARDNER LLP
                                        111 Huntington Avenue
                                        Boston, Massachusetts 02199
                                        Telephone: (617) 342-4000
                                        Facsimile: (617) 342-4001
                                        mlowrie@foley.com
                                        amoore@foley.com
                                        rrodrigues@foley.com

*Counsel for Plaintiff CertusView Technologies, LLC*