**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | | |
|---|---|---|
| CERTUSVIEW TECHNOLOGIES, LLC | § | |
| | § | **FILED UNDER SEAL** |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:13-cv-346 (MSD) (TEM) |
| | § | |
| S&N LOCATING SERVICES, LLC and | § | |
| S&N COMMUNICATIONS, INC. | § | |
| | § | Jury Trial Demanded |
| Defendants. | § | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
EXCEPTIONAL CASE FINDING AND ATTORNEYS' FEES**</u>

Pursuant to Federal Rule of Civil Procedure 54(d)(2) and 35 U.S.C. § 285, S&N Communications, Inc. and S&N Locating Services, LLC ("S&N" or "Defendants") file this Memorandum of Law in Support of Defendants' Motion for Exceptional Case Finding and Attorneys' Fees (the "Motion") against CertusView Technologies, LLC ("CertusView"), and respectfully state as follows:

## I.     INTRODUCTION

In this plainly exceptional case, CertusView, the subsidiary of publicly-held Dycom Industries, Inc. ("Dycom"), engaged in a deliberate campaign to blanket what it described as an "IP ignorant market" with patents on locating processes that had been in place for decades.  To do so, CertusView knowingly withheld and misrepresented key prior art and made material misrepresentations in its applications to the Patent and Trademark Office ("PTO").  CertusView also spent millions of dollars on third-party consultants to devise a way to "co-opt" its (and its parent, Dycom's) competitors, like S&N, by aggressively enforcing meritless patents and then engaging its competitors' customers to bully them once patent litigation had begun.  Finally,

1

having secured its patents through inequitable conduct, CertusView concealed all evidence of its well-thought out and lavishly documented plan. Although its third-party consultants were not lawyers, did not render legal advice, and created reams of highly relevant documents, CertusView did not produce *or even assert a colorable privilege claim on a log* on a trove of critical documents until ordered to do so, and then only after being sanctioned.

CertusView also purposefully asserted a large number of largely redundant patent claims, which CertusView's counsel of record knew would "*drastically increase the costs of litigation*." Ruben J. Rodrigues, *Limiting Patent Claims and Prior Art (with or without a Model Order)*, FOLEY & LARDNER IP LITIG. CURRENT (July 31, 2013), http://www.foley.com/intelligence/detailpdf.aspx?int=aede6591-5f62-4417-b591-f5eae1ca9822 (emphasis added), attached at Ex. A. The end result is that S&N, a very small player in the industry compared to Dycom, was forced to spend millions of dollars defending itself against baseless patent infringement claims and in uncovering conduct that should have been disclosed in discovery. Now, S&N has prevailed and CertusView can no longer escape the consequences of its actions. Under 35 U.S.C. § 285 and recent Supreme Court authority, a district court may award attorneys' fees and costs to a prevailing party, like S&N, where either: 1) the case stands apart because of the weakness of the plaintiff's positions, *or* 2) the plaintiff litigated the lawsuit in an unreasonable manner. A moving party need only satisfy one of these tests, but this case clearly satisfies both.

*First*, CertusView's legal positions were more than precarious, even before suit was filed. Specifically, CertusView has claimed that each of the Patents-in-Suit covered the same invention, albeit with certain minor variations. But that alleged invention is nothing more than the digital drawing of lines over an image to reflect where paint, stakes, or flags were placed on

the ground by a locate technician.  As CertusView's own expert was forced to concede, that process had been in practice *decades* before the Patents-in-Suit were sought.  Moreover, simply implementing a pre-existing process, traditionally done by hand, with generic computer equipment, does not give rise to an invention worthy of patent protection.  As this Court has found, the CertusView patents present this exact situation.

Realizing its unsupportable position with respect to its patents, CertusView and its highest ranking executives, including Messrs. Steven Nielsen and Curtis Chambers, withheld and misrepresented material information from the PTO.  In fact, CertusView's counsel even stated that, if an examiner did not accept CertusView's spin on its patents, CertusView would threaten the examiner with further legal proceedings:



(Email from J. Teja to C. Chambers, D. Crawford, and S. Brown dated Jan. 27, 2013, CV0153094, attached at Ex. B.)  As detailed below, the Patents-in-Suit were improperly obtained, and this suit was brought in bad faith.  Those circumstances alone justify the award sought by S&N.

This matter also stands apart, however, because of the unreasonable manner in which it was litigated.  Given the weakness of the merits of its claims, CertusView embarked on a strategy to increase costs in hopes of extorting a confiscatory settlement from a smaller (but successful) player in the industry.  To that end, CertusView and its counsel purposefully withheld non-privileged documents detailing its knowledge that the prior art anticipated the

patent claims at issue. CertusView also followed a model of asserting an inordinate amount of claims to drive up costs, again in hopes, of driving S&N into submission. This strategy, touted by its counsel, greatly harmed S&N, which was forced to endure (and prevail against) these tactics, after great and unnecessary expense. Based on indisputable facts set forth herein, including admissions from CertusView and its counsel, CertusView acted improperly before and after this lawsuit was filed, and similar behavior must be deterred. As set forth more fully below, S&N respectfully requests its attorneys' fees and costs in this exceptional (and unfortunate) case.

## II. STATEMENT OF FACTS

### A. CertusView retained a third-party consultant, Commercial Strategy LLC to create an after the fact patent portfolio.

In 2008, Mr. Steven Nielsen, the CEO of CertusView's parent company, Dycom Industries, Inc. ("Dycom"), read an article about Commercial Strategy LLC and its business model of creating patent portfolios to create a business advantage. Through its various business units, which engage in locating and other construction-related services, Dycom through its affiliates, is a competitor of S&N. (Nielsen Dep. 230:9-20, Jan. 9, 2015, attached at Ex. C; Davis Dep. 103:7-9, Jan. 6, 2015, attached at Ex. D.) Mr. Nielsen subsequently determined to retain Commercial Strategy for the purpose of seeing an advantage over competitors. (Commercial Strategy Master Services Agreement ("MSA"), CS0004197-210, attached at Ex. E.)

One of Commercial Strategy's first tasks was to conduct market research on CertusView's (and the Dycom's family's) various product lines to determine where CertusView might be able to insert patent applications. (Davis Dep. 59:19-60:15, Jan. 6, 2015, Ex. D; Commercial Strategy MSA, CS0004197-210, Ex. E.) With respect to the e-Sketch product, CertusView's commercial embodiment of the Patents-in-Suit, Commercial Strategy almost

4

immediately uncovered third-party products and patents that disclosed the core of the alleged invention, *i.e.*, drawing lines on digital maps, and that information was disclosed to Messrs. Nielsen and Chambers.  (Patent Search Report, e-Sketch Product ("e-Sketch Patent Search"), CS0004197-210, attached at Ex. F;  Commercial Strategy, Market Intelligence Report Version 6.0, June 22, 2008 ("MIR"), UQ0047717-839, attached at Ex. G.)

