UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CERTUSVIEW TECHNOLOGIES, LLC,

      Plaintiff,

v.                               Civil Action No. 2:13cv346

S&N LOCATING SERVICES, LLC,
and
S&N COMMUNICATIONS, INC.,

      Defendants.

## OPINION AND ORDER

This matter is before the Court on CertusView Technologies,
LLC's ("Plaintiff") Rule 72 objections, ECF No. 256, to the
magistrate judge's January 16, 2015 Order granting S&N
Communications, Inc., and S&N Locating Services, LLC,
(collectively "Defendants" or "S&N") leave to amend their answer
and counterclaims, and on Plaintiff's Motion to Strike and in
the Alternative to Dismiss S&N's First Amended Answer and
Counterclaims ("Motion to Dismiss"), ECF No. 260. After
examining the briefs and the record, the Court determines that
oral argument is unnecessary because the facts and legal
contentions are adequately presented and oral argument would not
aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va.
Loc. R. 7(J).

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

This is a patent infringement action involving the following five patents: U.S. Patent No. 8,290,204 ("the '204 patent"), U.S. Patent No. 8,407,001 ("the '001 patent"), U.S. Patent No. 8,340,359 ("the '359 patent"), U.S. Patent No. 8,265,344 ("the '344 patent"), and U.S. Patent No. 8,532,341 ("the '341 patent" and, collectively with the '204, '001, '359, and '344 patents, "the patents-in-suit"). On May 29, 2013, Plaintiff filed an action in this Court alleging that Defendants "have infringed, and continue to infringe, literally and/or under the doctrine of equivalents," four of the five patents-in-suit "by making, using, offering to sell, and/or selling devices and/or services covered by the claims of the [patents] and by actively and intentionally inducing others to infringe one or more claims of the [patents]." Compl. ¶¶ 14, 18, 22, 26, ECF No. 1. On December 6, 2013, Plaintiff filed an amended complaint, alleging infringement of all five patents-in-suit. See Am. Compl. ¶¶ 15, 19, 23, 27, 32, ECF No. 55. On December 23, 2013, Defendants filed an Answer denying Plaintiff's allegations of infringement. Answer at 6-10, ECF No. 61.

On October 28, 2014, Defendants moved for judgment on the pleadings, seeking to invalidate the asserted claims of the

---

[1] The Court sets forth only those facts necessary to resolve the instant motions. For a more detailed factual and procedural history, see Opinion and Order Part I, ECF No. 250.

2

patents-in-suit because they did not claim patent-eligible subject matter under 35 U.S.C. § 101. Defs.' Mot. for J. on the Pleadings, ECF No. 197. On November 10, 2014, Defendants moved for leave to amend their answer to assert inequitable conduct declaratory judgment counterclaims. Defs.' Mot. for Leave to File First Am. Answer & Countercls., ECF No. 204. Defendants attached their proposed amended answer to their memorandum in support of the motion for leave to amend. Defs.' Mem. Supp. Mot. for Leave to File First Am. Answer & Countercls. Ex. A, ECF No. 204-1. In opposition to Defendants' motion for leave to amend, Plaintiff contended that the Court should deny leave to amend on the basis of futility because the inequitable conduct counterclaims in the proposed amended answer did not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). See Pl.'s Mem. Opp'n Mot. for Leave to File First Am. Answer & Countercls. at 1, ECF No. 224.

On January 16, 2015, the Court—by Order of the magistrate judge co-assigned to this action—granted Defendants' motion for leave to amend. Order at 2-3, ECF No. 248. The Court held that Defendants had sufficiently pleaded inequitable conduct and, therefore, that granting Defendants leave to amend their answer and counterclaims would not be futile. Id. at 2. The Court directed Defendants "to file the Amended Answer no later than January 23, 2015." Id. at 3.

On January 21, 2015, the Court granted Defendants' motion for judgment on the pleadings and held that each of the asserted claims of the patents-in-suit were invalid because they did not claim patent-eligible subject matter. See Opinion and Order at 95, ECF No. 250. On that same date, the Court entered judgment in favor of Defendants on Plaintiff's infringement claims. ECF No. 251. On January 23, 2015, Defendants filed their First Amended Answer. ECF No. 253.

On February 2, 2015, Plaintiff objected to the magistrate judge's January 16, 2015 Order. Pl.'s Objections to the Magistrate Judge's Order ("Pl.'s Objections"), ECF No. 256. In its objections, Plaintiff contends that the magistrate judge erred by granting leave to amend because Defendants' proposed amendments did not sufficiently allege an inequitable conduct claim upon which relief can be granted and, therefore, amendment was futile. Id. at 1. On February 9, 2015, Plaintiff moved to dismiss Defendants' inequitable conduct counterclaim. Pl.'s Mot. to Dismiss, ECF No. 260. As discussed further below, in its motion to dismiss, Plaintiff argues that Defendants improperly filed their First Amended Answer because they did so after the entry of judgment and Plaintiff challenges the sufficiency of Defendants' pleading. Defendants timely responded both to Plaintiff's objections to the magistrate judge's ruling and to Plaintiff's motion to dismiss. See Defs.'

Resp. Opp'n Pl.'s Objections, ECF No. 268; Defs.' Resp. Opp'n Mot. to Dismiss, ECF No. 274. Accordingly, both matters are now ripe for disposition.

## II. STANDARD OF REVIEW

### A. Rule 72

Rule 72(a) of the Federal Rules of Civil Procedure provides that "[t]he district judge in the case must consider timely objections" to a magistrate judge's ruling on non-dispositive matters and must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); 28 U.S.C. § 636 (b)(1)(A); see Fed. Election Comm'n v. Christian Coal., 178 F.R.D. 456, 459-60 (E.D. Va. 1998) (citing Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990)). A magistrate judge's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). If a court is not firmly convinced that such an error has occurred, then "the magistrate judge's order must be affirmed." Giganti v. Gen-X Strategies, Inc., 222 F.R.D. 299, 304-05 (E.D. Va. 2004). Indeed, "altering a magistrat[e] [judge's] non-dispositive orders [is] 'extremely difficult to justify.'" Carlucci v. Han, 292 F.R.D. 309, 312 (E.D. Va. 2013) (quoting 12 Charles Alan

5

Wright & Arthur R. Miller et al., <u>Federal Practice & Procedure</u> § 3069 (2d ed. 1997)).   However, "[f]or questions of law there is no practical difference between review under Rule 72(a)'s contrary to law standard and a de novo standard." <u>Bruce v. Hartford</u>, 21 F. Supp. 3d 590, 594 (E.D. Va. 2014) (Cacheris, J.) (alterations, citations, and internal quotation marks omitted).

## B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint, or a claim within a complaint, based on the plaintiff's "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)) (omission in original).   The United States Supreme Court has interpreted the pleading standard set forth in Rule 8(a) as requiring that a complaint include enough facts for the claim to be "plausible on its face" and thereby "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Id.</u> at 555,

570 (internal citations omitted). The plausibility requirement is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility" that a defendant is liable. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556). In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 663.

In a patent infringement suit, the laws of the regional courts of appeals govern whether to grant a motion to dismiss under Rule 12(b)(6). K-Tech Telecomms., Inc. v. Time Warner Cable, Inc., 714 F.3d 1277, 1282 (Fed. Cir. 2013) (citations omitted). Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dep't v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011)). Accordingly, "'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'" Twombly, 550 U.S. at 555 (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)) (omission in original). A complaint may therefore survive a

7

motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'"  Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### C. Rule 9(b)

In addition to the general pleading standard set forth in Rule 8(a), Rule 9 of the Federal Rules of Civil Procedure establishes pleading requirements for "special matters."  Fed. R. Civ. P. 9.  Subsection (b) of Rule 9 addresses the pleading requirements for "fraud or mistake" and "conditions of mind" and provides that: "(b) In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The Court of Appeals for the Federal Circuit has held that the defense of inequitable conduct must be pleaded with particularity under Rule 9(b).  Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326-27 (Fed. Cir. 2009) (citing Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1344 (Fed. Cir. 2003)).  Federal Circuit law governs whether a defendant has pleaded inequitable conduct with sufficient particularity under Rule 9(b).  Id. at 1318 (citing Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007)).