For example, in 2008, Commercial Strategy prepared a "Patent Search Report ESKETCH Product," in which it conducted a search for patents that specifically referenced:  *An electronic drawing tool for human marking of geographically referenced locations on graphic images of a region of the earth's surface*.  (e-Sketch Patent Search, CS0004198, Ex. F.) Numerous patents were uncovered fitting that description, including the following:

| US7142196B1 Geographical data markup on a personal digital assistant (PDA) Assignee: Autodesk, Inc. Filed: 7/31/2000 Published: 11/28/2006 Expires: 10/12/2019 Value Chain: eSketch - System - System | How to mark up utility line locations on electronic map on portable computer? | The invention uses a PDA with stylus input for drawing lines on electronic maps. |
| --- | --- | --- |

(*Id.* at CS0004199.)  Commercial Strategy shared this report with CertusView and its senior leadership, making all aware of the references that describe the essence of CertusView's later-claimed invention, ***six years before the initiation of this lawsuit***.  (Email from D. Crawford to S. Nielsen, C. Chambers, *et. al.* of June 9, 2008, attached at Ex. H;  Davis Dep. 69:4-70:5, Jan. 6, 2015 (explaining that the Commercial Strategy patent search reports would have been shared with CertusView's executives), Ex. D.)

Commercial Strategy also uncovered (and, again, disclosed to CertusView's high-ranking executives) third-party products already on the market that anticipated or rendered obvious CertusView's claimed invention.   Specifically, Commercial Strategy created a Market

Intelligence Report ("MIR") focusing on products in the market that might anticipate CertusView's alleged invention asserted in this matter.  (Commercial Strategy MIR, UQ0047717-839, Ex. G.)  With respect to one entity examined in that report, TelDig, Inc. ("TelDig"), Commercial Strategy reached the conclusion that "[o]f particular interest is the TelDig Utility Suite product which appears similar to the eSketch concept," and "[a]t this time it does ***appear*** that TelDig is investing in solving problems that Dycom is interested in." (Commercial Strategy MIR, UQ0047791-95 (emphasis in original), Ex. G.)  Remarkably, no one from CertusView, including Messrs. Nielsen and Chambers, both of whom met with the patent examiners, disclosed TelDig to the PTO.  (Pl.'s Resp. to S&N's Emergency Mot. to Extend Deadlines at 14, ECF No. 182 (noting that TelDig was not cited in the asserted patents).)

**B.      CertusView and its leaders determined to blanket the PTO with patent applications.**

CertusView pressed its patent agenda despite substantial evidence that the claimed invention was not worthy of patent protection.

### 1.      CertusView buried material information in documents submitted to the PTO relating to the Virginia Pilot Project.

Throughout prosecution, CertusView consistently distinguished the prior art as lacking a "digital representation of physical locate marks."  (*E.g.*, Amendment and Reply Under 37 CFR 1.111, Patent App. No. 12/366,050 (Feb. 13, 2012), CV0011870-93, at CV0011877, attached at Ex. I.)  But CertusView knew that the industry had already come up with this idea well before CertusView filed its patents.  (*See, e.g.*, Pevarski Decl. ¶¶ 13-19, attached at Ex. J.)  Indeed, from 2005 until early 2008, CertusView's operating-company affiliate, another Dycom company, UtiliQuest, was a stakeholder in a project called the Virginia Pilot Project.  (Pevarski Decl. ¶ 12 & Exs. 1-3 thereto, Ex. J.)  As early as 2005, UtiliQuest, and, thus, the senior officers of Dycom and CertusView, knew that Phase II of the Virginia Pilot Project concerned the creation of

electronic manifests that included a digital representation of physical locate marks. (Pevarski Decl. ¶¶ 13-19 & Exs. 1-23 thereto, Ex. J.) According to Rick Pevarski, one of the Virginia Pilot Project leads, not only was this idea discussed at meetings, but several Virginia Pilot Project documents also showed an electronic manifest including a digital representation of locate marks made in the field, which was the focus of Phase II, including in the following Figure 9 from a November 2007 report:



Figure 8: An example of a hand-drawn locator manifest

Figure 9: Projected electronic manifest overlaid on ortho-photograph

(Pevarski Decl. ¶¶ 17-18 & Ex. 23 thereto at VUPS00000251, Ex. J.)

UtiliQuest employees attended many meetings where the concept shown and described above was explicitly discussed, well before CertusView applied for its patents. (Pevarski Decl. ¶¶ 12-14, Ex. J.) For example, two UtiliQuest representatives attended a January 18, 2008 Virginia Pilot Project meeting where the following was discussed:




(Pevarski Decl. ¶ 14 and Exs. 17-18 thereto, Ex. J.)  One month after UtiliQuest representatives attended this meeting, CertusView filed its first e-Sketch patent application on February 12, 2008, but the other Virginia Pilot Project participants did not find out about CertusView's patents until approximately two years later.  (*See, e.g.*, U.S. Pat. No. 8,340,359 (claiming priority to U.S. App. No. 12/029,732 filed on Feb. 12, 2008), attached at Ex. K.)

After the other participants in the Virginia Pilot Project found out what CertusView was trying to patent, they sent CertusView a binder and cover letter on April 7, 2010, explaining that:

> Virginia Utility Protection Service, Inc. (VUPS) feels that many of the claims identified in the Dycom/CertusView patent application (filed by application inventor Steven Nielsen) are in direct conflict with technologies that VUPS has already initiated through OCARS, Newtin, Virginia Pilot Program Phase I and II.