In applying the Rule 9(b) standard to the defense of inequitable conduct, the Federal Circuit has held:

> to plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific <u>who, what, when, where, and how</u> of the material misrepresentation or omission committed before the PTO. Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

<u>Exergen</u>, 575 F.3d at 1328-29 (emphasis added).[2]   Furthermore, "[a] reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective

---

[2] Following its decision in <u>Exergen</u>, in <u>Therasense, Inc. v. Becton, Dickinson & Co.</u>, 649 F.3d 1276 (Fed. Cir. 2011), the Federal Circuit established a heightened standard for proving inequitable conduct at the merits stage.   Under <u>Therasense</u>, in a case involving non-disclosure, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." 649 F.3d at 1290.   "Thus, a party alleging inequitable conduct must show '<u>but-for materiality</u>' and that the intent to deceive is '<u>the single most reasonable inference</u>' able to be drawn from the evidence." <u>W.L. Gore & Assocs., Inc. v. Medtronic, Inc.</u>, 850 F. Supp. 2d 630, 633 n.1 (E.D. Va. 2012) (Davis, J.) (emphasis in original) (quoting <u>Therasense</u>, 649 F.3d at 1290-91).   Other courts have determined that the heightened standard set forth in <u>Therasense</u> must be applied at the pleading stage. <u>E.g.</u>, <u>Pfizer, Inc. v. Teva Pharms. USA, Inc.</u>, 803 F. Supp. 2d 409, 432 (E.D. Va. 2011).   However, the Court will apply the standard set forth in <u>Exergen</u>, as interpreted in the Federal Circuit's post-<u>Therasense</u> opinion in <u>Delano Farms Co. v. Cal. Table Grape Comm'n</u>, 655 F.3d 1337 (Fed. Cir. 2011), to determine the sufficiency of Defendants' pleading. <u>W.L. Gore</u>, 850 F. Supp. 2d at 633 n.1; <u>see also, e.g.</u>, <u>iLife Techs. Inc. v. Body Media, Inc.</u>, Civil Action No. 14-990, 2015 WL 1000193, at *2-3 (W.D. Pa. Mar. 6, 2015).

indications of candor and good faith." Id. at 1329 n.5 (citation omitted).

### III. DISCUSSION

#### A. Rule 72 Objections

The Court will begin by assessing Plaintiff's objections to the magistrate judge's January 16, 2015 Order granting Defendants leave to amend their answer and counterclaims. Federal Rule of Civil Procedure 15 governs amendments to pleadings. Under Federal Rule of Civil Procedure 15(a):

> (1) A party may amend its pleading once as a matter of course within:(A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
> (2) In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires. . . .

Fed. R. Civ. P. 15(a)(1)-(2). The law of the Court of Appeals for the Fourth Circuit governs whether to grant a motion for leave to amend under Rule 15. See Exergen, 575 F.3d at 1318 (citing Cent. Admixture, 482 F.3d at 1356).

As noted above, the text of Federal Rule of Civil Procedure 15(a)(2) requires that the Court "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on

technicalities." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (citations omitted). However, "a district court may deny leave to amend if the amendment 'would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 461 (4th Cir. 2013) (quoting Laber, 438 F.3d at 426)). Regarding futility, leave to amend "'[may] be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face.'" Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 200 (4th Cir. 2014) (alteration in original) (quoting Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986)). Thus, a court may deny leave to amend if "the proposed amendments could not withstand a motion to dismiss." Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995) (citations omitted). The "futility vel non of [a] motion to amend presents a purely legal question." HCMF Corp. v. Allen, 238 F.3d 273, 277 n.2 (4th Cir. 2001); see also United States ex rel. Ahumada v. NISH, 756 F.3d 268, 724 (4th Cir. 2014) (stating that a court of appeals reviews de novo the denial of a motion for leave to amend on the basis of futility).

In this case, the crux of Plaintiff's objections to the magistrate judge's ruling concerns the sufficiency of the Defendants' proposed amended answer and counterclaims. In

11

Plaintiff's view, the magistrate judge erred by granting Defendants leave to amend their answer and counterclaims because Defendants' inequitable conduct counterclaim allegations do not state a claim upon which relief can be granted and, therefore, granting leave to amend to add such claims was futile.   See Pl.'s Objections at 5.   In short, Plaintiff's objections turn on whether Defendants have sufficiently pleaded inequitable conduct in their amended answer and counterclaims to survive a motion to dismiss.   And that is the same question presented in Plaintiff's motion to dismiss Defendants' inequitable conduct counterclaims, albeit in a slightly different procedural posture.   Accordingly, the success of Plaintiff's Rule 72 objections essentially rises and falls with the Court's analysis of Plaintiff's motion to dismiss: if Defendants have adequately pleaded inequitable conduct with particularity, it can hardly be said that the magistrate judge should have denied Defendants leave to amend. As discussed below, Defendants pleaded sufficient factual matter to state an inequitable conduct claim and to satisfy Rule 9(b)'s particularity requirements under a number of theories. Therefore, the Court **OVERRULES** Plaintiff's objections to the magistrate judge's order granting Defendants leave to amend their answer and counterclaims.

## B. Motion to Dismiss

As noted above, Defendants have alleged that Plaintiff engaged in inequitable conduct by: (1) materially misrepresenting inventorship; (2) failing to disclose material prior art; and (3) misrepresenting prior art. Plaintiff challenges both the procedural propriety of, and substantive allegations in, Defendants' amended answer and counterclaims. Therefore, the Court must begin by addressing Plaintiff's procedural argument.

With respect to procedure, Plaintiff contends that the Court's entry of judgment in favor of Defendants, on January 21, 2015, barred any further amendment to the pleadings thereafter, absent an order of the Court setting aside the judgment. Pl.'s Mot. to Dismiss at 4. Accordingly, in Plaintiff's view, the Court should strike Defendants' First Amended Answer because it was filed subsequent to the entry of judgment in Defendants' favor. Id. at 4-6. In response, Defendants argue that the Court granted them leave to file an amended answer prior to the entry of judgment and, therefore, the entry of judgment did not bar them from filing their amended answer and counterclaims thereafter in accordance with the date set forth in the Order granting leave to amend. Def.'s Resp. Opp'n Mot. to Dismiss at 8-9.

The point at which a court enters judgment is pivotal with respect to such court's ability to grant a party leave to amend its pleadings.   The Fourth Circuit has established that "'a post-judgment motion to amend is evaluated under the same legal standard'—grounded on Rule 15(a)—'as a similar motion filed before judgment was entered.'"   Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 193 (4th Cir. 2009) (quoting Laber, 438 F.3d at 428).   However, our regional court of appeals has also noted an important caveat to such rule.   "There is one difference between a pre- and a post-judgment motion to amend: the district court may not grant the post-judgment motion unless the judgment is vacated pursuant to Rule 59(e) or Fed. R. Civ. P. 60(b)."   Laber, 438 F.3d at 427; see also 6 Wright & Miller, supra, § 1489 (3d ed. 2010).   Consequently, courts must distinguish between pre- and post-judgment motions to amend.   A court may grant the latter only after first altering, reopening, or setting aside the judgment.

Here, the Court's entry of judgment in Defendants' favor in Plaintiff's patent-infringement action, on January 21, 2015, did not bar Defendants from filing their First Amended Answer on January 23, 2015 because the Court granted Defendants leave to amend their answer prior to the entry of judgment.   Perhaps unsurprisingly, the Fourth Circuit has not considered to what extent the entry of judgment limits a party's ability to file an

14

amended pleading in accordance with a pre-judgment order granting leave to amend. However, <u>Laber</u> distinguished between pre- and post-judgment <u>motions for leave to amend</u>, rather than pre- and post-judgment <u>amendment filings</u>. <u>See</u> 438 F.3d at 427. Thus, the Court concludes that the timing of a party's motion for leave to amend, not the timing of the filing of the amended pleading, determines the extent to which a judgment bars the amendment. In this case, Defendants moved to amend their answer on November 10, 2014, well in advance of the Court's entry of judgment in their favor on Plaintiff's infringement claims on January 21, 2015. Prior to the entry of judgment, Plaintiff had a full opportunity to litigate, before the magistrate judge, the propriety of Defendants' proposed amendments. Moreover, prior to the entry of judgment, the Court granted Defendants' motion for leave to amend and expressly authorized Defendants to file their amended answer "no later than January 23, 2015." Order at 2-3, ECF No. 248. In short, once the Court granted Defendants' pre-judgment motion for leave to amend their answer to assert an inequitable conduct counterclaim, the mere fact that the Court entered judgment on Plaintiff's infringement claims during the period—provided by the Court's Order—for filing such amendments did not require Defendants to move the Court to set aside or alter the judgment before filing their amended answer.[3]

---

[3] At first blush, the permissibility of Defendants filing their

15

Accordingly, the Court rejects Plaintiff's contention that the entry of judgment barred Defendants from filing their amended answer within the period prescribed by the Court's Order granting Defendants leave to amend.