(VUPS Binder 1 at DY0002-05, CV0030596-99, attached at Ex. L.)  CertusView waited a year to disclose the VUPS binder to the PTO at all, and then only did so in connection with the prosecution of four of the Patents-in-Suit, even though it was material to the patentability of all five Patents-in-Suit.  (*E.g.*, IDS, Patent App. No. 12/208,846, CV0192082-91 (Nov. 15, 2011), attached at Ex. M-1;  IDS, Patent App. No. 12/366,050, CV0189528-36 (Nov. 17, 2011), attached at Ex. M-2;  IDS, Patent App. No. 12/369,232, CV0183039-45 (Nov. 15, 2011), attached at Ex. M-3;  IDS, Patent App. No. 13/796,487, CV0195100-18, CV0200708-15, CV0200735-38 (Mar. 12, 2013), attached at Ex. M-4.)  The binder also included the images and

slides shown above that directly reference a "digital representation *of physical locate marks*," among other documents showing the same thing.  (Pevarski Decl. ¶¶ 14-18 & Exs. 17-18, 22-23 thereto, Ex. J.)  Although the binder unquestionably contained material information, CertusView did not bother to point the examiner to any specific pages containing such information, leaving it up to the examiner to sift through thousands of pages.[1]

Similarly, before any of the Patents-in-Suit issued, Dycom's IP Analyst, Gail Sternstein, sent an email on August 16, 2012 acknowledging the Virginia Pilot Project's teaching of an "electronic manifest."  (Email from G. Sternstein to D. Crawford of Aug. 16, 2012, attached at Ex. N.)  CertusView had a significant opportunity to disclose this information to the PTO given that the Patents-in-Suit did not issue until September 11, 2012, October 16, 2012, December 25, 2012, March 26, 2013, and September 10, 2013, but CertusView did not do so.  (*See* U.S. Pat. Nos. 8,340,359, 8,265,344, 8,290,204, 8,407,001, and 8,532,341, attached at Exs. K, O-R.)

### 2.    CertusView made intentional misrepresentations to the PTO.

As set forth in S&N's First Amended Answer, CertusView also made intentional misrepresentations to the PTO regarding two cited prior art references during prosecution of the '344 Patent.  (S&N's First Am. Answer ¶¶ 83-85, 90, ECF No. 253.)  Specifically, CertusView told the PTO that two references, from Messrs. Tucker and Sawyer, were not relevant to the locating field, and, critically, that neither disclosed a "locate ticket" or a "locate operation." (Amendment and Reply Under 37 CFR 1.111, Patent App. No. 12/366,050 (Feb. 13, 2012), CV0011870-93, at CV0011877, Ex. I.)  Mr. Nielsen even participated in an in-person meeting with the PTO where this argument was made by the prosecuting attorney.  (Email from J. Teja Jr.

---

[1] The PTO requests that applicants submitting lengthy documents point the examiner to particular pages containing material information.  (*See* MPEP § 609.04(a) ("Concise explanations (especially those which point out the relevant pages and lines) are helpful to the Office, particularly where documents are lengthy and complex and applicant is aware of a section that is highly relevant to patentability or where a large number of documents are submitted and applicant is aware that one or more are highly relevant to patentability.").)

to S. Nielsen, D. Crawford, *et al.* of Dec. 4, 2011 and attachment thereto, CV0153654-91, attached at Ex. S;  Nielsen Dep. 371:24-373:4, Jan. 9, 2015, Ex. C.)

Contrary to CertusView's statements to the PTO, both of those elements were plainly spelled out in the Tucker and Sawyer references.  Indeed, Paragraph 44 of U.S. Publication No. 2007/0219722 to Sawyer *et al.*, also published as WO 2007/106871 A2, clearly discloses the concepts of a locate operation and locate ticket:

> The ONECALL block represents the function performed by ONECALL™ centers that act as a central clearinghouse for marking of utilities in areas where digging will occur.  A user can call ONECALL™ and tell them that the user will be digging, for example, at the corner of 7th street and ELM Ave.  ***ONECALL™ then sends a locate ticket to all utility companies that may have utilities in that area.  The utility companies are then required to mark the location of the utilities.***  A ONECALL™ entity could serve as the sponsor or clearing house for a public damage prevention system by utilizing the system and method of the present invention.

(U.S. Pub. No. 2007/0219722 ¶ 44 (emphasis added), attached at Ex. T.)  U.S. Publication No. 2006/0077095 to Tucker *et al.* also clearly describes a locate operation, for example, in claims 1 and 6:

> 1.  A method of identifying a location of a utility comprising:
> defining at least one geographic database comprising at least one utility location with accuracy of at least a decimeter;
> determining, with accuracy of at least a decimeter, a current location; and determining a distance between the current location and the at least one utility location.
> . . .
> 6.  A method of collecting utility location information comprising:
> identifying a current location;
> identifying at least one utility at the current location;
> associating the current location with the at least one utility;
> displaying a representation of an area comprising the current location and a representation of the at least one utility, the displayed representation changing, in real-time, in accordance with at least one of a change of position and a change of direction associated with the current location; and
> storing data in at least one database in accordance with the associated current location and at least one utility.

(U.S. Pub. No. 2006/0077095, claims 1 and 6, attached at Ex. U.)

Consistent with the above, Mr. Tucker testified in discovery in this matter that he does not know how one could have ***actually read*** his patents and described them as CertusView did during prosecution.  (Tucker Dep. at 65:17-24, Aug. 22, 2014, attached at Ex. V.)

### 3.  The inventors and prosecuting attorney made material misrepresentations to the PTO regarding inventorship.

CertusView's senior leadership, specifically Messrs. Nielsen and Chambers, also made materially false statements to the PTO when they failed to include Greg Block as a named inventor on the '204,'359, '344, and '341 Patents.  Mr. Block contributed in a significant manner to the conception and reduction to practice of the e-Sketch product, which is an embodiment of the claims of the asserted patents.  (Pl.'s Resp. to S&N's First Set of Interrogs., served Jan. 7, 2014, attached at Ex. W.)   Indeed, documents that CertusView initially (and improperly) withheld in discovery revealed that CertusView knew of Mr. Block's role and even prepared a self-described "script" to walk him through an explanation of CertusView's portrayal of his inventive role.  (Email from J. Teja Jr. to C. Chambers, D. Crawford, and T. Halky of Dec. 14, 2011 (***"Subject:  Script for Greg Block re: inventorship on e-Sketch."***), attached at Ex. X.) Additional evidence adduced by S&N established that Mr. Block was one of the "primary developers" at the "genesis" of what became the e-Sketch product that Messrs. Nielsen, Chambers, and Farr subsequently sought to patent solely in their names.  (Chambers Dep. 64:6-22, Aug. 21, 2014, Ex. Y.)