Having considered, and ultimately rejected, Plaintiff's procedural challenge to Defendants' First Amended Answer and

---

First Amended Answer and Counterclaims after the entry of judgment in their favor on Plaintiff's infringement claims may seem like a purely scholastic issue. After all, none of Plaintiff's infringement claims remain in this action because the Court has held that the asserted claims of Plaintiff's patents are invalid for failure to claim patentable subject matter. See generally Opinion and Order, ECF No. 250. However, notwithstanding the favorable judgment on Plaintiff's infringement claims, Defendants have a nontrivial reason to continue to pursue their alleged inequitable conduct counterclaims. Assuming, arguendo, that Defendants prevailed on their inequitable conduct counterclaims, their remedies against Plaintiff far exceed the relief they received in the Court's January 21, 2015 Opinion and Order—invalidation of fifteen patent claims and the dismissal of Plaintiff's action. As the Federal Circuit succinctly has described:

> [T]he remedy for inequitable conduct is the "atomic bomb" of patent law. Unlike validity defenses, which are claim specific, inequitable conduct regarding any single claim renders the entire patent unenforceable. Unlike other deficiencies, inequitable conduct cannot be cured by reissue or reexamination. Moreover, the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family. Thus, a finding of inequitable conduct may endanger a substantial portion of a company's patent portfolio.
>
> A finding of inequitable conduct may also spawn antitrust and unfair competition claims. Further, prevailing on a claim of inequitable conduct often makes a case "exceptional," leading potentially to an award of attorneys' fees under 35 U.S.C. § 285. A finding of inequitable conduct may also prove the crime or fraud exception to the attorney-client privilege.

Therasense, Inc. v. Beckton, Dickinson & Co., 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (en banc) (internal citations omitted).

Counterclaims, the Court must now consider Plaintiff's substantive challenge to the sufficiency of Defendants' inequitable conduct allegations. Therefore, the Court will assess the extent to which Defendants have pleaded with particularity each subset of the allegations comprising Defendants' alleged inequitable conduct counterclaims.

### 1. Inventorship

In their First Amended Answer and Counterclaims, Defendants, first, allege that Plaintiff engaged in inequitable conduct by misrepresenting the inventorship of the patents-in-suit. More specifically, Defendants allege (1) that Jeffrey Farr ("Farr"), Curtis Chambers ("Chambers"), Steven Nielsen ("Nielsen")—the named inventors of the '204, '341, and '001 patents—and Joseph Teja ("Teja")—the prosecuting attorney—misrepresented to the Patent and Trademark Office ("PTO") that Farr was an inventor of the '204, '341, and '001 patents; and (2) that Chambers, Nielsen, and Teja—as well as Farr with respect to the '204 and '341 patents—misrepresented the inventorship of the '204, '359, '344, and '341 patents to the PTO by failing to name Greg Block ("Block") as an inventor. See First Am. Answer & Countercls. ¶¶ 63, 65-66, 68.

### a. Farr

With respect to Farr's inventorship, Defendants allege that Plaintiff engaged in inequitable conduct when Farr, Chambers,

and Nielsen signed, and Teja submitted, declarations to the PTO that listed Farr as a named inventor of the '204, '341, and '001 patents, even though Farr was not, in fact, an inventor of such patents.    Id.    ¶¶    63-65.    According    to    Defendants, notwithstanding such declarations,

> Farr has now admitted under oath that he was not involved in conception of the idea that became the e-Sketch product, which is Plaintiff's embodiment of the asserted independent claims of the Patents-in-Suit, including the independent claims of the '204, '341, and '001 Patents.  Nor did Farr reduce the patented invention to practice.  Chambers and Farr knew that Farr did not have a substantial role in the conception of [the] e-Sketch product or building a prototype of the e-Sketch product.

Id. ¶ 66.[4]  Moreover, Defendants allege that Farr signed the false declarations even though "Teja discussed with Farr whether he should be named as an inventor or co-inventor on any patent applications."    Id.    Defendants    further    allege    that    any misrepresentations with regard to inventorship are material because "inventorship is a critical requirement for obtaining a patent." Id. ¶ 67. Finally, Defendants allege, on information and belief, that "Farr's false statements regarding inventorship were made with specific intent to deceive to the Patent Office, as it is implausible for Farr to have believed himself to be an

---

[4] The Court notes that Defendants allegations are, in part, based on statements that Farr made during a deposition.  The Court has in no way considered evidence outside of Defendants' First Amended Answer and Counterclaims in resolving the instant motion.  Instead, the Court simply has accepted the truth of Defendants' express allegations in their amended answer regarding Farr's deposition statements.

inventor of particular subject matter, knowing that he was not involved in the conception thereof." Id.

In response, Plaintiff contests the sufficiency of Defendants' allegations that: Farr was not an inventor of the '204, '341, and '001 patents, the inclusion of Farr as an inventor was material, and any misrepresentation was made with the specific intent to deceive the PTO. See Pl.'s Mot. to Dismiss at 7-9. First, Plaintiff contends that Defendants have not alleged facts sufficient to support their assertion that Farr was not an inventor of the '204, '341, and '001 patents because Defendants have merely alleged that Farr was not involved in the development of the embodiment of the claims of the '203, '341, and '001 patents, the e-Sketch product, rather than alleging that Farr was not involved in the conception of the claims of such patents. See id. at 7-8. In other words, Plaintiff asserts that Defendants have not stated a plausible claim because inventorship hinges on development of the claims of the patents, rather than of the products embodying such claims. Second, Plaintiff argues that Defendants have failed to plead materiality because they have not adequately alleged that the inclusion of Farr as an inventor qualified as a material misrepresentation to the PTO. Id. at 8-9. Third, Plaintiff contends that Defendants have failed to plead intent because they have only done so "on information and belief." Id. at 9.

19

The Court concludes that Defendants have adequately pleaded inequitable conduct regarding Farr's inventorship of the '204, '341, and '001 patents. Defendants have identified the "who" of the alleged misrepresentations by identifying Farr, Chambers, and Nielsen as the individuals that signed, and Teja[5] as the individual that submitted, the allegedly false declarations. See Exergen, 575 F.3d at 1329; First Am. Answer & Countercls. ¶¶ 63-65. Likewise, Defendants have identified when the alleged misrepresentations took place because they have alleged the specific dates upon which Farr, Chambers, and Nielsen signed, and Teja submitted, the alleged false declarations.[6]    See Exergen, 575 F.3d at 1328.    Similarly, Defendants have identified where the material information that Farr, Nielsen, Chambers, and Teja allegedly misrepresented is found by identifying, in each declaration, the specific alleged misrepresentation: Farr's statements that he was an original and

---

[5] The Court must accept the truth of the allegations in the First Amended Answer and Counterclaims, even those regarding alleged misrepresentations by a member of the patent bar, regardless whether the Court believes such allegations. Twombly, 550 U.S. at 555

[6] More specifically, as to the '204 patent, Defendant alleges that Farr signed a false declaration on April 10, 2009, Chambers and Nielsen signed such declaration on April 9, 2009 and April 13, 2009, respectively, and that Teja filed such declaration with the PTO on April 20, 2009.    First Am. Answer ¶ 63.    With respect to the '341 patent, Defendant alleges that Farr, Chambers, and Nielsen signed a false declaration that Teja submitted to the PTO on March 12, 2013. Id. ¶ 64.    Finally, regarding the '001 patent, Defendant alleges that Farr, Chambers, and Nielsen signed a false declaration on March 12, 2007, and that Teja filed such declaration with the PTO on December 16, 2009. Id. ¶ 65.

first inventor of each patent.   See Exergen, 575 F.3d at 1329; First Am. Answer & Countercls. ¶¶ 63-65.   And Defendants have identified how a patent examiner would use the allegedly false misrepresentation in assessing the '204, '341, and '001 patents because the Court reasonably can infer from Defendants' inventorship allegations—assumed true for the purposes of resolving this motion—that the PTO would not have issued the patents with Farr as an inventor if it had known that Farr had not contributed to such patents.   See Exergen, 575 F.3d at 1330.