Messrs. Nielsen and Chambers were aware that they were not inventors and of the true facts regarding Mr. Block, yet they prepared and executed declarations excluding Mr. Block as an inventor on the '204, '359, '344, and '341 Patents.  (*See* Inventor Decl., Patent App. No. 12/208,846, CV0011131-32, attached at Ex. Z;  Inventor Decl., Patent App. No. 12/366,050, CV0013050-51, attached at Ex. AA;  Inventor Decl., Patent App. No. 12/369,232, CV0014033,

attached at Ex. BB;  Inventor Decl., Patent App. No. 13/796,487, CV0035786-88, attached at Ex. CC.)  That these claims of inventorship were false was further driven home in the depositions of Mr. Nielsen, who is not an engineer and has no technical training or background.  (Nielsen Dep. 193:7-15, Aug. 11, 2014, Ex. DD;  Nielsen Dep. 309:13-19, Jan. 9, 2015, Ex. C.)  With the assistance of his counsel's improper objections, he refused to cite a single inventive concept which he created or to which he contributed, without taking hours of deposition time to review each patent:



(Nielsen Dep. 128:14-129:11, Aug. 11, 2014, Ex. DD.)





(Nielsen Dep. 405:13-407:15, Jan. 9, 2015, Ex. C.)

**C.    CertusView's conduct goes from bad to worse.**

CertusView's next step in its plan to exert pressure over the locating industry was to threaten infringement and file suit against industry participants it wanted to intimidate.  (Trade Show Notes, AIP0000177-82, attached at Ex. EE.)  As spelled out in CertusView's notes:

- ████████████████████████████████████████████████████████████████ "

- ████████████████████████████████████████████████████

- ██████████████████████████████

- ████████████████████████████████████

- ███████████████████████████████████████

- ███████████████████████████████████████

(*Id.* at AIP0000179, AIP0000182, Ex. EE.)

**D.    CertusView's litigation misconduct was pervasive and corroborates that it knew it could not prevail on the law or facts.**

**1.    CertusView refused to timely limit the number of asserted claims.**

From the outset, CertusView litigated this case in bad faith.  For starters, CertusView did not name a single accused instrumentality or asserted claim in its Complaint, even though it had been investigating S&N since at least 2012.  (Pl.'s Compl., ECF No. 1;  Pl.'s First Am. Compl., ECF No. 55;  *e.g.*, IP Meeting Agenda, Sept. 14, 2012, CV0148208, attached at Ex. FF.) Instead, CertusView waited over eight months after filing to identify the sole accused instrumentality and to assert a total of 68 claims across the five Patents-in-Suit.  (Pl.'s Resp. to S&N's First Set of Interrogs., served Jan. 7, 2014, Ex. W.)  CertusView's identification of 68 asserted claims was not only untimely, but also unmanageable, unnecessary, and entirely disproportionate to the 10-term limit for claim construction that the Court set in its scheduling order.  (*See, e.g.*, Defs.' Mot. to Limit & Memorandum of Law, ECF Nos. 64-65;  Ct.'s Scheduling Order of Mar. 27, 2014, ECF No. 96.)  Given the large degree of overlap and simplicity of the purported inventions, there was no reason (other than driving up costs) for CertusView to assert such a volume of claims.

CertusView subsequently represented to the Court that, after certain milestones, it would reduce the number of asserted patent claims.  (Pl.'s Resp. to S&N's Mot. to Limit at 10, ECF No. 77 ("CertusView is not unwilling to limit claims at the appropriate point . . .").)  In response to CertusView's representation that it was "willing to reasonably limit the number of asserted

claims at the appropriate time," (Pl.'s Resp. to S&N's Mot. to Limit at 1, ECF No. 77), the Court

said that it "fully expects Plaintiff to do so."  (Ct.'s Order at 5, ECF No. 86.)  CertusView instead

chose to follow the tactic described in an article, written during the pendency of this lawsuit, by

CertusView's counsel, Mr. Ruben Rodrigues:

> Savvy plaintiffs can leverage the complexity of a large number of patents
> which may themselves have a large number of claims . . . to *drastically
> increase the costs of litigation*. *This can often be the case even when the
> scope of the asserted claims is largely redundant.*

Ruben J. Rodrigues, *Limiting Patent Claims and Prior Art (with or without a Model Order)*,

(emphasis added), Ex. A.

In fact, CertusView, clearly a "savvy plaintiff," acknowledged that it could have

proceeded with only 30 claims as of July 28, 2014, and 20 claims as of August 6, 2014.  (Email

from A. Moore to B. Kelly of July 28, 2014, attached at Ex. GG;  Email from A. Moore to B.

Rankin of August 6, 2014, attached at Ex. HH.)  But, because S&N believed that the number

should be limited further, CertusView refused *any* reduction.  (Email from A. Moore to B. Kelly

of Sept. 16, 2014, attached at Ex. II.)  Thus, after July 28, 2014, S&N was forced to continue to

litigate—and prepare expert reports on—68 claims, even though at least 38 of those claims, by

CertusView's own admission, would not be tried.  (Email from A. Moore to B. Kelly of July 28,

2014, Ex. GG.)  Because CertusView did not limit its claims in a timely manner, S&N was

forced to serve interrogatory responses, and later expert reports, at great expense, on all 68

claims, and CertusView knew this because S&N was diligent about asking CertusView to reduce

its claims in advance of the expert report deadline.  (S&N's Suppl. Obj. & Resp. to Interrog. No.

5, served Apr. 25, 2014, attached at Ex. JJ;  S&N's Suppl. Obj. & Resp. to Interrog. Nos. 1, 6, 7,

& 8, served Apr. 29, 2014, attached at Ex. KK;  Letter from B. Kelly to R. Rodrigues of July 15,

2014, attached at Ex. LL;  Opening Expert Report of Ivan Zatkovich, Sept. 3, 2014, attached at Ex. MM.)

CertusView ultimately reduced the number of claims to fifteen in October 2014, but it only did so after the initial expert report deadline had passed, and after S&N had to move the Court again for such relief.  (S&N's Renewed Mot. to Limit & Memorandum of Law, ECF Nos. 140-141;  Email from A. Moore to B. Rankin of Oct. 7, 2014, attached at Ex. NN.)  In its Order granting S&N's renewed motion, the Court acknowledged that CertusView did not fulfill the promises it previously made to S&N and the Court.  (Ct.'s Order at 12, ECF No. 159 ("[D]espite this direction from the Court, Certusview failed to reasonably limit its claims prior to the deadline for S&N to file its opening invalidity expert report.").)  After CertusView finally reduced the number of claims in October, S&N had to prepare additional expert reports to address the reduced number of claims asserted, further driving up S&N's costs.  (Amended Opening Expert Report of Ivan Zatkovich, Oct. 28, 2014, attached at Ex. OO.)

### 2. CertusView concealed numerous important documents and witnesses, and made multiple misrepresentations to S&N and the Court.