The adequacy of Defendants' allegations regarding the "what" of inequitable conduct based on Farr's inventorship is a somewhat closer question.   The core of Defendants' allegations with respect to Farr is that the declarations indicating that Farr was an inventor of the '204, '341, and '001 patents were misrepresentations because Farr has admitted that he was not involved in the conception of the idea that became the e-Sketch product, the embodiment of the asserted independent claims of such patents.   See First Am. Answer & Countercls. ¶ 66.   With respect to inventorship, the Federal Circuit has noted:

> Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention. . . . As to the required degree of contribution to conception, we have recognized that [t]he determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case. The underlying principle from our case law is that a joint inventor's contribution must be not insignificant in

quality, when that contribution is measured against the dimension of the full invention.

Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 776 F.3d 837, 845 (Fed. Cir. 2015) (alteration in original) (internal citations and quotation marks omitted). In addition, "a co-inventor need not make a contribution to every claim of a patent. A contribution to one claim is enough. Thus, the critical question for joint conception is who conceived, as that term is used in the patent law, the subject matter of the claims at issue." Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998) (internal citations omitted).

The Court finds that Defendants' allegations regarding the "what" of the alleged misrepresentations as to Farr are sufficient to survive Plaintiff's motion to dismiss. Plaintiff correctly notes that inventorship depends on the extent to which Farr contributed to the conception of the claims of the '204, '341, and '001 patents—rather than Farr's contribution to the embodiment of such claims—and that Farr need only have contributed to one claim of each such patent to qualify as an inventor thereof. Admittedly, Defendants have not expressly alleged that Farr did not contribute to any single claim of the '204, '341, and '001 patents. However, Defendants have alleged that Farr "admitted under oath that he was not involved in conception of the idea that became the e-Sketch product, which

22

is Plaintiff's embodiment of the asserted independent claims of the Patents-in-Suit." First Am. Answer & Countercls. ¶ 66. While such allegation is not equivalent to an allegation that Farr did not contribute to the conception of any claim of the '204, '341, and '001 patents, to the extent that the e-Sketch product is Plaintiff's embodiment of the claims of such patents, if Farr was not involved in conceiving the idea that became such product, the Court reasonably can infer that he did not contribute to any claim of the '204, '341, and '001 patents. In other words, the Court recognizes the distinction between contributing to one of a patent's claims and contributing to the embodiment of a patent's claims, but finds that Defendants' allegation that Farr did not contribute even to the idea that ultimately became the product embodying the '204, '341, and '001 patents' independent claims permits the reasonable inference that Farr was not sufficiently involved in the conception of such patents' claims to qualify as an inventor.[7]  Therefore,

---

[7] It is worth noting that Defendants allege that "Block was the 'primary developer' at 'the genesis' of what became the e-Sketch product that Nielsen, Chambers, and Farr later sought to patent" and that "Block was the 'architect' and 'responsible for the overall design' of the project that Nielsen, Chambers, and Farr later sought to patent." First Am. Answer & Countercls. ¶ 69 (emphasis added). Those allegations permit the reasonable inference that Block and others developed the e-Sketch product, and Nielsen, Chambers, and Farr subsequently sought to patent the technology embodied therein, as opposed to Nielsen, Chambers, and Farr developing the e-Sketch product with a view, from the start, towards obtaining patents on the technology therein. To the extent Defendants allege that Farr has admitted that he was not involved in developing the e-Sketch product,

Defendants have adequately alleged the who, what, when, where, and how of the alleged inequitable conduct relating to Farr's inventorship.

As to Farr's inventorship, Defendants also have adequately pleaded materiality and intent. Contrary to Plaintiff's assertion, the Federal Circuit has held that misrepresentations regarding inventorship are material. See Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., 607 F.3d 817, 828 (Fed. Cir. 2010) (citations omitted); Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd., 292 F.3d 1363, 1377 (Fed. Cir. 2002); PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1322 (Fed. Cir. 2000). Thus, Defendants' allegation that Farr, Chambers, Nielsen, and Teja misrepresented Farr's inventorship satisfies the materiality element of an inequitable conduct claim. Furthermore, Defendants have also sufficiently pleaded that, at a minimum, Farr misrepresented his inventorship with the specific intent to deceive the PTO. Plaintiff correctly notes that, as a general rule, a defendant cannot satisfy Rule 9(b) by pleading deceptive intent solely on information and belief. See Exergen, 575 F.3d at 1330. However, in this case, in addition to Defendants' conclusory

---

the allegation that Nielsen, Chambers, and Farr sought to patent the e-Sketch product subsequent to its development arguably renders even more reasonable the inference that Farr did not contribute to any claim of the '204, '341, and '001 patents.

allegations that "on information and belief, Farr's false statements regarding inventorship were made with the specific intent to deceive," First Am. Answer & Countercls. ¶ 68, Defendants allege facts that, if true, allow the Court to reasonably infer that Farr misrepresented his inventorship to the PTO with the specific intent to deceive such office.   The allegation that the prosecuting attorney, "Teja[,] discussed with Farr whether he should be named as an inventor or co-inventor on any patent applications," id. ¶ 66, permits the Court to reasonably infer that Farr was aware of the requirement that he contribute to the conception of at least one claim of the '204, '341, and '001 patents to qualify as an inventor thereof.   When combined with the allegation that Farr himself has admitted that he was not involved in the conception of the idea that became the product embodying the asserted independent claims of the patents-in-suit, the allegation that Farr met with Teja and specifically discussed whether Farr should be named as an inventor permits the Court to reasonably infer that Farr had the specific intent to deceive the PTO when he signed the declarations that listed himself as an inventor.   Furthermore, Defendants' allegations that Farr met with Teja and discussed whether he should be listed as a named inventor on the '204, '359, '344, and '359 patents, see id. ¶ 71, but that Farr was not named as an inventor on the '359 and '344 patents, see id.

at 26 n.1, bolsters the reasonableness of inferring that Farr possessed the specific intent to deceive the PTO because it suggests that Farr reflected upon the quantum of contribution necessary to qualify as an inventor and then consciously chose to name himself as an inventor on some patents, but not others.[8] In short, the Court finds that Defendants have stated an inequitable conduct claim based on misrepresentations about Farr's inventorship. Thus, the Court will **DENY IN PART** Plaintiff's motion as to such claim.[9]

### b. Block

Defendants' allegations regarding Block's inventorship are essentially the converse of their allegations regarding Farr's alleged non-inventorship. Defendants allege that Plaintiff engaged in inequitable conduct when Nielsen, Farr, Chambers, and Teja failed to disclose Block as an inventor of the '204, '359, '344, and '341 patents. First Am. Answer & Countercls. ¶ 68.

---

[8] In its motion to dismiss, numerous times, Plaintiff raises arguments based on facts not present in Defendants' First Amended Answer and Counterclaims. For example, Plaintiff asserts that it would not "have made sense for CertusView to 'intend to deceive' the Patent Office about the inventorship status of Mr. Farr or Mr. Block" because both were obligated to assign their rights to Plaintiff. Pl.'s Mot. to Dismiss at 9. In attempting to rely on facts not present in Defendants' First Amended Answer and Counterclaims, Plaintiff ignores the standard of review applicable to its Rule 12(b)(6) motion. Accordingly, the Court need not address any argument Plaintiff has raised based on facts not appearing within the First Amended Answer and Counterclaims.

[9] The Court notes that, ultimately, to meet their burden of proof, Defendants will have to present evidence to substantiate their allegations of inequitable conduct. At this juncture, however, the Court concerns itself only with Defendants' allegations.

Defendants allege that Block "contributed in a significant manner to the conception and reduction to practice of the e-Sketch product," "was the 'primary developer' at 'the genesis' of what became the e-Sketch product that Nielsen, Chambers, and Farr later sought to patent," and "built the e-Sketch prototype and wrote much of the code himself for the prototype." Id. ¶ 69. Despite such alleged participation in the development of the e-Sketch product, Defendants allege that Nielsen and Chambers failed to name Block in declarations submitted during prosecution of the '204, '359, '344, and '341 patents, and that Farr failed to name Block in declarations submitted during prosecution of the '204 and '341 patents. See First Am. Answer & Countercls. ¶ 71 & 26 n.1. Moreover, according to Defendants, "Nielsen, Chambers, and Farr were actively involved . . . in identifying who would be named as purported inventors, and in reviewing in advance written submissions to the [PTO]." Id. ¶ 60. Defendants also allege that "Teja knew the standard for being named as an inventor or co-inventor, and discussed inventorship with Farr, Chambers, and Nielsen in connection with listing them as named inventors on the '204, '359, '344, and '341 patents." Id. ¶ 71.