CertusView also "drastically" drove up litigation costs through its refusal to comply with the rules of discovery and its overbroad, unsupportable, and after-the-fact assertions of the attorney-client privilege.  First, CertusView did not disclose the existence of the most critical witnesses in the case—including Commercial Strategy, AdvantageIP, Dave Crawford, Don Davis, Greg Block, Gail Sternstein, and Travis Halky, all of whom possessed information critical to S&N's defense—in its initial disclosures or in its interrogatory responses.  (Pl.'s Initial Disclosures, attached at Ex. PP.)  Instead, CertusView followed the approach that its counsel described to the Court, which was that S&N "*should be required to **sift through the documents***

*that they requested and we produced to find people.*"   (Hr'g Tr. 24:4-25:7, Nov. 19, 2014, attached at Ex. QQ.)

But CertusView did not even produce all of the relevant non-privileged documents in its possession—far from it.  In reality, CertusView failed to produce tens of thousand of pages that were clearly relevant and not privileged.  (*See, e.g.*, Commercial Strategy MIR, UQ0047717-839, Ex. G;  e-Sketch Patent Search, CS0004197-210, Ex. F;  Non-Disclosure Agreement between Dycom and TelDig ("TelDig NDA"), CV0147743-48, attached at Ex. RR.)  For example, CertusView withheld almost all of the documents concerning Commercial Strategy (and subsequent consultants) and ***never*** even disclosed their existence, much less their purported basis for being withheld, on a privilege log given to S&N.  (Pl.'s Privilege Log, served July 18, 2014, attached at Ex. SS.)  In fact, the only way S&N discovered the existence of CertusView's plan was through CertusView's inadvertent disclosure of a Commercial Strategy document, known as the MIR, which CertusView fought to claw back by any means necessary.  (*E.g.*, Chambers Dep. 226:8-230:9, Aug. 21, 2014, Ex. Y;  Pl.'s Emergency Mot. for Protective Order & Memorandum of Law, ECF Nos. 132-133;  Pl.'s Resp. to S&N's Mot. to Compel, ECF No. 152;  Decl. of Curtis Chambers, ECF No. 152-1;  Hr'g Tr. 24:4-25:7, Nov. 19, 2014, Ex. QQ.)

As s part of this claw-back effort, Mr. Chambers, a Dycom executive and named inventor on the Patents-in-Suit, submitted a false declaration to this Court.  (Decl. of Curtis Chambers, ECF No. 152-1.)  In an attempt to keep the MIR concealed, CertusView told the Court that it was privileged, with Mr. Chambers submitting a declaration stating:

> 4.     The document previously produced by CertusView with Bates Nos. CV0074879 and UQ0047717 were prepared in consultation with CertusView's IP attorneys at the time, Messrs. Mark Leonardo and Edward Laughton of Brown Rudnick LLP.
>
> . . .

7.     Attorney Mark Leonardo provided direction and instruction with respect to preparing and selecting information to be included in these materials.

(Chambers Decl. ¶¶ 4, 6-8, ECF No. 152-1.)  But Mr. Chambers later testified:



(Chambers Dep. 311:20-312:3, Oct. 21, 2014, Ex. TT.)  Importantly, Dycom's General Counsel and all three of the named inventors of the Patents-in-Suit, including Dycom's CEO, Steve Nielsen, were fully aware in 2008 that the MIR was actually created by a third party and was not prepared by or at the direction of either Dycom's or CertusView's attorney.  (Chambers Dep. 298:24-301:17, 338:18-339:6, Oct. 21, 2014, Ex. TT.)

But for S&N's diligence and expense, these (and other) highly relevant materials would have remained concealed.  (*E.g.*, S&N's Resp. to Pl.'s Emergency Mot. for Protective Order, ECF No. 136;  S&N's Mot. to Compel & Memorandum of Law, ECF Nos. 138-139;  S&N's Emergency Mot. to Extend Deadlines & Memorandum of Law, ECF Nos. 176-177.)  For example, CertusView's counsel, Mr. Matthew Lowrie, instructed CertusView witnesses not to disclose whether a patent search had ***even been conducted***, though this information was clearly relevant and not privileged.  (Chambers Dep. 208:3-25, Aug. 21, 2014, Ex. Y.)  Later, Mr. Chambers testified that the only result of any prior art search was just a *two-page* document containing a double-spaced listing of patent numbers when nothing could be further from the truth.  (Chambers Dep. 295:21-297:4, 395:11-397:8 & Ex. 39 thereto, Oct. 21, 2014, Ex. TT.)

There are also many instances where CertusView produced documents only after significant and costly follow-up from S&N.  S&N propounded its discovery requests back in

November 2013.  (S&N's First Req. for Production to Pl., served Nov. 22, 2013, attached at Ex. VV;  S&N's First Set of Interrogs. to Pl., served Nov. 22, 2013, attached at Ex. WW.)  CertusView made an initial production of about 1,400 documents on January 9, 2014.  (Email from A. Moore to B. Rankin of Jan. 9, 2014 (including initial production containing approximately 1,400 documents), attached at Ex. XX.)  CertusView's initial production was deficient, however, and neither UtiliQuest nor Joseph Teja, Jr. had not produced any documents despite being subpoenaed months before, so S&N sent follow-up correspondence in June 2014 asking these entities to supplement their productions before depositions began.  (Letter from B. Rankin to A. Moore of June 17, 2014 regarding CertusView's Production Deficiencies, attached at Ex. YY;  Letter from B. Rankin to A. Moore of June 20, 2014 regarding UtiliQuest's Production Deficiencies, attached at Ex ZZ;  Letter from B. Rankin to T. Friel, Jr. of June 20, 2014 regarding Teja Production Deficiencies, attached at Ex. AAA.)  However, CertusView and UtiliQuest waited until late July and early August, on eve of S&N's first deposition in the case, to supplement their productions with over 12,884 additional documents—nine times the number of documents in CertusView's initial production six months before.  (Email from H. Dasari to B. Rankin and B. Kelly of July 25, 2014 (including supplemental production containing approximately 8,318 documents), attached at Ex. BBB;  Email from H. Dasari to B. Rankin and B. Kelly of Aug. 6, 2014 (including second supplemental production containing 4,566 documents), attached at Ex. CCC.)