Plaintiff challenges the sufficiency of Defendants' allegation with respect to Block for reasons similar to those asserted regarding Farr. In particular, Plaintiff argues that

27

Defendants' allegations that Block contributed to the conception of the e-Sketch product, which is the <u>embodiment</u> of the independent claims of the patents-in-suit, do not permit the reasonable inference that Block contributed to any <u>claim</u> of the '204, '359, '344, and '341 patents and that Defendants have failed to allege materiality or deceptive intent.  <u>See</u> Pl.'s Mot. to Dismiss at 7-9.

Like Defendants' inequitable conduct allegations regarding Farr's inventorship, or alleged lack thereof, Defendants have plausibly alleged an inequitable conduct claim based on misrepresentations of Block's inventorship.  As with the allegations regarding Farr's inventorship, the allegations that Farr, Nielsen, Chambers, and Teja submitted false declarations to the PTO during prosecution of the '204 and '341 patents, and that Nielsen, Chambers, and Teja did so during prosecution of the '344 patents and '359 patents are sufficient to satisfy the who, where, when, and how of an inequitable conduct claim.  <u>See</u> <u>supra</u> Part III.B.1.a; First Am. Answer & Countercls. ¶¶ 68-71. And, again like the Farr-inventorship allegations, Defendants' allegations that Block contributed to the conception of the e-Sketch product permit the Court to reasonably infer that Block contributed to the conception of at least one of the claims of the '204, '341, '344, and '359 patents.  Indeed, Defendants have alleged, in detail, that Block: "was the 'primary developer' at

'the genesis' of what became the e-Sketch product that Nielsen, Chambers, and Farr subsequently sought to patent," "'envisioned' the concept that became the e-Sketch product," "was the 'architect' and 'responsible for the overall design' of the project that Nielsen, Chambers, and Farr later sought to patent," and "built the e-Sketch prototype and wrote much of the code himself for the prototype." First Am. Answer & Countercls. ¶ 69. At the motion-to-dismiss stage, such allegations are sufficient for the Court to reasonably infer that Block contributed to the claims of the '204, '359, '344, and '341 patents and that Nielsen, Chambers, and Teja—as well as Farr, as to the '204 and '341 patents—misrepresented the inventorship of such patents by failing to name Block as an inventor.

The Court also concludes that Defendants have adequately alleged materiality and deceptive intent. For the same reasons stated above, the alleged misrepresentation of Block's inventorship is material. See, e.g., Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., 607 F.3d 817, 828 (Fed. Cir. 2010) (citations omitted); supra Part III.B.1.a. Furthermore, the Court finds that Defendants have alleged sufficient factual matter to permit a reasonable inference that Farr, Nielsen, Chambers, and Teja misrepresented Block's inventorship, by submitting declarations that did not list him as an inventor, with the specific intent to deceive the PTO.

Defendants have alleged that Farr, Chambers, and Nielsen were "actively involved . . . in identifying who would be named as purported inventors," First Am. Answer & Countercls. ¶ 60, and that "Teja knew the standards for being named as an inventor or co-inventor, and discussed inventorship with Farr, Chambers, and Nielsen in connection with listing them as named inventors on the '204, '359, '344, and '341 patents," id. ¶ 71. Such allegations permit the reasonable inference that Farr, Chambers, Nielsen, and Teja understood the standard for inventorship prior to filing the declarations regarding inventorship. Considered in combination with the allegations of Block's significant contribution to the conception of the embodiment of the '204, '341, '344, and '359 patents—the e-Sketch product—including the allegations that Block "envisioned the concept that became the e-Sketch product" and "was the architect and responsible for the overall design of the project that Nielsen, Chambers, and Farr later sought to patent," id. ¶ 69 (internal quotation marks omitted), the Court reasonably can infer that Farr, Chambers, Nielsen, and Teja omitted Block as a named inventor in the declarations with a specific intent to deceive the PTO. Therefore, the Court will not dismiss Defendants' inequitable conduct counterclaim based on Block's inventorship and will **DENY IN PART** Plaintiff's motion as to such claim.

## 2. Failure to Disclose Prior Art

Second, Defendants allege that Plaintiff engaged in inequitable conduct by failing to disclose material prior art during the prosecution of the patents-in-suit. More specifically, Defendants allege that Plaintiff failed to disclose the following material prior art: (1) the "TelDig Utility Suite product;" and (2) the "ESRI ArcPad software." Id. ¶¶ 82, 85. The Court will consider, in turn, Defendants' allegations with respect to each item of alleged prior art. However, before turning to Defendants' specific allegations with respect to TelDig Systems, Inc.'s ("TelDig") Utility Suite product and ESRI's ArcPad Software, the Court will set forth Defendants' general allegations regarding Plaintiff's prior art searches because such allegations pertain to both TelDig's and ESRI's alleged prior art.

Defendants allege that "[b]eginning in 2008 at the latest, Dycom[—Plaintiff's parent company—], Nielsen, Chambers, Farr, and Teja embarked on a plan to blanket their business sector with patent applications." Id. ¶ 60. According to Defendants, in April 2008, Plaintiff engaged a "third-party consulting company, Commercial Strategy, LLC, which is in the business of providing strategic management and intellectual property consulting in support of innovation and growth initiatives." Id. ¶ 75. "As part of its engagement, Commercial Strategy was

31

asked to do a study and prepare a report on the prior art products and services that were material to the technology that Dycom was working on, specifically the e-Sketch technology that Nielsen, Chambers, and Farr later sought to patent and resulted in the patents asserted in this case." Id. ¶ 76. Defendants allege that this study generated the "Market Intelligence Report" ("MIR"). See id. ¶ 76. "The MIR stated that, '[t]he objective of this study is to analyze companies (industry players) of interest to Dycom for the express purpose of understanding . . .' each company and its intellectual property." Id. ¶ 77 (alteration in original). Thus, according to Defendants, "[t]he MIR identified a 'Target List' of companies and 'a profile of each company from the Target List that was found of interest and therefore found to be highly relevant to Dycom objectives." Id. Additionally, Defendants allege that the MIR "contained discussion of material prior art specifically identified . . . as highly relevant to what [Plaintiff] sought to patent." Id. According to Defendants, "[t]hroughout the prosecution of the asserted patents, representatives of Dycom and CertusView, including Nielsen, Chambers, and Farr, were actively involved in the prosecution, in what would be submitted to and what would be withheld from the [PTO], . . . and in reviewing in advance written submissions to the [PTO]." Id. ¶ 60.

32

### a. TelDig Utility Suite

Regarding failure to disclose material prior art, Defendants first allege that Plaintiff's failure to disclose the TelDig Utility Suite product constitutes inequitable conduct. In addition to the general allegations set forth above, Defendants allege that the MIR identified TelDig as a company "having technology 'highly relevant' to what Dycom was pursuing." Id. ¶ 77. Therefore, the MIR included "a five-page discussion regarding [TelDig]" and stated that "[o]f particular interest is the TelDig Utility Suite product which appears similar to the eSketch concept." Id. ¶ 79. On that basis, according to Defendants, the MIR concluded that "[a]t this time it does appear that TelDig is investing in solving problems that Dycom is interested in." Id.

More specifically, according to Defendants, the MIR's discussion "ma[de] clear that TelDig's technology does more than just ticket management." Id. ¶ 81. Defendants allege that the MIR stated that "TelDig Utility Suite 'has the unique capability to receive sketches and maps, edit them if necessary and send them out with the locate ticket in a totally paperless process.'" Id. Moreover, Defendants allege the MIR also stated that "in addition to ticket management, TelDig's technology has wireless data sharing, mapping and GIS, and image and audio storage capabilities." Id. Indeed, according to Defendants,

"Nielsen, Chambers, and Farr knew that the TelDig technology was much more than just 'ticket management software.'" Id. Yet, Defendants allege that "Teja did not receive the MIR, and was told by Nielsen, Chambers and Farr that TelDig's technology was merely 'ticket management software.'" Id.