Additionally, after S&N filed motions to compel in August and October 2014, CertusView produced close to 10,000 previously-withheld documents, totaling over 65,000 pages produced pursuant to the Court's November Order.  (Ct.'s Order of Nov. 20, 2014, ECF No. 220.)  Even then, S&N had to follow-up with CertusView multiple times to get the complete

set of documents that should have been produced by the Court's deadline, and S&N was still receiving documents as late as January 9, 2015.  (*E.g.*, Letter from B. Kelly to R. Rodrigues of Dec. 2, 2014, attached at Ex. DDD;  Letter from B. Kelly to R. Rodrigues of Dec. 3, 2014, attached at Ex. EEE;  Letter from B. Kelly to R. Rodrigues of Dec. 17, 2014, attached at Ex. FFF.)  Because of CertusView's discovery behavior, the Court had to vacate the case schedule and January 2015 trial date and S&N had to incur the expense of re-deposing CertusView's witnesses.  (Ct.'s Order of Nov. 20, 2014, ECF No. 220.)

The above documents contained highly relevant, non-privileged information that should have been produced long before.  For example, CertusView withheld an executed copy of a Non-Disclosure Agreement ("NDA") between Dycom and TelDig, Inc. ("TelDig").  (*See* TelDig NDA, CV0147743-48, Ex. RR.)  CertusView does not—and, indeed, cannot—dispute TelDig's relevance given that it is a third-party whose products were cited as invalidating prior art by S&N's invalidity expert.  (*See* Opening Expert Report of Ivan Zatkovitch, Sept. 3, 2014, Ex. MM;  Amended Opening Expert Report of Ivan Zatkovitch, Oct. 28, 2014, Ex. OO.)  CertusView recently told the Court that it withheld this document because "it was included as an attachment to one of the communications . . . that had been deemed [by CertusView to be] privileged pursuant to the functional equivalence doctrine."  (Proposed Sur-Reply at 6, ECF No. 249-1.)  But the TelDig NDA was attached to an email containing ***no text at all***, and was sent from a non-attorney to two other non-attorneys.  (Email from C. Chambers to D. Crawford and T. Halky of Aug. 1, 2012, attached at Ex. GGG.)  Even if the email were privileged, and it is not, CertusView would have still been obligated to produce the free-standing version of the executed TelDig NDA given its unquestionable relevance to this case.  (*See, e.g.*, TelDig NDA, CV0147743-48, Ex. RR.)  This is just one example of CertusView's serial discovery misconduct.

As CertusView's discovery abuses unfolded and the true story of its behavior (both before and after the filing of this suit) became clear, S&N was granted leave to amend its answer and counterclaims to allege that CertusView obtained its patents through inequitable conduct. (Ct.'s Order of Jan. 16, 2015, ECF No. 248.)   But before S&N could present the compelling evidence of CertusView's wrongful conduct, the Court rendered CertusView's asserted patent claims invalid under § 101, and entered judgment in S&N's favor.

### III.   ARGUMENT AND AUTHORITIES

**A.   S&N is the prevailing party and this is plainly an exceptional case.**

Last year, the Supreme Court lowered the previous "overly rigid" standard for what constitutes an "exceptional" case, making it easier for courts to award attorneys' fees under Section 285.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). In doing so, the Supreme Court held:

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* at 1756.   The Supreme Court identified factors that courts might consider include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence," although that list is not exhaustive.  *Id.* at 1756, n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, n.19 (1994)).   The Supreme Court also made clear that fees may be awarded even if a party's unreasonable conduct is not independently sanctionable.  *Id.* at 1757. Finally, the Supreme Court lowered the burden of proof, so now litigants can prove their entitlement to fees by a preponderance of the evidence.  *Id.* at 1758.

21

Since *Octane Fitness*, several patent cases have been deemed exceptional under Section 285.[2]   As one court explained, "Section 285 discourages certain 'exceptional' conduct by imposing the cost of bad decisions on the decision maker."   *Cambrian Sci Corp. v Cox Commc'ns., Inc*, No. SAVC-11-1011 AG (JPRx), 2015 U.S. Dist. LEXIS 4415, at *3 (C.D. Cal. Jan. 6, 2015).   In awarding fees in an "exceptional case," courts have focused on a party's motivation in bringing suit and bad faith litigation tactics.   *See, e.g.*, *Pure Fishing, Inc. v. Normark Corp.*, No. 10-cv-2140-CMC, 2014 U.S. Dist. LEXIS 153272, at *13 (D.S.C. Oct. 28, 2014).   Deterrence and the need for compensation can certainly be factors.   *Summit Data Sys., LLC v. EMC Corp.*, No. 10-749-GMS, 2014 U.S. Dist. LEXIS 138248, at *15 (D. Del. Sept. 25, 2014) ("[T]he court is convinced that an award of attorneys' fees in this case is necessary to deter this sort of reckless and wasteful litigation in the future.").   Here, CertusView acted with bad motive, obtained its patents through inequitable conduct, asserted baseless claims, and its behavior should be deterred.

## B.     CertusView acted with bad motive.

CertusView had ample motive to act in the way it has.  *Octane Fitness*, 134 S. Ct. at 1756, n.6 (noting that "motivation" is a factor courts should consider in the totality of the circumstances when determining whether a case is "exceptional").   First and foremost, CertusView embarked on a deliberate "IP Strategy and Portfolio Development" effort, which the company described as a "deployment" of dozens of inventions, and which, in fact, contained

---

[2]*See, e.g.*, *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 24 F. Supp. 3d 329 (S.D.N.Y. 2014);  *Intex Rec. Corp. v. Team Worldwide Corp.*, No. No. 04-1785 (PLF), 2015 U.S. Dist. LEXIS 2847 (D.D.C. Jan. 9, 2015); *Bayer Cropscience Ag v. Dow Agrosciences LLC*, No. 12-256 (RMB/JS), 2015 U.S. Dist. LEXIS 5880 (D. Del. Jan. 5, 2015);  *Logic Devices, Inc. v. Apple Inc.*, No. C 13-02943 WHA, 2014 U.S. Dist. LEXIS 168380 (N.D. Cal. Dec. 4, 2014);  *Yufa v. TSI Inc.*, No. 09-cv-01315-KAW, 2014 U.S. Dist. LEXIS 113148 (N.D. Cal. Aug. 14, 2014); *Falana v. Kent State Univ.*, No. 5:08cv720, 2014 U.S. Dist. LEXIS 105777 (N.D. Ohio July 31, 2014);  *Cognex Corp. v. Microscan Sys.*, No. 13-cv-2027 (JSR), 2014 U.S. Dist. LEXIS 91203 (S.D.N.Y. June 29, 2014);  *Intellect Wireless, Inc. v. Sharp Corp.*, No. 10 C 6763, 2014 U.S. Dist. LEXIS 73653 (N.D. Ill. May 30, 2014);  *Classen Immunotherapies, Inc. v. Biogen Idec*, No. WDQ-04-2607, 2014 U.S. Dist. LEXIS 67169 (D. Md. May 14, 2014).