Defendants allege that "[d]espite the fact that Nielsen and Chambers were aware of the materiality of the TelDig Utility Suite product at least as early as July 22, 2008, they never disclosed the TelDig Utility Suite product, or any TelDig prior art, for that matter, to the [PTO] during the prosecution of the Patents-in-Suit." Id. ¶ 82. According to Defendants, "[d]uring prosecution of the '204, '001, '359, '344, and '341 [p]atents, the [PTO] concluded that the cited prior art did not disclose at least a digital representation of a physical locate mark, but this element is present in the TelDig Utility Suite product discussed in the MIR." Id. ¶ 83. Thus, Defendants allege that "[t]his element was not found by the examiners in any other cited prior art, and had the examiners of the [']204, '001, '359, '344, and '341 [p]atents known about the MIR and the TelDig Utility Suite product disclosed therein, the Patents-in-Suit would not have issued." Id.

Under Exergen, Defendants must allege the "who, what, when, where, and how" of the alleged failure to disclose prior art. 575 F.3d at 1328. Defendants have adequately alleged the "who"

34

of the alleged inequitable conduct by alleging that Nielsen and Chambers failed to disclose the TelDig Utility Suite product to the PTO. Id. ¶ 82. Defendants have also adequately alleged the "when" of the alleged inequitable conduct by alleging that Nielsen and Chambers were aware of the TelDig Utility Suite product as early as the July 22, 2008 MIR, but never disclosed such alleged prior art to the PTO. See id. ¶¶ 81-82. Similarly, Defendants sufficiently have alleged "where" the material information allegedly withheld from the PTO can be found within the alleged omission by identifying the TelDig Utility Suite product and the allegedly material feature of such product—the "digital representation of a physical locate mark," First Am. Answer & Countercls. ¶ 83. See Keystone Global LLC v. Décor Essentials Ltd., No. 12 Civ. 9077(DLC), 2014 WL 888336, at *2 (S.D.N.Y. Mar. 6, 2014) (finding that factual allegations satisfied Rule 9(b)'s requirements, in part, by specifying the piece of prior art, a product, that the applicants allegedly failed to disclose to the PTO). And Defendants have adequately alleged "'how' an examiner would have used [the allegedly withheld] information in assessing the patentability of the claims." Exergen, 575 F.3d at 1329-30. Defendants allege that "the cited prior art did not disclose at least a digital representation of a physical locate mark, but this element is

35

present in the TelDig Utility Suite product,"[10] First Am. Answer & Countercls. ¶ 83, and such allegation identifies "the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record," Exergen, 575 F.3d at 1329-30, namely, the "digital representation of a physical locate mark."[11]

However, Defendants have failed to allege the "what" of the inequitable conduct claim predicated on the nondisclosure of the TelDig Utility Suite product. To satisfy the "what" requirement, Defendants must identify to "which claims, and

_____

[10] Plaintiff contends that Defendants' allegation that a "digital representation of a physical locate mark" was present in the TelDig Utility Suite product "is simply a misrepresentation of the record" because "the TelDig material does not say anything about a digital representation of a physical locate mark." Pl.'s Mot. to Dismiss at 10. The Court notes that it must accept the truth of Defendants' allegations at this juncture.

[11] Plaintiff contends that Defendants have failed to identify "how an examiner would have used" the TelDig Utility Suite product information "in assessing the patentability of the claims" because Defendants "have not allege[d] that TelDig anticipates, and mak[e] no effort to explain how an examiner might have used TelDig in combination with other references to invalidate any claim." Pl.'s Mot. to Dismiss at 10. In a nontechnical sense, Plaintiff is correct that explaining the specifics of how the TelDig Utility Suite product would anticipate, or render obvious, the claims of the patents-in-suit would identify how an examiner would use the information about the TelDig Utility Suite product. However, the Federal Circuit has equated explaining "'how' an examiner would have used [the] information in assessing the patentability of the claims" with "identify[ing] the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record." Exergen, 575 F.3d at 1329-30. Defendants have done so here. While a more in-depth explanation of the relationship between the TelDig Utility Suite product, other prior art, and the claims of the patents-in-suit might improve Defendants' allegations, the absence of such an explanation is not fatal to Defendants' claim.

which limitations in those claims, the withheld references are relevant." Exergen, 575 F.3d at 1329.  Here, Defendants have failed to satisfy that requirement because they do not identify any specific claims, much less any claim limitations, to which the TelDig Utility Suite product's "digital representation of a physical locate mark" element is relevant.[12]  Accordingly, the Court concludes that Defendants have failed to plead with particularity an inequitable conduct claim predicated on the alleged nondisclosure of the TelDig Utility Suite product because Defendants have not sufficiently alleged the "what" of the alleged inequitable conduct.[13]  The Court will **GRANT IN PART**

---

[12] In the Court's Opinion and Order, ECF No. 250, on Defendants' motion for judgment on the pleadings, in assessing whether the asserted claims of the patents-in-suit were directed to patent-eligible subject matter, the Court conducted an element-by-element analysis of the fifteen asserted claims.  Thus, the Court is well aware that many of the claims of the patents-in-suit include a "digital representation of a physical locate mark."  But Defendants have not identified such claims in their First Amended Answer and Counterclaims.  Therefore, the Court must conclude that Defendants' allegations are deficient, even though the Court is aware that claims of the patents-in-suit include as a limitation the digital representation of a physical locate mark allegedly present in the TelDig Utility Suite product.

[13] The Court notes that, if Defendants had adequately alleged the "what" of the inequitable conduct regarding the TelDig Utility Suite product, Defendants' allegations permit the Court to reasonably infer that Nielsen and Chambers did not disclose such product because they had the specific intent to deceive the PTO.  This inference is reasonable based on the allegations that: Nielsen and Chambers, along with others, were part of a strategic plan to "blanket their business sector with patent applications," First Am. Answer ¶ 60; Nielsen and Chambers "were actively involved in the prosecution [of the patents-in-suit], in what would be submitted to and what would be withheld from the [PTO], id.; Plaintiff commissioned Commercial Strategy to "prepare a report on prior art products and services that were

37

Plaintiff's motion to dismiss regarding the inequitable conduct claim predicated on the alleged nondisclosure of the TelDig Utility Suite product.

### b. ESRI ArcPad Software

Defendants next allege that Plaintiff engaged in inequitable conduct by failing to disclose the ESRI ArcPad software. Along with the general allegations set forth above, Defendants allege that the MIR included a "nine-page discussion regarding ESRI" and stated that "many [ESRI] applications[,] including the ArcPad software, read very closely to the eSketch concept." Id. ¶ 84 (alterations in original). As alleged by Defendants, "the MIR state[d] that ESRI's technology included the following: GPS, wireless data sharing, data analysis, ticket management, utilization management, mapping and GIS, and image and audio storage." Id. The MIR also concluded that "ESRI does appear to be investing in problems Dycom is interested in solving." Id. (emphasis omitted).

---

material to the technology that Dycom was working on, specifically the e-Sketch technology that Nielsen, Chambers, and Farr later sought to patent and resulted in the patents asserted in this case," id. ¶ 76; the MIR created by Commercial Strategy discussed the TelDig Utility Suite product and indicated that it contained more than just ticket management software, id. ¶ 81; and, notwithstanding, Nielsen and Chambers told Teja that TelDig's technology was merely ticket management software, id. Based on those allegations, the Court can reasonably infer that Nielsen and Chambers "(1) knew of the withheld material information . . . and (2) withheld . . . this information with a specific intent to deceive the PTO." See Exergen, 575 F.3d at 1328-29.

Defendants allege that "[d]uring prosecution of the '204 and '344 [p]atents, the [PTO] concluded that the cited prior art did not disclose at least a digital representation of a physical locate mark, but this element is present in the ESRI ArcPad software discussed in the MIR." Id. ¶ 90. Moreover, according to Defendants, "[t]his element was not found by examiners in any other cited prior art, and had examiners of the '204 and '344 [p]atents known about the MIR and the ESRI ArcPad software disclosed therein, the '204 and '344 [p]atents would not have issued." Id.

Defendants allege that Nielsen and Chambers were "put on express notice of the materiality of the ESRI ArcPad software to that which they sought to patent as early as July 22, 2008." Id. ¶ 85. However, according to Defendants, Nielsen and Chambers did not disclose the ESRI ArcPad software or other ESRI prior art to the PTO during prosecution of the '344 patent. Id. Furthermore, Defendants allege that Nielsen and Chambers did not disclose the ESRI ArcPad software or other ESRI prior art to the PTO during the prosecution of the '204 patent, although they did disclose the ESRI ArcPad software roughly two weeks prior to the issuance of the '204 patent, but only in connection with the prosecution of the '359 patent and another patent. According to Defendants, Plaintiff also disclosed the ESRI ArcPad software during prosecution of the '001 and '341 patents. See id. ¶ 88.