nothing inventive at all.  (*See, e.g.*, Email from D. Davis to Nielsen *et al.* of Apr. 2, 2009, CV0157781-782, attached at Ex. HHH.)  The stated goal of this deployment  was to "co-opt" CertusView's competitors by asserting its patents against smaller players it deemed to be "IP Ignorant."  (Trade Show Summary Notes at AIP000177, Ex. EE.)  CertusView planned to use its artificially beefed-up portfolio and get much "more explicit" about the threat it posed to the competition, even contemplating "one-on-one informational sessions" with key customers in the industry, like "Verizon, AT&T, [and] Comcast" about its superior position.  (*Id.*) ███████

███████████████████████████████████

███████████████████████████████████

███████████████████████

Unfortunately for S&N, whom Mr. Nielsen has acknowledged was a Dycom "competitor," it stood squarely in CertusView's way.  (Nielsen Dep. 230:9-20, Jan. 9, 2015, Ex. C.) ██████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████

Of course, central to CertusView's plan to threaten competitors (particularly S&N) was its need to secure patents.  And, in that effort, CertusView's conduct was equally base and

ruthless.  For example, in claiming inventorship over the Patents-in-Suit, Mr. Nielsen "declare[d] that all statements made herein of my own knowledge are true," when the opposite has proven to be the case.  (Inventor Decl., Ex. Z;  Inventor Decl. Exs. Z-CC.)  In reality, Mr. Nielsen invented nothing, as made plain by his evasive answers about his contributions to the Patents-in-Suit under oath.  *See* Section II.B.3., *supra*.  And, while Mr. Nielsen had no business claiming inventorship, Mr. Block, the "architect," "responsible for the overall design" behind the E-Sketch concept was egregiously omitted from the applications.  (Chambers Dep. 65:15-66:25, Aug. 21, 2014, Ex. Y.) ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███ This misrepresentations are material.  Where, as here, inventors "deliberately conceal a true inventor's involvement, the applicants ***have*** committed inequitable conduct."  *Advance Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 830-32 (Fed. Cir. 2010) (emphasis supplied).  While CertusView may claim that their statements about Mr. Nielsen's role were somehow innocuous,"[n]o party is ever 'reasonably justified' in making false statements to the PTO or to the court."  *See, e.g., Intellect Wireless, Inc. v. Sharp Corp.*, No. 10 C 6763, at *32 (N.D. Ill. May 30, 2014).

CertusView's bad behavior before the PTO was not just limited to its application.  Instead, as detailed below, CertusView needed to withhold and misrepresent prior art because of the weakness of its purported invention.

## C.    CertusView's position on the validity of its patents has always been meritless.

CertusView's position about the validity of its patents is unsupported by both the facts and the law.  In such cases, courts have found patent cases to be exceptional under similar circumstances.  *Logic Devices, Inc. v. Apple Inc.*, No. C 13-02943 WHA, 2014 U.S. Dist. LEXIS

168380, at *12 (N.D. Cal. Dec. 4, 2014) ("This is also an exceptional case because it stands out from the others with respect to the substantive strength of Logic Devices' litigation position. Logic Devices' validity position was unsupported by the record[.]")

      **1.**      **CertusView should have never filed these patent applications or this lawsuit.**

CertusView has always been aware that the Patents-in-Suit were of suspect validity. Indeed, when CertusView filed applications on the Patents-in-Suit, it knew that the alleged "invention" was anticipated or, at the very least, obvious, in view of (at least) the Virginia Pilot Project, TelDig, and Tucker prior art.  *See also* Section II.B., *supra*.  Throughout this litigation, CertusView relied on the same narrow distinction of this prior art as it made during prosecution, *i.e.*, that it did not disclose a "digital representation of physical locate marks."  (*Compare* Amendment and Reply Under 37 CFR 1.111, Patent App. No. 12/366,050 (Feb. 13, 2012) at CV0011877, Ex. I, *with* Responsive Expert Report of Randel Dymond, Sept. 30, 2014, attached at Ex. KKK.)  But all of the above referenced prior art *actually disclosed this element* and CertusView's efforts to explain this point away in this case are exceptionally weak.  (Responsive Expert Report of Randel Dymond, Sept. 30, 2014, Ex. KKK.)

First, from as early as 2005 (three years before it filed its first patent application), CertusView knew that its purported invention was being widely considered by the locating industry.  (Pervarski Decl. ¶¶ 12-19, Ex. J.)  Indeed, CertusView's affiliate, UtiliQuest, was heavily involved in the Virginia Pilot Project from 2005 to 2008, and UtiliQuest employees attended meetings where the concept was discussed.  (Pevarski Decl. ¶¶ 13-14 & Exs. 17-18 thereto, Ex. J.)  It is no surprise, therefore, that when other Virginia Pilot Project participants learned of CertusView's application, they alerted Dycom that Mr. Nielsen's inventions were not patentable.  (VUPS Binder 1 at DY0002-05, CV0030596-99, Ex. L.)  Thus, the position that CertusView sold to the (misled) PTO—that it had invented the making of an electronic record of

a locate operation with digital locate marks on the ground—was a charade from the start.  (*Cf.* Pevarski Decl. ¶¶ 13-19, Ex. J.)

Throughout this litigation, CertusView also falsely claimed that the TelDig prior art did not disclose a "digital representation of physical locate marks."  (*E.g.*, Responsive Expert Report of Randel Dymond, Sept. 30, 2014, Ex. KKK.)  But even CertusView's expert admitted that a locate technician can use TelDig's products to edit an electronic sketch.  (Dymond Dep. 346:8-347:13, Nov. 18, 2014, Ex. LLL (emphasis added).)

Likewise, in this litigation, CertusView (and its expert) made the same frivolous argument about the Tucker patents:



(Dymond Dep. 297:24-298:11, Nov. 18, 2014, Ex. LLL;  Amendment and Reply Under 37 CFR 1.111, Patent App. No. 12/366,050 (Feb. 13, 2012) at CV0011877, Ex. I;  *cf.* Tucker, Ex. U; Sawyer, Ex. T.)  Of course, this characterization of the Tucker patent contradicts both its plain language and distorts that prior art, as Mr. Tucker himself explained.  (*See* Tucker Dep. at 65:17-24, Aug. 22, 2014, Ex. V.)