39

The now-familiar Exergen standard governs the sufficiency of Defendants' pleading with respect to the inequitable conduct claims predicated on the nondisclosure of the ESRI ArcPad software during the prosecution of the '204 and '344 patents. In light of the similarity between Defendants' allegations regarding the TelDig Utility Suite product and the ESRI ArcPad software, the Court's analysis of Defendants' alleged inequitable conduct claim with respect to the TelDig Utility Suite product and the ESRI ArcPad software is the same. Defendants have adequately alleged the who, when, where, and how of an inequitable conduct claim with respect to the nondisclosure of the ESRI ArcPad software. See Exergen, 575 F.3d at 1328-30; First Am. Answer & Countercls. ¶¶ 82-90; supra Part III.B.1. However, Defendants have not alleged the "what" because they have failed to identify the claims, and limitations within such claims, to which the ESRI ArcPad software's alleged element of a digital representation of a physical locate mark is relevant. See Exergen 575 F.3d at 1329. Accordingly—though the Court is aware that claims within the '204 and '344 patents reference a digital representation of a physical locate mark, see supra note 12—Defendants have failed to plead with particularity an inequitable conduct claim based on nondisclosure of the ESRI ArcPad software during the prosecution

40

of the '204 and '344 patents.[14]  Therefore, the Court will **GRANT IN PART** Plaintiff's motion to dismiss as to such inequitable conduct allegations.

### 3. Misrepresentation of Prior Art

In the third and final subset of inequitable conduct allegations, Defendants assert that Plaintiff engaged in inequitable conduct during the prosecution of the '344 patent because, "to overcome a rejection of all pending claims under 35 U.S.C. § 103(a),[15] Nielsen, Chambers, and Teja misrepresented two prior art references: (1) U.S. Pub. No. 2007/0219722 ("Sawyer"); and (2) U.S. Pub. No. 2006/0077095 ("Tucker").  First Am. Answer & Countercls. ¶ 92.  Defendants allege that, on October 6, 2011, the examiner "reject[ed] claims 1-26 of U.S. Patent Application No. 12/366,050, which ultimately issued as the '344 patent, under 35 U.S.C. § 103(a) based on [Sawyer] in view of [Tucker]."  Id. ¶ 94.  In response to such office action, "Defendants allege

---

[14] For the same reasons stated supra note 13, if Defendants had adequately alleged the "what" with respect to nondisclosure of the ESRI ArcPad software, the First Amended Answer contains sufficient allegations for the Court reasonably to infer that Nielsen and Chambers failed to disclose the ESRI ArcPad software during the prosecution of the '204 and '344 patents because they possessed the specific intent to deceive the PTO.

[15] Section 103(a) governs non-obviousness and provides: "A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made."  35 U.S.C. § 103(a).

41

that Teja, Nielsen, and Chambers made the following arguments to

the PTO:

> No new matter is added by the amendments herein.
> In particular, the amendments to the independent
> claims are based at least in part on moving language
> previously recited in the preamble to the body of the
> claims so as to clarify the recitation of a "locate
> operation," which is **completely absent from the cited
> prior art references.**
> Further support for the claim amendments relating
> to a locate "ticket" can be found throughout
> Applicant's specification as originally filed (e.g.,
> see paragraphs [002], [003], [0023], [0045] and
> [0046]). As with "locate operation," the concept of a
> **locate ticket** including information identifying a dig
> area to be excavated or disturbed during planned
> excavation activities, as now recited in Applicant's
> independent claims, is **completely absent from the
> cited prior art references.**
> Accordingly, the application as now presented is
> believed to be in allowable condition.

Id. ¶ 96 (emphasis in original). Defendants further allege that

"the language shown in bold above is shown in bold, for

emphasis, in the original filed with the [PTO]" and that the

"cited prior art references" are Tucker and Sawyer. Id.

Defendants allege that the above-quoted statement of

Chambers, Nielsen, and Teja, "including the language shown . . .

in bold for emphasis," in response to the October 6, 2011 office

action, was false. Id. ¶ 97. Specifically, Defendants allege

that "the concepts of a locate operation and a locate ticket are

clearly present in these prior art references." Id. In support

of such allegation, Defendants allege that Paragraph 44 of

Sawyer "clearly discloses the concepts of a locate operation and

locate ticket" and Defendants set forth the portion of such paragraph in Sawyer. Id. ¶ 98. Defendants also allege that Tucker "clearly describes a locate operation, for example in claims 1 and 6," and Defendants set forth such claims in Tucker. Id. ¶ 99.

Defendants allege that Chambers, Nielsen, and Teja made additional false statements in another portion of their response to the October 6, 2011 office action. According to Defendants, Chambers, Nielsen, and Teja told the examiner that ". . . Tucker . . . is **not concerned with locate operations** to identify a presence or absence of underground facilities within a specified dig area in advance of planned excavation activities at the dig area." Id. ¶ 100 (emphasis in original). Likewise, Defendants allege that Chambers, Nielsen, and Teja told the examiner that "Sawyer . . . **is not concerned with locate operations** to identify a presence or absence of underground facilities within a specified dig area in advance of planned excavation activities in the dig area." Id. ¶ 101 (emphasis in original). According to Defendants, those two statements regarding Tucker and Sawyer were a "misrepresentation of the prior art" and "unmistakably false." Id. ¶¶ 100-01. Defendants allege that "Tucker is in fact concerned with locate operations to identify the presence or absence of underground facilities within a specified dig area in advance of [] planned excavation activities in the dig area."

Id. ¶ 100.  Likewise, according to Defendants, "Sawyer is in fact concerned with locate operations to identify the presence or absence of underground facilities within a specified dig area in advance of planned excavation activities in the dig area." Id. ¶ 101.

Defendants allege that "[g]iven that these statements were made with emphasis to the [PTO], and they were blatantly incorrect, the single most likely inference that can be drawn from the facts alleged is that they were made with specific intent to deceive the [PTO]." Id. ¶ 106.  Additionally, Defendants allege that the "egregiousness of Teja, Nielsen, and Chambers' misrepresentations" is evidenced by the fact that, "according to Page Tucker, one of the named inventors on both the Tucker and Sawyer references . . ., the concepts of a 'locate operation' and a 'locate ticket' are 'clearly present' in the cited Tucker and Sawyer prior art references." Id. ¶ 103.  Defendants allege that "Mr. Tucker does not know how one could have actually read his patents and made the statements that Teja, Nielsen, and Chambers made about them during prosecution." Id.

According to Defendants, "[t]he examiner would not have allowed claims 1-26 of the '344 [p]atent had he been aware of these unmistakably false statements regarding the prior art." Id. ¶ 106.  Defendants allege that, although the examiner issued

44

another office action rejecting the claims of the '344 patent on a different basis, the examiner "accepted as true" "the unmistakably false statements regarding the Tucker and Sawyer references." Id. Defendants assert that, after Teja responded to the examiner's rejection of the claims on a different basis than obviousness in light of Sawyer and Tucker, the examiner found Teja's remarks to be persuasive and concluded that Tucker, Sawyer, and another reference "do not reach or suggest the features of claims or the newly added features." Id. Yet, Defendants allege, "[h]ad the examiner known that the statements regarding [Tucker] and [Sawyer] in the stated office action response were false, the examiner would not have issued the claims." Id.