Like its positions on the prior art, CertusView had no real basis to claim its patents were inventive.  Indeed, CertusView's patents expressly state that creating a manifest to document physical locate marks is not a new concept.  (*See, e.g.*, '204 Patent col.2 l.39-41, Ex. P.)  And,

the named inventors admitted that their purported "invention" was nothing more than a generic computer implementation of this well-known idea.  (*See, e.g.*, Chambers Dep. 97:8-98:6, 213:16-25, Aug. 21, 2014, Ex. Y;  Farr Dep. 129:15-130:9, 130:10-15, 130:17-131:2, Aug. 22, 2014, Ex. NNN;  Ct.'s Opinion & Order, ECF No. 250.)  Tellingly, neither CertusView (nor its expert) were able to articulate why a generic computer implementation of decades-old concept was not obvious.  (*See* Responsive Expert Report of Randel Dymond, Sept. 30, 2014, Ex. KKK.)  ███

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████  But this statement could not be further from the truth, as the Virginia Pilot Project material expressly discussed the concept of electronically documenting *physical locate marks*, as CertusView knew when it filed and prosecuted its patent applications.  (Pevarski Decl. ¶¶ 12-19, Ex. J.)[3]  At bottom, CertusView knew its patents where in firm and could never have been obtained in the ordinary course.

**D.    CertusView litigated this case in an unreasonable manner.**

Compounding its pre-suit conduct, CertusView has litigated this meritless case, using scorched-earth tactics to drive up S&N's costs and force it to capitulate, CertusView's conduct during the pending of this litigation unquestionably provides yet another basis for the Court to

---

[3]The secondary considerations of non-obviousness identified by CertusView's expert witness were also exceptionally weak.  (Responsive Expert Report of Randel Dymond ¶¶ 150-167, Sept. 30, 2014, Ex. KKK.) ████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████  Given that CertusView knew that the electronic documentation of physical locate marks was the focus of Phase II of the Virginia Pilot Project, CertusView and its expert's argument is disingenuous.  (*See also* Pevarski Decl. ¶¶ 11-19, Ex. J.)

find this case exceptional.  *Octane Fitness*, 134 S. Ct. at 1756.  Indeed, where, as here, the plaintiff engages in tactics that drive up fees and burden the court an "exceptional" finding should be made.  *See, e.g.*, *Pure Fishing*, 2014 U.S. Dist. LEXIS 153272, at *13;  *Chalumeau Power Sys. LLC v. Alcatel-Lucent USA Inc.*, No. 11-1175-RGA, 2014 U.S. Dist. LEXIS 127645, at *9-10 (D. Del. Sept. 12, 2014) (finding case to be exceptional where the plaintiff "filed a frivolous lawsuit with the sole purpose of extorting a settlement fee").

*Pure Fishing* is instructive on this point.  In that case, after the defendant obtained favorable claim construction rulings, the plaintiff voluntarily dismissed just one of its patent infringement claims.  2014 U.S. Dist. LEXIS 153272, at *13.  Later on, at summary judgment, the court dismissed plaintiffs remaining infringement claims.  (*Id*.)  Although the defendant did not prevail on its inequitable conduct counterclaim, the court nonetheless awarded attorneys' fees as an exceptional case because plaintiff had taken shifting positions during claim construction, "result[ing] in an unwarranted increase in the expense of litigation imposed on [defendant] and burden imposed on the court and support[ed] a finding that [plaintiff] litigated the [claim] in an unreasonable manner."  *Id.*  In doing so, the court said that, "[t]he exceptional weakness of the [claim] combined with the unreasonable manner of its pursuit also suggest the need for compensation and deterrence."  *Id.*

As in *Pure Fishing*, CertusView litigated this case in an unreasonable manner.  For example, its assertion of a 68 patent claims and unwillingness to timely reduce them, needlessly drove costs and resulted in an unnecessary additional burden on the Court, not to mention S&N.  *Pure Fishing*, 2014 U.S. Dist. LEXIS 153272, at *13.  The same is true of CertusView's concealment of key documents and multiple misrepresentations to the Court, all of which are appropriate factors to consider as part of the totality of the circumstances.  *Cambrian Sci. Corp.*,

2015 U.S. Dist. LEXIS 4415, at *20 ("The court here discusses the prior discovery rulings because they are a part of the totality of the circumstances of Cambrian's manner of litigating this case."). CertusView's litigation misconduct was no accident. It was a deliberate strategy, that came directly out of the playbook of its counsel, and is even advertised on its website. Ruben J. Rodrigues, *Limiting Patent Claims and Prior Art (with or without a Model Order)*, Ex. A. While these tactics may have been part of CertusView's plan, they were not without consequence and required the Court to vacate the entire case schedule and January 2015 trial setting, again to the expense of S&N. Moreover, S&N was forced to burden the Court with discovery motions, and spend additional time and money re-deposing witnesses, among other things. This is precisely the type of conduct that other courts have deemed to be exceptional, and S&N respectfully asks that the Court award S&N reasonable attorneys' fees to compensate S&N and deter CertusView, its counsel, and other "savvy plaintiffs" from similar misbehavior in the future. *E.g.*, *Pure Fishing*, 2014 U.S. Dist. LEXIS 153272, at *13.

## IV.    CONCLUSION

Considering the totality of circumstances, this case was not only litigated in a wholly unreasonable manner from the beginning, but it also stands out from the others with respect to CertusView's exceptionally weak litigation position. Accordingly, Defendants respectfully request that the Court grant their Motion for Exceptional Case Finding and Attorneys' Fees or order an evidentiary hearing as the Court deems appropriate.

Dated:  February 4, 2015        Respectfully submitted,

/s/ Brian L. Whisler
_____

Brian L. Whisler (Lead Counsel)
Virginia Bar No. 30435
E-mail: brian.whisler@bakermckenzie.com
BAKER & MCKENZIE LLP
815 Connecticut Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 452-7019
Facsimile:  (202) 416-6937

Michael A. Duffy
E-mail: michael.duffy@bakermckenzie.com
BAKER & MCKENZIE LLP
300 East Randolph Street, Suite 5000
Chicago, Illinois 60601
Telephone:  (312) 861-8000
Facsimile:  (312) 861-2899

John G. Flaim
E-mail: john.flaim@bakermckenzie.com
BAKER & MCKENZIE LLP
2300 Trammell Crow Center
Dallas, TX  75201
Telephone:  (214) 978-3000
Facsimile:  (214) 978-3099

ATTORNEYS FOR DEFENDANTS,
S&N LOCATING SERVICES LLC AND
S&N COMMUNICATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February 2015, a true and correct copy of the foregoing document was served on Plaintiff's counsel of record at the following e-mail address: MLockerby@foley.com.

/s/  Brian L. Whisler
_____