Defendants have pleaded with particularity an inequitable conduct claim based on the alleged misrepresentation of Tucker and Sawyer during the prosecution of the '344 patent. Defendants have alleged the "who" with respect to Tucker and Sawyer by identifying Nielsen, Chambers, and Teja as the persons who allegedly misrepresented the Tucker and Sawyer prior art. See Exergen, 575 F.3d at 1328-29; First Am. Answer & Countercls. ¶¶ 92. Defendants have satisfied the "what" requirement by identifying claims 1-26 of the '344 patent, and by specifying that, following the examiner's rejection of claims 1-26 as obvious based on Sawyer in view of Tucker, Chambers, Nielsen,

45

and Teja emphasized that the "recitation of a 'locate operation'" and the "concept of a locate ticket including information identifying a dig area to be excavated or disturbed during planned excavation activities" rendered the claims of the '344 patent "allowable." See Exergen, 575 F.3d at 1329; First Am. Answer & Countercls. ¶¶ 94, 96. Additionally, Defendants have sufficiently identified the "what" of the alleged inequitable conduct by identifying the specific allegedly false statements regarding Tucker and Sawyer within Teja's response to the October 6, 2011 office action. See First Am. Answer & Countercls. ¶¶ 96, 100-101. Likewise, Defendants have adequately pleaded "when" the inequitable conduct occurred: in the response to the October 6, 2011 office action during the prosecution of the '344 patent. See Exergen, 575 F.3d at 1329. And Defendants have identified "where" in the Tucker and Sawyer references the information that allegedly renders false Defendants' statements regarding Tucker and Sawyer can be found: Paragraph 44 of Sawyer, First Am. Answer & Countercls. ¶ 98, and claims 1 and 6 of Tucker, id. ¶ 99. See Exergen, 575 F.3d at 1329. Finally, Defendants have identified "how" the examiner would have used the information that Chambers, Nielsen, and Teja allegedly misrepresented because they have alleged that Tucker and Sawyer both described a locate operation, First Am. Answer & Countercls. ¶¶ 98-99, and that the examiner considered the

46

alleged misrepresentations regarding Tucker and Sawyer to reevaluate the examiner's prior assessment that claims 1-26 were obvious based on Sawyer in view of Tucker, First Am. Answer & Countercls. ¶¶ 94,106.  Therefore, the Court concludes that Defendants have adequately alleged the who, what, when, where, and how of Plaintiff's alleged inequitable conduct through misrepresentation of Tucker and Sawyer.

The Court also finds that Defendants have alleged sufficient facts to show that the misrepresentation regarding Tucker and Sawyer was material, at least for the purposes of surviving the instant motion.[16]  Defendants allege that the examiner had rejected claims 1-26 of the '344 patent because they were obvious based on Sawyer in view of Tucker.  Id. ¶ 94. Defendants allege that Chambers, Nielsen, and Teja then responded to such rejection by making misrepresentations about Tucker and Sawyer and the extent to which such references disclosed the concepts of a locate operation and locate ticket. Id. ¶¶ 96, 98-99.  According to Defendants, "the examiner accepted these statements as true, but issued another office action rejecting the claims on a different basis."  Id. ¶ 106. Ultimately, following Teja's response to the second office

---

[16] The Court notes that, to prevail on the merits, rather than simply plead their claim, Defendants must demonstrate, by clear and convincing evidence, but-for materiality with respect to any misrepresentation regarding the Sawyer or Tucker references. See Therasense, 649 F.3d at 1291-92.

action, the examiner found that "[t]he combination of cited references [Tucker], [Sawyer] and [another reference] do not reach or suggest the features of claims or the newly added features." Id. Considering all the allegations regarding Tucker and Sawyer in the First Amended Answer, the Court concludes that Defendants have sufficiently pleaded materiality.[17]

Finally, the Court finds that Defendants have pleaded sufficient facts to allow the Court to reasonably infer that Chambers, Nielsen, and Teja made the allegedly false statements about Tucker and Sawyer with the specific intent to deceive the PTO. Defendants have alleged that Nielsen and Chambers were "actively involved in prosecution, in what would be submitted to and what would be withheld from the [PTO] . . . and in reviewing

---

[17] The Court rejects Plaintiff's contention that Defendants have failed to state a claim because "the allegations acknowledge on their face that the patent examiner was already in possession of and had reviewed the Tucker and Sawyer references," Pl.'s Mot. to Dismiss at 12. See W.L. Gore, 850 F. Supp. 2d at 636. The Court also rejects Plaintiff's contention that Defendants' claim fails because "the allegedly incorrect statements were not accepted by the examiner, and did not result in any claims being allowed." Pl.'s Mot. to Dismiss at 12. Defendants have expressly alleged that "the examiner accepted" the statements regarding Tucker and Sawyer. First Am. Answer ¶ 106. The Court cannot disregard Defendants' allegations in favor of a factual assertion by Plaintiff. See Kensington Volunteer Fire Dep't v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012). To the extent that Plaintiff attempts to attack the sufficiency of Defendants' First Amended Answer and Counterclaims by relying on documents in the prosecution history of the '344 patent, the Court declines to consider such documents because they are not attached to the First Amended Answer and Counterclaims, much less "integral to" such pleading. Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir. 2014) (citations omitted).

in advance written submissions to the [PTO]." First Am. Answer & Countercls. ¶ 60. Defendants allege that, according to Mr. Tucker, the concepts of a locate operation and locate ticket are clearly present in Tucker and Sawyer. Id. ¶ 103. However, Defendants allege that, in response to the examiner's rejection of the claims of the '344 patent as obvious in view of Tucker and Sawyer, Nielsen, Chambers, and Teja falsely stated that the concept of a locate operation and locate ticket including information identifying a dig area to be excavated or disturbed during planned excavation activities were completely absent from the prior art and that Tucker and Sawyer did not concern locate operations. Id. ¶¶ 94, 96, 98-101. Indeed, according to Defendants, Chambers, Nielsen, and Teja made such statements "in bold, for emphasis." Id. ¶ 96. Considering those allegations in light of the other allegations in the First Amended Answer, for the purposes of this motion, the Court finds that it can reasonably infer that Chambers, Nielsen, and Teja knew of the falsity of their statements with respect to Tucker and Sawyer and misrepresented the contents of Tucker and Sawyer with a specific intent to deceive the PTO. Accordingly, the Court will **DENY IN PART** Plaintiff's motion to dismiss as to Defendants' inequitable conduct allegations based on misrepresentations of the Tucker and Sawyer references.

## C. Leave to Amend

Although the parties failed to raise the issue, having granted in part Plaintiff's motion to dismiss, the Court must consider whether to grant Defendants leave to amend their First Amended Answer and Counterclaims to correct the deficiencies therein.  Courts ordinarily grant leave to amend following a dismissal for failure to satisfy Rule 9(b)'s particularity requirement.  See In re BP Lubricants USA Inc., 637 F.3d 1307, 1313 (Fed. Cir. 2011) (citation omitted); see also Ostrzenski v. Seigel, 177 F.3d 245, 252-53 (4th Cir. 1999) (noting that courts normally grant leave to amend following a dismissal under Rule 12(b)(6)).  In considering whether to grant leave to amend, as noted above, "a district court may deny leave to amend if the amendment 'would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'"  U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 461 (4th Cir. 2013) (quoting Laber v. Harvey, 438 F.3d, 404, 426 (4th Cir. 2006)).  Here, in its motion to dismiss, Plaintiff did not indicate whether the Court should dismiss Defendants' First Amended Answer with, or without, prejudice.  However, there is no evidence of bad faith on the part of Defendants, nor prejudice to Plaintiff should the Court grant leave to amend.  Moreover, at this stage, the Court cannot say that it would be futile to grant Defendants leave to

amend their allegations with respect to failure to disclose the TelDig Utility Suite product and the ESRI ArcPad software because it is possible that Defendants may be able to allege additional facts to satisfy Rule 9(b)'s particularity requirement. Thus, the Court will dismiss such claims without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court **OVERRULES** Plaintiff's objections, ECF No. 256, to the magistrate judge's January 16, 2015 Order. The Court **GRANTS IN PART** and **DENIES IN PART** CertusView's Motion to Strike and in the Alternative Dismiss S&N's First Amended Answer and Counterclaims, ECF No. 260. The Court **DENIES** such motion with respect to Defendants' inequitable conduct counterclaims predicated on misrepresentation of inventorship and misrepresentation of prior art. The Court **GRANTS** such motion with respect to Defendants' inequitable conduct counterclaims predicated on failure to disclose the TelDig Utility Suite product and the ESRI ArcPad software and **DISMISSES WITHOUT PREJUDICE** such claims. However, the Court **PROVIDES** Defendants with leave to amend their First Amended Answer and Counterclaims to allege additional facts to satisfy Rule 9(b)'s requirements with respect to nondisclosure of the TelDig Utility Suite product and the ESRI ArcPad software. If Defendants fail to adequately amend such claims

within twenty-one (21) days after the entry of this Opinion and Order, the Court will dismiss such claims with prejudice.

Based on the Court's ruling on the instant motion and Rule 72 objections, Defendants' inequitable conduct counterclaims remain pending in this matter. Accordingly, although the Court has entered judgment in Defendants' favor on Plaintiff's infringement claims, the Court **DIRECTS** the Clerk of the Court to re-open this matter to allow Defendants to proceed with their inequitable conduct counterclaims.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____
/s/ Mark S. Davis
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 22 , 2015