**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| CERTUSVIEW TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 2:13-cv-346 (MSD/TEM) |
| | ) | |
| S & N LOCATING | ) | |
| SERVICES, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF CERTUSVIEW'S MOTION FOR SUMMARY
JUDGMENT ON S&N'S INEQUITABLE CONDUCT COUNTERCLAIMS**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 1

II.     UNDISPUTED FACTS ............................................................................ 1

III.    LEGAL BACKGROUND ......................................................................... 2

IV.     ARGUMENT ............................................................................................ 4

      A.      CertusView Is Entitled to Summary Judgment of
            No Inequitable Conduct Regarding Inventorship
            Because There Can Be No But-For Materiality ................................ 5

      B.      CertusView Is Entitled to Summary Judgment of No Inequitable
            Conduct on S&N's Allegation That Jeffrey Farr Should Not Have
            Been Named As An Inventor ............................................................. 7

            1.      There Is No Evidence of Any Material Misrepresentation ....................... 7

            2.      There Is No Evidence of Improper Intent ................................. 11

      C.      CertusView Is Entitled to Summary Judgment of
            No Inequitable Conduct on S&N's Allegation That
            Greg Block Should Have Been Named As An Inventor ...................... 14

            1.      There Is No Evidence of Any Material Misrepresentation ..................... 17

            2.      There Is No Evidence of Improper Intent ................................. 19

      D.      CertusView Is Entitled to Summary Judgment of No
            Inequitable Conduct on S&N's Allegation  That CertusView
            Improperly Withheld "TelDig" and "ESRI" ...................................... 20

            1.      There Is No Evidence of Materiality Regarding TelDig ......................... 20

            2.      There Is No Evidence of Materiality Regarding ESRI ........................... 21

            3.      There Is No Evidence of Improper Intent ................................. 22

      E.      CertusView Is Entitled to Summary Judgment of
            No Inequitable Conduct on S&N's Allegation That
            CertusView Made Misrepresentations to the Patent Office
            Concerning "Tucker" and "Sawyer" ................................................ 24

            1.      There Is No Evidence of Any Material Misrepresentation ..................... 25

            2.      There Is No Evidence of Improper Intent ................................. 30

V.      CONCLUSION ......................................................................................... 30

## TABLE OF AUTHORITIES

*Cases*

*1st Media, LLC v. Elec. Arts, Inc.*,
    694 F.3d 1367 (Fed. Cir. 2012)...................................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................ 2

*Antares Pharma, Inc. v. Medac Pharma Inc.*,
    771 F.3d 1354 (Fed. Cir. 2014)...................................................................... 8

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    776 F.3d 837 (Fed. Cir. 2015)....................................................................... 18

*Bd. of Educ. v. Am. BioScience, Inc.*,
    333 F.3d 1330 (Fed. Cir. 2003)...................................................................... 7

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................ 5

*Digital Control Inc. v. Charles Mach. Works*,
    437 F.3d 1309 (Fed. Cir. 2006)...................................................................... 2

*Ethicon, Inc. v. U.S. Surgical Corp.*,
    135 F.3d 1456 (Fed. Cir. 1998)................................................................... 9, 15

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
    391 U.S. 253 (1968)........................................................................................ 2

*Fujifilm Corp. v. Motorola Mobility LLC*,
    2014 U.S. Dist. LEXIS 81644 (N.D. Cal. June 16, 2014) ............................. 9

*Grantley Patent Holdings, Ltd. v. Clear Channel Communs., Inc.*,
    540 F.Supp.2d 724 (E.D. Tex. Mar. 31, 2008) ............................................ 15

*Hazel-Atlas Glass v. Hartford-Empire Co.*,
    322 U.S. 238 (1944)...................................................................................... 29

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
    488 F.3d 982 (Fed. Cir. 2007)...................................................................... 21

*KFX Medical Corp. v. Arthrex Inc.*,
    2013 U.S. Dist. LEXIS 100473 (S.D. Cal. July 10, 2013) ............................. 3

*Larson Mfg. Co. v. Aluminart Prods. Ltd.*,
    559 F.3d 1317 (Fed. Cir. 2009)..................................................................... 24

*McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*,
    487 F.3d 897 (Fed. Cir. 2007)...........................................................................3

*MeadWestvaco Corp. v. Rexam PLC*,
    809 F. Supp. 2d 463 (E.D. Va. 2011) ....................................................24, 28

*Medtronic Sofamor Danek USA, Inc. v. Nuvasive*,
    2012 WL 474181 (S.D. Cal. Feb. 14, 2012) ...............................................24

*Rothman v. Target Corp.*,
    556 F.3d 1310 (Fed. Cir. 2009)....................................................................28

*Shum v. Intel Corp.*,
    499 F.3d 1272 (Fed. Cir. 2007)....................................................................18

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
    537 F.3d 1357 (Fed. Cir. 2008)......................................................................3

*Therasense v. Becton Dickinson and Co.*,
    649 F.3d 1276 (Fed. Cir. 2011).............................................................2, 3, 12

*Va. Innovation Scis. Inc. v. Samsung Elecs. Co.*,
    11 F. Supp. 3d 622 (E.D. Va. 2014) ..............................................................6

*Young v. Lumenis, Inc.*,
    492 F.3d 1336 (Fed. Cir. 2007)....................................................................28

**Statutes**

35 U.S.C. § 115 .........................................................................................................5, 6

**Rules**

37 C.F.R. § 1.67(a).........................................................................................................5

Fed. R. Civ. P. 56(a) ......................................................................................................2

**Other Authorities**

M.P.E.P. § 602.03 (8th ed. Rev. 9 August 2012).........................................................5

I.     **INTRODUCTION**

Plaintiff CertusView Technologies, LLC ("CertusView"), by counsel, hereby moves for summary judgment on Counterclaim Eleven of the First Amended Answer of Defendants S&N Communications, Inc. and S&N Locating Services, LLC (collectively, "S&N").

II.    **UNDISPUTED FACTS**

CertusView's asserted patents are generally directed to systems and methods for adding digital representations of physical locate marks to an image or geographic representation of a dig area in order to create a record of a locate operation.  In a locate operation, a person called a locator goes to the site of a proposed excavation, uses specialized tools to locate underground utilities, and marks the location of the utility on the ground using paint or flags.  The excavator then uses paint or flags (called "locate marks") to avoid damaging the utility.  The locator makes a record of where the locate marks were placed for the purpose of assessing liability should a utility be damaged.  (*See* D.I. 250, at 2-7.)

Four of the asserted patents, U.S. Patent Nos. 8,290,204 (the "'204 patent," Ex. A); 8,532,341 (the "'341 patent," Ex. B); 8,265,344 (the "'344 patent," Ex. C); and 8,340,359 (the "'359 patent," Ex. D) are directed to systems and methods for creating searchable electric records or electronic manifests of a geographic area including the physical locate marks left by the locate technician.  While the '344 and '359 patents are continuations of U.S. Application No. 12/029,732, the other two patents ('204 and '341) are continuations-in-part of U.S. Application Nos. 12/050,555, 12/366,853, and 12/029,732.  (*Id.*)  U.S. Patent No. 8,407,001 (the "'001 patent," Ex. E) describes a system for displaying locate marks applied to the ground by a marking system or tool and obtaining geographic coordinates for the marks.  Steven Nielsen and Curtis Chambers are named inventors on all five patents, while Jeffrey Farr is also a named inventor on the '001, '204 and '341 Patents.  (*See* Ex. A-E.)

1

True and correct testimony of inventors Curtis Chambers, and Jeffrey Farr, patent counsel Joseph Teja, Jr., CertusView consultant David Crawford, and former CertusView consultant Gregory Bock is attached hereto as Exhibits F-J, respectively.

## III.   LEGAL BACKGROUND

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  Notably, unsupported attorney arguments are insufficient.  *See Digital Control Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1313 (Fed. Cir. 2006) ("A genuine issue of material fact is not raised by the submission of merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses.").

In an effort to eradicate the "plague" of  inequitable conduct claims, the Federal Circuit articulated a heightened standard in *Therasense v. Becton Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011).  Post-*Therasense*, a court may find deceptive intent only if all the evidence, "including evidence indicative of good faith," is "sufficient to **require** a finding of deceitful intent."  *Therasense*, 649 F.3d at 1290 (emphasis added).  In the case of prior art, such culpable intent exists only where the evidence shows the patent applicant "[a] knew of the reference, [b] knew that it was material, and [c] made a deliberate decision to withhold it."  *Id.*  Mere error,

negligence, or even gross negligence is not enough.  *Id.*  And, although deceptive intent may be proved by circumstantial evidence, it must be "***the single most reasonable inference able to be drawn from the evidence***."  *Id.* at 1290-91 (emphasis added).  Thus, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Id.*  This is true at the summary-judgment stage.  *See, e.g., KFX Medical Corp. v. Arthrex Inc.*, 2013 U.S. Dist. LEXIS 100473, at *11-12 n.1 (S.D. Cal. July 10, 2013).

*Therasense* held that, as a general rule, the materiality required to establish inequitable conduct is "but-for" materiality:  that the PTO would not have allowed the subject patent claim to issue had the withheld information been disclosed to the PTO.  *Therasense*, 649 F.3d at 1291.  While the court also announced a narrow exception to the "but-for" standard for the materiality prong of inequitable conduct for "affirmative egregious misconduct," the court offered as sole example of a possible affirmative act of egregious misconduct "the filing of an unmistakably false affidavit."  *Id.* at 1292.  Otherwise, in explaining the nature of what it meant by "affirmative acts of egregious misconduct," the court made note of prior Supreme Court "unclean hands" cases involving "perjury, manufacture and suppression of evidence, and bribery," in attempts to undeservedly obtain a patent.  *Id.*, 649 F.3d at 1293.

Both the materiality and intent elements are fact-driven, and the proponent of the theory bears the burden of proving a threshold level of the requisite elements by clear and convincing evidence.  *See McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 902 (Fed. Cir. 2007); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).  "Intent and materiality are separate requirements," and a court "should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa."  *Therasense*, 649 F.3d at 1290 (the court "must weigh the evidence

of intent to deceive independent of its analysis of materiality").  Due to the severe penalties associated with inequitable conduct, courts "strictly enforce the burden of proof and elevated standard of proof."  *Star Scientific*, 537 F.3d at 1365-56.

## IV.   ARGUMENT

S&N has articulated four supposed grounds for its inequitable conduct defense:  (1) that Jeffrey Farr was improperly named as an inventor, (2) that Greg Block was improperly omitted as an inventor, (3) that the applicants did not submit the "TelDig" and "ESRI" references, and (4) that the prosecuting attorney mischaracterized two references ("Tucker" and "Sawyer") that the examiner specifically considered.  However, S&N completely fails to carry its burden of establishing "but-for" materiality or anything remotely close to deceptive intent as the single most reasonable inference to be drawn from the scant so-called "evidence" to which it points.  Thus, these are ***exactly*** the type of allegations, "brought on the slenderest grounds," that *Therasense* was intended to eradicate.

With regard to inventorship, the fact that corrective declarations could have been filed if there were an error in naming inventors means that S&N cannot show the required "but-for" materiality.  Moreover, the uncontroverted record demonstrates that Mr. Farr was named on the three continuation-in-part patents because he contributed refinements that were ***claimed*** in those ***later*** applications, and that Mr. Block was not named on any of the asserted patents simply because (as he confirmed without equivocation at his deposition) he did not contribute to the conception of any claims in those patents.  There is no evidence to the contrary, and there is ***zero*** evidence that anyone intended to deceive the Patent Office in making the inventorship determinations and filing the corresponding declarations.

With respect to TelDig and ESRI, there can be no showing of materiality, because the references simply do not show sketching of locate marks (and could not even be used to record

4

locate marks) and, even if that were not the case, there is again *zero* evidence of an intent to deceive, as the inventors testified that they did not believe that either reference was relevant, and the references were cumulative in any event.  Thus, there is not even a colorable argument that the inventors (a) knew of any specific reference, (b) knew that it was material (and not cumulative), or (c) made a deliberate decision to improperly withhold anything.

Finally, Mr. Teja's written discussion of Tucker and Sawyer was correct and, thus, not a misrepresentation.  Moreover, there again is *zero* evidence of intent, which is not surprising given that the examiner had the references before her, specifically considered them, and allowed the patent for other reasons.  This is run-of-the-mill patent prosecution, not inequitable conduct.

Because S&N bears the burden of establishing its inequitable conduct defense by clear and convincing evidence, CertusView can prevail by pointing to the lack of evidence supporting S&N's position.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  Here, as there is no evidence—and certainly not "clear and convincing" evidence—of inequitable conduct by the inventors or patent prosecutor, CertusView is entitled to summary judgment.

### A.    CertusView Is Entitled to Summary Judgment of No Inequitable Conduct Regarding Inventorship Because There Can Be No But-For Materiality

As an initial matter, CertusView is entitled to summary judgment of no inequitable conduct concerning *all* of S&N's allegations of improper declarations/inventorship because, even if S&N's allegations about inventorship are true (they are not), and inventorship is material, S&N cannot make the required clear and convincing showing of "but-for" materiality.

Had the Patent Office been aware that the inventor declarations were incorrect, it would have given the applicant an opportunity to correct the error.  *See* 37 C.F.R. § 1.67(a) ("The Office may require, or inventors and applicants may submit, a supplemental oath or declaration meeting the requirements of §1.63 or § 1.162 to correct any deficiencies or inaccuracies present

in the earlier filed oath or declaration."); M.P.E.P. § 602.03 (8th ed. Rev. 9 August 2012) ("In the first Office action the examiner must point out every deficiency in a declaration or oath and require that the same be remedied.").  Inventor declarations are governed by 35 U.S.C. § 115, which specifically authorizes corrections:  "Any person making a statement required under this section may withdraw, replace, or otherwise correct the statement at any time."  *Id.* § 115(h)(1).

Thus, had the Patent Office been aware of the error, it would have advised the applicant that a new declaration was required, and the applicant would have filed a new declaration pursuant to § 115(h)(1).  Because any purported error would have been corrected, with no other effect on the prosecution,[1] it could not have been "but-for" material.  *See Va. Innovation Scis. Inc. v. Samsung Elecs. Co.*, 11 F. Supp. 3d 622, 643 (E.D. Va. 2014) ("Notably, had the USPTO been aware of Dr. Wang having signed Prof. Halal's name with his authorization, patentee VIS would have been given the opportunity to remedy the error through the submission of a supplemental declaration pursuant to M.P.E.P. . . . Thus, "but-for" materiality would not have been met, even drawing all inferences in Samsung's favor.")

Moreover, Section 115 specifically provides that "[a] patent ***shall not be invalid or unenforceable*** based upon the failure to comply with a requirement under this section if the failure is remedied as provided under paragraph (1)."  35 U.S.C. § 115(h)(1) (emphasis added).  Thus, *by operation of statute*, any errors in the original declaration could not have been the basis for a finding of inequitable conduct.[2]

---

[1] Neither removal of Mr. Farr nor addition of Mr. Block would have changed the course of the prosecution in any way.  CertusView has other patents both naming and not naming both inventors.  *See infra*, Sections IV.B.2 and IV.C.2.

[2] In addition, should it be finally determined that inventorship is incorrect, CertusView would file corrected declarations (the statute provides for doing that "at any time"), which, by operation of § 115(h)(3), would remove any basis for finding a patent unenforceable.

**B.** **CertusView Is Entitled to Summary Judgment of No Inequitable Conduct on S&N's Allegation That Jeffrey Farr Should Not Have Been Named As An Inventor**

"Because the issuance of a patent creates a presumption that the named inventors are the true and only inventors, the burden of showing misjoinder or nonjoinder of inventors . . . must be proved by clear and convincing evidence." *Bd. of Educ. v. Am. BioScience, Inc.*, 333 F.3d 1330, 1337 (Fed. Cir. 2003). This burden "is a heavy one," *id.*, and one that S&N cannot carry.

### 1.    There Is No Evidence of Any Material Misrepresentation

In paragraphs 62-65 of the First Amended Answer (the "Answer"), S&N alleges that Jeffry Farr signed declarations in connection CertusView's applications for the '204 patent, the '341 patent, and the '001 patent asserting that he was an inventor of subject matter to be claimed in those applications, that the prosecuting attorney, Jospeh Teja, Jr., filed the declarations, and that inventors Chambers and Nielsen signed the declarations as well. (D.I. 253, at ¶¶ 62-65.)

In paragraph 66 of the Answer, S&N alleges that "Farr has now admitted under oath that he was not involved in conception of the idea that became the e-Sketch **product**, which is Plaintiff's embodiment of the asserted independent claims of the Patents-in-Suit, including the independent claims of the '204, '341, and '001 Patents." (D.I. 253, at ¶¶ 62-65 (emphasis added).) S&N further alleges that Mr. Farr "did not reduce the patented invention to practice" and that "Chambers and Farr knew that Farr did not have a substantial role in the conception of e-Sketch **product** or building a prototype of the e-Sketch **product**." (*Id.*) S&N also alleges in that paragraph that "Teja discussed with Farr whether he should be named as an inventor or co-inventor on any patent applications." (*Id.*)

S&N's allegations are a deliberate distortion of the actual events. During the deposition, Mr. Farr explained (1) that "the initial conception of the e-Sketch product" was not his idea; (2) that Mr. Nielsen and Mr. Chambers conceived of the product initially; and (3) that at some later

7

point he took responsibility for the product.  (*See* Farr Dep. (Ex. G), at 58:8-71:13.)

The sequence of events is shown in the timeline below, illustrating how Mr. Nielsen and Mr. Chambers came up with the original idea (for the eSketch product), the original patent applications were filed to protect that product, Mr. Farr became involved, and then the continuation-in-part ("CIP") applications naming Mr. Farr, and reflecting his later contributions, were filed.[3]



S&N is trying to deform this into a foundation for inequitable conduct by conflating the original idea for the ***product*** with the ideas claimed in the ***patents***.  The fact that Mr. Farr was not involved at the genesis of the original product concept has no bearing on whether he was properly named on later CIP applications which, *by definition*, included additional subject matter.  *See Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354, 1358 (Fed. Cir. 2014) (observing that continuations-in-part introduce new subject matter).

S&N's argument boils down to the idea that because the CIP patents cover the eSketch product, Mr. Farr should not have been named because he did not conceive of the original product concept.  That position is logically defective, and thus insufficient as matter of law, because (a) it is not the case that every inventor must contribute to every claim, and (b) it is not

---

[3] S&N does not meaningfully address the '001 patent.  Mr. Farr testified that he was involved in the development of the "paint wand" that was an embodiment of that patent.  (*See* Farr Dep. (Ex. G) at 202-205.)

the case that every claim of a patent must cover a product in order for the patent to cover the product (*i.e.*, just one claim would be sufficient). *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (observing that "a co-inventor need not make a contribution to every claim of a patent" and that "a contribution to one claim is enough"); *Fujifilm Corp. v. Motorola Mobility LLC*, 2014 U.S. Dist. LEXIS 81644, 10-11 (N.D. Cal. June 16, 2014) ("In order to qualify as an inventor, a person must contribute to the conception of at least one claim.").

Because the later applications claim priority to the original applications, they can have **both** (1) claims supported just by the original Nielsen/Chambers applications **and** (2) claims supported by additional subject matter contributed by Mr. Farr.  In other words, it is perfectly appropriate for Mr. Farr to have been named as an inventor on the CIP applications, which include the original **and new** subject matter, even if he did not conceive of the original subject matter.  This can be illustrated in a Venn diagram:



Thus, S&N's allegation that Mr. Farr cannot have been properly named because he did not conceive of the original product concept is legally incorrect.  And, for its part, S&N never

even asked Mr. Farr what he contributed to the later patents, or to the '001 patent, so it cannot actually allege that he did not make a contribution to those patents.

Moreover, while CertusView asserts that the CIP patents and the '001 patent cover the current eSketch product, it does not allege that **every claim** of the CIP patents covers that product (just as it does not allege that every claim covers the accused products). The CIP patents naming Mr. Farr can cover the original product even though he did not conceive the original product concept, because the CIP claims that cover the product are supported by the original applications. This can be illustrated as follows:



In other words, the entire premise of S&N's argument, that there is an inconsistency because CertusView asserts that the CIP patents cover the current product, but Mr. Farr says he did not conceive of the original product concept, is flawed because Mr. Farr need not have contributed to the CIP patent claims that cover the original product.

Additionally, S&N's argument that there is inconsistency between CertusView's assertion that the CIP patents cover the *current* eSketch *product* and Mr. Farr's explanation that he did not conceive of the *original* eSketch *concept* also would depend on the current product

10

being identical to the original concept.  There is no evidence to that effect (and, of course, additional development has occurred over time).

In the end, S&N's argument regarding Mr. Farr is based on his deposition testimony that he did not contribute to the conception of the original eSketch ***product***.  The argument fails because it is based on two unsupported and inaccurate assumptions:  (a) that Mr. Farr conceived of all of the claims in the CIP patents and (b) that all of the claims in the CIP patents must cover the original product.  Those things are simply not true.

In fact, S&N has not even *alleged* that Mr. Farr did not contribute to any ***claim*** of the ***patents*** on which he was named as an inventor, which is the correct standard.  There is, thus, absolutely no basis for finding that Mr. Farr was improperly named as an inventor.  The clouds that S&N seeks to use to obscure the issue (the testimony about the original product concept) are easily dispersed:  Mr. Nielsen and Mr. Chambers originally "conceived" of "e-Sketch," and Mr. Farr became involved later, adding concepts that were included as new matter in CIP applications, a sequence of events that is fully consistent with the current inventorship of the patents.  As there was no misrepresentation, there cannot have been any inequitable conduct.

### 2.    There Is No Evidence of Improper Intent

Without a misrepresentation, there can be no intent to deceive (one cannot have intended to do something that did not happen), and the Court need not reach the second prong.  But, if it does, it will not find a shred of evidence of improper intent.

The extent of S&N's allegations regarding intent to deceive with respect to naming Mr. Farr as an inventor are found in paragraph 68 of the Answer, where S&N alleges that "[t]he '204, '341, and '001 Patents would not have issued but for Farr's misrepresentation that he was an inventor" and that "[f]urther, on information and belief, Farr's false statements regarding inventorship were made with specific intent to deceive to the Patent Office, as it is implausible

11

for Farr to have believed himself to be an inventor of particular subject matter, knowing that he was not involved in the conception thereof."  (D.I. 253, at ¶ 68.)

The first allegation, that the patents "would not have issued but for Farr's misrepresentation that he was an inventor" makes no sense.  S&N cannot, and does not even try to, explain how removing Mr. Farr as an inventor would have prevented the patent from issuing.  Quite the contrary, if there had been an error, Mr. Farr could easily have been removed from the application (as was done for Mr. Block in an unrelated application, as discussed below).  In any event, that point relates to materiality only—intent is a distinct element.  *See Therasense*, 649 F.3d at 1290 ("Intent and materiality are separate requirements.").

The second allegation ("it is implausible that . . ."), which is the only thing approaching factual support S&N identifies for intent, is based on another logical error.  As explained above, the fact that Mr. Farr did not conceive of the ***original product concept*** does not mean that he did not believe that he conceived of subject matter that was ***claimed*** in the later CIP patent applications.  Mr. Farr can accurately say ***both*** (a) that he ***did not*** conceive of the original product concept (the one described in the original patent applications relating to the product before he got involved) ***and*** (b) that he ***did*** contribute to the inventions claimed in the CIP patents, which include additions to the original ideas.

In any event, even if S&N's argument were correct, and it was "implausible" for Mr. Farr to have believed both that he did not contribute to the conception of the product and did contribute to the conception of what was claimed in the later patents, that would be far from sufficient to constitute *clear and convincing evidence of a specific intent to deceive the Patent Office*.  S&N's musings about "plausibility" are not facts from which one could conclude that deceptive intent is the "single most reasonable inference able to be drawn from the evidence."

12

S&N has absolutely no evidence that could support a finding of an intent to deceive with respect to Mr. Farr's inventorship.  Instead, the facts show that (a) Mr. Farr met with counsel to determine whether he should be named as an inventor and (b) the conclusion was that he did contribute to material that was being claimed in the '001, '204, and '359 patents, so he was named.  (*See* Teja Dep. (Ex. H), at 31:6-20.)  The single most reasonable inference from the totality of facts is that Mr. Farr was named as an inventor on the CIP patents because everyone believed he was, in fact, an inventor.

Nor would there have been any conceivable motivation for Mr. Farr, Mr. Teja, Mr. Chambers, and Mr. Nielsen to have added Mr. Farr if they did not believe that to be the correct thing to do.  As Mr. Farr's absence as an inventor would have had no bearing on whether the patent would be granted, there would have been nothing to gain by manipulating inventorship.  CertusView's behavior demonstrates as much:  while CertusView has named Mr. Farr on a number of patent applications, there are many on which Mr. Farr is not named.[4]

S&N's allegation that four people attempted to defraud the Patent Office for no reason at all is the only thing connected with this argument that is "implausible."  And it certainly is not the "single most reasonable inference" to be drawn from the so-called "evidence."

Because it would be perfectly reasonable to infer that Mr. Farr and the others declared that Mr. Farr was an inventor on the CIP patents because they actually believed that he was an inventor of additional subject matter claimed in the CIP applications, S&N cannot show intent to deceive.  *See Therasense*, 649 F.3d at 1290-91 (explaining that "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found").

---

[4] *Compare* Ex. K (listing 120 patents assigned to CertusView) *with* Ex. L (listing the 95 patents assigned to CertusView that also include Mr. Farr as an inventor).

**C.    CertusView Is Entitled to Summary Judgment of No
Inequitable Conduct on S&N's Allegation That Greg
Block Should Have Been Named As An Inventor**

In paragraph 68 of the Answer, S&N alleges that "Nielsen, Chambers, Farr, and Teja
made materially false statements to the Patent Office when they failed to include Greg Block as a
named inventor on the '204,'359, '344, and '341 Patents and, on information and belief, these
false statements were made with specific intent to deceive the PTO."  (D.I. 253, ¶ 68.)

S&N then makes the following additional claims in paragraphs 69 and 70:

> Block contributed in a significant manner to the conception and reduction to
> practice of the e-Sketch product, which is an embodiment of the claims of the
> '204, '359, '344, and '341 Patents.  Block was the "primary developer" at "the
> genesis" of what became the e-Sketch product that Nielsen, Chambers, and Farr
> subsequently sought to patent in their names, without naming Block as an
> inventor.  Block "envisioned" the concept that became the e-Sketch product.
> Block was the "architect" and "responsible for the overall design" of the project
> that Nielsen, Chambers, and Farr later sought to patent.  Block built the e-Sketch
> prototype and wrote much of the code himself for the prototype.  Indeed, he
> "designed the code" used in the prototype for e-Sketch.  Because the patented
> invention (i.e., "e-Sketch") is software, writing the code is the equivalent of
> making a working model (reducing it to practice).
>
> Unlike Nielsen, Chambers, and Farr, Block was not an officer and/or within
> senior management of Dycom and/or CertusView. As such, he had nothing to
> gain from the granting of the '204, '359, '344, and '341 Patents or the assertion of
> the '204, '359, '344, and '341 Patents.

These allegations are undeniably untrue, as confirmed by Mr. Block himself in his
deposition.  The actual facts show beyond any dispute that Mr. Block was not an inventor on
these patents; thus, S&N certainly cannot show by clear and convincing evidence that he was.

First, similar to the allegations concerning Mr. Farr, S&N's claim that "Block contributed
in a significant manner to the conception and reduction to practice of the e-Sketch ***product***" is a
non-sequitur; the relevant question would be whether or not he contributed to something that is
***claimed***.  S&N does not identify ***anything*** in ***any claim*** that was Mr. Block's conception.

More importantly, S&N's pleading is based on a deliberate distortion of the actual

14

chronology.  S&N would have the court believe that the product was conceived by Mr. Block and then the applications were filed by the inventors.  That is the opposite of what actually happened.  The named inventors conceived of the product and then hired Mr. Block (among others) to write software to implement it.  Being involved in implementation does not, of itself, qualify someone to be named as an inventor.  *See Univ. of Utah v. Max-Planck-Gesellschaft zur Forderung der Wissenschaften E.V.*, 734 F.3d 1315, 1323 (Fed. Cir. 2013) ("Conception is the touchstone of inventorship, the completion of the mental part of invention."); *Ethicon*, 135 F.3d at 1460 ("[O]ne does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention."); *Murdock Webbing Co. v. Dalloz Safety, Inc.*, 213 F. Supp. 2d 95, 100-03 (D.R.I. 2002) (granting defendant's motion for summary judgment where the unnamed individual's contributions "did not rise beyond the level of simply reducing the claimed invention to practice"); *Grantley Patent Holdings, Ltd. v. Clear Channel Communs., Inc.*, 540 F. Supp.2d 724, 733-34 (E.D. Tex. Mar. 31, 2008) (granting the plaintiff's motion for summary judgment of no inequitable conduct concerning inventorship where the unnamed individual merely wrote code to implement the invention).

At his deposition, Mr. Block explained that his role was that of an application or software architect, who developed technical specifications based on requirements provided by others:

> My title, I believe, was application architect.  It was also used interchangeably with software architect.  And as an application architect, my duties included accepting software specifications and developing technical specifications based on the requirements, and assessing feasible technology solutions that would implement those requirements.

(*See* Block Dep. (Ex. J), at 23:6-14.)

In stark contrast to the tale spun in S&N's pleading, Mr. Block described how he became aware of the e-Sketch product ***after arriving at Dycom, when the idea was brought to him***:

15

Q.  We've been talking some about the e-Sketch product.  When did you first become aware of that?

A.  I believe it was within the first month of my coming on board at Dycom as a contract employee.  Actually, I need to clarify that.  The ideas were brought to me during the first month of my work as a contract employee at Dycom.

(*Id.*, at 58:13-23.)

For example, Mr. Block explained that inventor Nielsen provided the idea of "electronic marking on a tablet computer to identify the location of paint that was applied to the ground during the locate operation":

Q.  The first example that you gave using electronic marking on a tablet computer to identify the location of paint that was applied to the ground during the locate operation, how did you go about implementing that?

A.  That particular idea was introduced to me by Steve Nielsen in a meeting that we had had, just one-on-one, where he challenged me as a programmer to provide a technique for drawing on a screen on top of an image.  And the way I implemented that was by assessing third-party software components that would support a pallet of drawing tools, and allow certain overlays.

(*Id.*, at 46:12-25.)

Similarly, Mr. Block described how Mr. Nielsen presented him with the idea of allowing a locate technician to draw on the image in the field:

Q.  And so you wrote the code to integrate that electronic manifest, you described it in an aerial image, such that a locate technician would essentially draw on the image his or her work in the field?

A.  This idea was presented to me by—originally by Mr. Nielsen, and provided certain challenges with respect to locaters being out in the field on weak cellular networks, the challenges I mentioned before.  And based on his descriptions, I provided an implementation, working with Joseph and David, that implemented the features that he described.

(*Id.*, at 55:14-56:3.)

Likewise, Mr. Block explained that Mr. Nielsen literally drew him a picture of what he wanted:

16

Q.  So what were the—you said improve the presentation of a manifest.  You're referring to a paper manifest?

A.  So Mr. Nielsen presented to me a drawing that indicated what a paper manifest would like, and then annotated that drawing with a presentation of a satellite image to indicate how that would improve the generation of what he was describing as an electronic manifest, but maybe not using that terminology.

(*Id.*, at 109:8-19.)

Importantly, Mr. Block also confirmed that he did not face any technical challenges in implementing the inventors' ideas:

Q.  What were the challenges that you faced from a technical perspective?

A.  I believe the challenge was my lack of experience in both of those areas, because by selecting the right vendors and integrating the software, using standard software practices, there really weren't challenges.  I just needed to learn which vendors to choose, and how to properly implement the features as requested.

So really there were no challenges—there was no—nothing that I had to overcome, other than just learning additional things that I didn't know.

(*Id.*, at 56:14-57:3.)

And Mr. Block further explained that the original prototype of the product consisted of "features that were given to [him and his team]":

Q.  Sure.  Are you aware that a prototype of e-Sketch was built at some point?

A.  I'm not aware of any prototype of e-Sketch being built other than software that my team and I provided to implement features that were given to us.

(*Id.*, at 79:14-19.)

At no point during the deposition did Mr. Block identify *anything* that he contributed to any claim of any of the patents on which S&N claims he should have been named as an inventor, and, in fact, S&N did not even ***ask*** Mr. Block about any patent or any claimed subject matter.

**1.      There Is No Evidence of Any Material Misrepresentation**

Again, S&N's primary argument is that Mr. Block "contributed in a significant manner to the conception and reduction to practice of the e-Sketch product."  (D.I. 253, ¶ 69.)  Because the

17

allegation that Mr. Block contributed to the ***product***, it is, on its face, legally inadequate to show that he should have been listed as an inventor on any ***patent***.  S&N's pleading does not even try to show that Mr. Block contributed anything that is ***claimed*** in the patents, and S&N made no effort to cure that fatal problem with the deposition.

The testimony above, moreover, shows that Mr. Block simply implemented ideas conceived by others.  As such, there is no colorable argument that he is an inventor.  *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 776 F.3d 837, 845 (Fed. Cir. 2015) ("Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention."); *Shum v. Intel Corp.*, 499 F.3d 1272, 1277 (Fed. Cir. 2007) (noting that "in order to prove that he is an inventor of the claimed inventions, Shum was required to demonstrate that he conceived the inventions").

S&N simply ignores the fact that deposition testimony about the development of a ***product*** is not deposition testimony about the development of an ***invention***.  The named inventors conceived of inventive ideas that were ultimately codified in claims of a patent.  These inventors then engaged the help of others to turn those inventive ideas into a product.  This does not somehow convert everyone who worked on the product into additional inventors.

Moreover, even if S&N were able to point to testimony about the invention, as opposed to the product, S&N fails to explain how omission of an inventor could have been material in this instance.  S&N summarily concludes, without any articulated reasoning, that "had the Patent Office known the truth—i.e., that Mr. Farr was not actually an inventor, and that Mr. Block was—it would not have allowed the patents to issue as written."  Why would the Patent Office "not have allowed the patents to issue as written" if another person was listed as an inventor? In any event, as noted above in Section IV.A, if the Patent Office believed there were issues with

18

the declarations, it would have given the applicant an opportunity to correct the error.

As S&N has made no effort to show that Mr. Block originated any claimed concept, and as Mr. Block's testimony was unequivocally to the contrary, S&N cannot show that the declarations misrepresented anything.

### 2.      There Is No Evidence of Improper Intent

As with S&N's allegations concerning Mr. Farr, there is not a bit of evidence that anyone intended to deceive the Patent Office about Mr. Block.

Mr. Block clearly explained at his deposition that his role was simply to implement ideas provided to him by others.  As he was not first to conceive of anything in the claims, he was not an inventor and, therefore, should not have been named as one.

At the deposition, S&N asked questions that appeared to be intended to explore whether Mr. Block had a contract that required him to assign rights to CertusView.  Mr. Block testified that he was acting under the assumption that there was an NDA and assignment agreement.  (*See* Block Dep. (Ex. J), at 59:16-60:3.)  But even beyond that, he has both been named as an inventor on other CertusView applications relating to eSketch and assigned his rights to CertusView. (*See* Ex. M (CertusView patent naming Mr. Block).)  There was, therefore, no effort to keep Mr. Block off CertusView patents in general.  What possible motive (other than accuracy) could anyone have had to put Mr. Block on some eSketch applications and not others?  Any argument that CertusView omitted Mr. Block as an inventor due to issues about ownership of the inventions would be nothing more than speculation and attorney argument.

As with Mr. Farr, there is no evidence of any intent to deceive regarding Mr. Block, and it certainly is not the case that deceptive intent is the "single most reasonable inference" to be drawn from the facts.

**D.    CertusView Is Entitled to Summary Judgment of No Inequitable Conduct on S&N's Allegation That CertusView Improperly Withheld "TelDig" and "ESRI"**

**1.    There Is No Evidence of Materiality Regarding TelDig**

For TelDig, S&N's First Amended Answer asserts that "the Patent Office concluded that the cited prior art did not disclose at least a digital representation of a physical locate mark" and then, without any citation or further explanation, states that "this element is present in the TelDig Utility Suite." (D.I. 253, at ¶ 83.) This is simply a misrepresentation of the reference—the TelDig material does not say anything about a digital representation of a physical locate mark. At most, as described in the Answer, the TelDig product is described as having "the unique capability to receive sketches and maps, edit them if necessary and send them out with the locate ticket in a totally paperless process." (*See* D.I. 253, at ¶ 81.) This says only that TelDig may have received sketches of *some unidentified thing*, not that it taught or allowed for actually sketching anything or, more specifically, for recording a *physical locate mark*.

Indeed, the only testimony about TelDig demonstrates that TelDig clearly was *not* used for identifying physical locate marks. Mr. Chambers, Mr. Teja, and Mr. Crawford all testified that the TelDig software instead was used to identify dig areas of proposed excavations (with "polygons"), and *not* the location of the locate marks on the ground. (*See* Chambers (Ex. F), at 263:4-13, 412:19-21, 414:3-5, 459:2-460:15, 553:23-554:17; Teja Dep. (Ex. H), at 54:23-55:11, 170:13-23, 348:12-350:22; Crawford Dep. (Ex. I), at 310:8-311:2). In fact, TelDig could not have been used to record locate marks. (*See* Chambers Dep. (Ex. F), at 458:19-460:15 ("I think it's significantly different than what e-Sketch and Virtual WhiteLine do where you're drawing actual, you know, representations of paint marks at a much granular more defined level.").)

S&N also fails to meet its burden to establish "but-for" materiality in connection with TelDig because it does not allege that TelDig anticipates, and it makes no effort to explain how

an examiner might have used TelDig in combination with other references to invalidate any

claim. *See Therasense*, 649 F.3d at 1290 (explaining that "in assessing the materiality of a

withheld reference, the court must determine whether the PTO would have allowed the claim if it

had been aware of the undisclosed reference").

Finally, TelDig is cumulative of art of that was of record (*see* Teja Dep. (Ex. H), at

172:15-173:21), and cumulative information cannot be material. *See Honeywell Int'l Inc. v.*

*Universal Avionics Sys. Corp.*, 488 F.3d 982, 1000 (Fed. Cir. 2007) ("Information cumulative of

other information already before the Patent Office is not material."). In fact, in U.S. Application

No. 14/708,350, the Patent Office has recently allowed claims very similar to those in the '204

patent over the TelDig prior art.[5] Thus, Not only has S&N failed to prove that the Patent Office

would not have issued the patents had TelDig been disclosed, but the Patent Office is, in fact,

issuing patents in similar applications in which TelDig has been disclosed.

Because TelDig does not show recording locate marks, because S&N cannot show that an

examiner would not have allowed any claim in light of TelDig, and because TelDig is

cumulative, S&N cannot show materiality.

### 2.     There Is No Evidence of Materiality Regarding ESRI

S&N's allegations regarding ESRI are even more tenuous. As an initial matter, S&N

admits that CertusView did disclose ESRI in the '359 patent, the '001 patent, and the '341

patent. (D.I. 253, at ¶ 87.) Because the ESRI material was disclosed and considered by the

Patent Office in those applications (without so much as drawing a temporary rejection), there

cannot have been inequitable conduct for those patents. Once again, not only has S&N failed to

show that the applications would not have issued had ESRI been disclosed, but the Patent Office

---

[5] Ex. N includes a copy of the Application, the IDS, and the Notice of Allowance.

has not hesitated to grant similar patents even after ESRI was disclosed.

With respect to the remaining '204 and '344 patents, the Answer asserts that "[o]n information and belief, the '204 and '344 Patents' claims include elements found in the MIR that was [*sic*] not disclosed to the Patent Office, including in the sections relating to ESRI." (D.I. 253, at ¶ 90.) S&N then goes on to assert that "a digital representation of a physical locate mark . . . is present in the ESRI ArcPad software." (*Id.*) That is simply untrue, and S&N cites no evidence in support of that contention. In fact, inventor Chambers testified that "before we decided to start building e-Sketch, we looked at the ESRI suite, and we very quickly dismissed it, because it did not do what the e-Sketch product or what we wanted a product to document locate manifest to do." (Chambers Dep. (Ex. F), at 372:3-373:10.)

Finally, as with TelDig, S&N fails to explain how an examiner would have used this information. S&N does not allege that ESRI anticipates, and makes no effort to explain how an examiner might have used ESRI with other references to invalidate any claim. Again, the examiner allowed the '359, '001, and '341 patents over this very prior art. Without a showing of but-for materiality, ESRI cannot form the basis for a viable claim of inequitable conduct.

### 3.      There Is No Evidence of Improper Intent

As with the inventorship allegations, S&N's inability to show materiality means that the Court need not reach intent with respect to TelDig and ESRI. But, to the extent the Court does look at intent, it will again find a complete lack of evidence.

"An applicant's knowledge of a reference's materiality . . . cannot by itself prove, let alone clearly and convincingly prove, that any subsequent non-disclosure was based on a deliberate decision." *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1375 (Fed. Cir. 2012). Thus, S&N must show more than materiality and knowledge, and the record here shows that the inventors believed (correctly) that these references were not related to what they were claiming.

S&N alleges that the Market Intelligence Report ("MIR") shows that TelDig was relevant.[6]  (D.I. 253, ¶¶ 79-81.)  The inventor testimony, however, was that the MIR (prepared by someone who did not work in the industry) was incorrect, and that they believed, from *actually working with TelDig starting in 2008*, that TelDig had no product like e-Sketch.

Mr. Chambers specifically explained that "as we started working with TelDig to integrate our Virtual WhiteLine product into their utility suite, it was apparent to me that they had no tool like e-Sketch."  (Chambers Dep. (Ex. F), at 368:17-371:18; *see id.* 275:18-277:12; 410:20-414:10 (explaining that TelDig's sketching was of polygons); 415:4-7 ("[T]he important thing to me is that when TelDig saw our Virtual WhiteLine and e-Sketch offerings, they were like this is really different that what we have."); 430-435; 450:4-10; 454:3-460:15; 553:23-554:17.)

Mr. Teja testified to the same effect, explaining that TelDig "didn't appear to me to be relevant or material."  (Teja Dep. (Ex. H), at 307:15-308:8; *see id.* 54:23-55:11; 60:22-61:12; 170:13-23; 171:19-25 ("[I]t bore no connection in my mind whatsoever to the e-Sketch innovation space."); 308:4-8; 348:12-350:22.)  Other witnesses concurred.  (*See, e.g.*, Crawford Dep. (Ex. I), at 310:8-311:2.)

Nor can S&N show intent with respect to ESRI, as the only testimony, again from Mr. Chambers, is that ESRI was not relevant at all:

> I believe that—I believe that we looked at—before we decided to start building e-Sketch, we looked at the ESRI suite, and we very quickly dismissed it, because it did not do what the e-Sketch product or what we wanted a product to document locate manifest to do.  So I can tell you probably before I read this report, I would have disagreed with that. Because otherwise I would have just used an off-the-shelf product instead of build something on my own, to solve my business need.

_____

[6] The MIR was intended to research what companies were saying in the market about their products; it was not a prior art search and, in fact separate patent research reports were prepared, carefully reviewed, and relevant art disclosed.  (*See* Crawford Dep. (Ex. I), at 359:14-360:10; *id.* at 186:6-188:8; 256:17-257:21.)

(Chambers Dep. (Ex. F), at 372:3-373:10; *see* Teja Dep. (Ex. H), at 96:2-21 ("Q. Would you agree that [ESRI's] ArcPad is material to the claims of the '204 patent? A. I'd like to answer that question with respect to materiality no. Again, my recollection is that when ArcPad came to my attention . . . I do not remember thinking it was a reference that would have given rise to a *prime facia* case of patentability. And I likely thought it was cumulative as well to other things that may have been of record already. . . . My recollection is it struck me as not material.").)

As the only evidence concerning TelDig and ESRI is that the inventors and prosecutor did not think they were anything like eSketch, S&N cannot show an intent to deceive. *See Medtronic Sofamor Danek USA, Inc. v. Nuvasive*, 2012 WL 474181 at *5 (S.D. Cal. Feb. 14, 2012) ("[The inventor] provided credible testimony that he had no reason to hide [certain] publications from the PTO because [he] did not, and still does not, read them to disclose a translateral spinal implant as taught by the [patent-in-suit]."); *MeadWestvaco Corp. v. Rexam PLC*, 809 F. Supp. 2d 463, 476-77 (E.D. Va. 2011) ("[N]on-disclosure, by itself, cannot satisfy the deceptive intent element. . . . Defendants are unable to meet their burden because they cannot provide any evidence of a specific intent to deliberately withhold information to the PTO.") (quoting *Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009)).

> **E.    CertusView Is Entitled to Summary Judgment of No Inequitable Conduct on S&N's Allegation that CertusView Made Misrepresentations to the Patent Office Concerning "Tucker" and "Sawyer"**

Finally, S&N's First Amended Answer alleges inequitable conduct based upon supposed misrepresentations made to the Patent Office about the Tucker and Sawyer prior art references. (D.I. 253, ¶¶ 92-107.) Specifically, S&N claims that it was a material misrepresentation for Mr. Teja to have stated that the Tucker and Sawyer references did not pertain to "locate operations" and "locate tickets." *Id.*

These allegations of improper conduct on the part of Mr. Teja[7] are insufficient to withstand summary judgment because (a) these references were submitted to and explicitly considered by the Examiner, on the record, (b) the prosecutor's remarks were accurate, (c) in any case, the remarks were not accepted by the Examiner, and did not result in any claims being allowed, and (d) again, there is absolutely no evidence to support an intent to deceive.

### 1.    There Is No Evidence of Any Material Misrepresentation

The Tucker and Sawyer references are both directed to one company's use of GPS enabled equipment to obtain precise locations for utilities (not the locate paint marks).  The precise locations of utilities are in some instances shown on an electronic chart or image, which in turn may be provided to an excavator in real time during excavation.  In this manner, as excavation is occurring, the excavator can "see" the location of the utilities via the image on the digging equipment's display, and thereby avoid damaging them.  (Ex. O, ¶ 0026-27; 0152.) Thus, the idea was to precisely record and later display to the excavator the locations of the utilities themselves whether or not there was any paint on the ground.  (*Id.*, ¶ 0005.)  The system disclosed by Tucker and Sawyer had nothing to do with recording the location of physical locate marks, and in fact was intended to eliminate the need for paint on the ground by instead creating a permanent record of utility location.  The passage that S&N points to in Sawyer simply explains that the "OneCall" centers that manage underground utility locate operations could also be used to support his different system.  (*See* Ex. P, ¶ 44 ("A ONECALL™ entity could serve as the sponsor or clearing house for a public damage prevention system by utilizing the system and

---

[7] Mr. Teja has been practicing patent law since 2001.  In the latest edition of Chambers, he is praised by clients for his "very knowledgeable and very conscientious" approach to patent law. He is a partner at Cooley LLP and, prior to that, was a partner at Foley & Lardner LLP and at Wolf, Greenfield & Sacks, P.C.  (*See* Ex. U.)

method of the present invention.").)

The Examiner had explicitly considered both Tucker and Sawyer and issued an Office Action that rejected the claims using those references.  In response, CertusView amended the claims to recite, *inter alia*, that the invention was directed to a "locate operation" performed pursuant to a "locate ticket."  (Ex. Q, at 2-7.)

While S&N's allegations focus on a very brief summary of the argument that was made at the beginning of the response, Mr. Teja's discussion was actually much more involved, explaining, ***in detail***, the meaning of "locate operation" and "locate ticket" in the application:

> As discussed in Applicant's specification (e.g., see paragraphs [0002] and [0003]), a locate operation relates to the identification of underground utilities (also referred to as "underground facilities"), by a locate technician, prior to excavation activities at a specified "dig area," so as to mitigate possible damage to any underground facilities that may be present in the dig area. The presence of underground facilities is generally detected by the locate technician using a device commonly referred to as a "locate wand" (e.g., which may employ various electromagnetic, radio frequency or other techniques to detect underground facilities).  If one or more underground facilities are actually detected in a given dig area in advance of excavation activities, the presence of such facilities may be indicated or "marked" above-ground (e.g., on ground, pavement, or other surface in the dig area) using paint or flags, for example; such aboveground indications often are referred to as "locate marks."
>
> The locate technician performs the locate operation pursuant to a locate "ticket," which provides information (e.g., instructions) necessary for the locate technician to perform the locate operation.

(*Id.*, at 10.)

Addressing the rejections, Mr. Teja argued as follows:

> Tucker and Sawyer are not concerned with documenting performance by a locate technician of a locate operation relating to planned excavation activities, in which the locate technician performs the locate operation pursuant to a locate ticket including information identifying the dig area, wherein at least a portion of the dig area may be excavated or disturbed during the planned excavation activities.

(*Id.* at 11-12.)

Tucker is concerned primarily with assembling and providing an accurate

database of locations of utility lines, such as electric power lines, telephone lines, water lines, sewer lines, fiber-optic cable lines, and natural gas transmission lines (¶ [0003]). . . . As a result, Tucker proposes a solution in which data relating to the location of utility lines is accurately captured using precision GPS technologies.  (¶ [0012]).

(*Id.* at 13-14.)

While Tucker mentions various ground-penetrating activities such as excavation, it should be appreciated that Tucker is not necessarily concerned with the location of such excavation activities per se—rather, Tucker is concerned with the location of utility lines that may be damaged by such ground-penetrating activities, irrespective of where such activities may occur.

Since Tucker is not concerned with the location of planned excavation activities per se, Tucker similarly is not concerned with locate operations to identify a presence or absence of underground facilities within a specified dig area in advance of planned excavation activities at the dig area.  As such, Tucker does not disclose or suggest any concepts relating to a locate ticket pursuant to which a locate operation is performed, wherein the locate ticket includes information identifying the dig area, and wherein at least a portion of the dig area may be excavated or disturbed during the planned excavation activities.

(*Id.* at 16 (emphasis added).)  A similar discussion was included for the Sawyer reference:

Sawyer is assigned to the same assignee as Tucker (i.e., Global Precision Solutions, Inc.), and both of these references name inventors Tom Sawyer and Page Tucker.
…

[L]ike Tucker, Sawyer is not concerned with the location of planned excavation activities per se, and thus similarly is not concerned with locate operations to identify a presence or absence of underground facilities within a specified dig area in advance of planned excavation activities at the dig area.  As such, Sawyer also does not disclose or suggest any concepts relating to documentation of a locate operation (e.g., a timestamp indicative of when the locate operation occurred).

(*Id.* at 17-19 (emphasis added).)

Turning to the claims, Mr. Teja provided a detailed explanation of why the references

were believed to not render the pending claims obvious:

As noted above, neither Sawyer nor Tucker discloses or suggests such a locate operation, or any information associated therewith (such as a timestamp indicative of the locate operation, as claimed).

Instead, Sawyer merely discloses that locations of utilities generally may be

> indicated on a map, without any concern or regard to where any type of digging or excavation activities might occur in the future.
>
> …
>
> Sawyer does not disclose or suggest, however, that any of this activity is associated in any way with a locate operation that is performed at a dig area in advance of planned excavation activities at the dig area. Indeed Sawyer is interested in the locations of underground utilities generally, but not with the identification of same with respect to any particular dig area for planned excavation.
>
> …
>
> As Sawyer fails to disclose or suggest locate operations, and specifically a timestamp indicative of a locate operation, Tucker similarly fails to disclose or suggest such a limitation.

(*Id.* at 21-22 (emphasis added).)

Thus, in addition to asserting that Tucker/Sawyer did not relate to the "locate operation" or "locate ticket" that was being claimed, Mr. Teja explained to the Examiner ***exactly why he believed that to be the case***. What all of this shows is that, far from misleading the Examiner, the prosecuting attorney made a detailed argument explaining why the applicant believed that the claims were patentable over the references. The Examiner was free to accept or reject the argument. This type of exchange happens every day before the Patent Office; it is routine patent prosecution, not the stuff of inequitable conduct. *See Rothman v. Target Corp.*, 556 F.3d 1310, 1328-29 (Fed. Cir. 2009) ("[A] prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct. . . . This court has little basis to find deceptive intent in the routine back and forth between examiner and applicant."); *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007) ("We therefore fail to see how the statements . . . which consist of attorney argument and an interpretation of what the prior art discloses, constitute affirmative misrepresentations of material fact."); *MeadWestvaco*, 809 F. Supp. 2d at 477 (granting summary judgment against alleged "misrepresentations of the state of the prior art": "Lastly, the examiner had all prior art references as a result of Plaintiffs' numerous

disclosures; he made his own determination as to whether the claims were allowable. As established previously, the examiner's determination is allowed great deference.").

The facts here do not come anywhere close to circumstances in which courts may bypass the materiality requirement because the patentee engaged in "egregious misconduct."  In *Therasense*, the Federal Circuit held that "the unclean hands doctrine remains available to supply a remedy for egregious misconduct like that in the Supreme Court cases."  *Therasense*, 649 F.3d at 1288.  Those cases concerned obvious and unambiguous acts of actual or near criminality, including paying a witness to file a false affidavit; manufacturing false evidence; and "suppress[ing] evidence of perjury before the PTO."  *Id.* at 1285-87.  As the patent examiner had Tucker and Sawyer, and considered them closely enough to base rejections on them, there is hardly the type of "'deliberately planned and carefully executed scheme[]' to defraud the PTO and the courts" contemplated by the Federal Circuit.  *Therasense,* 649 F.3d at 1292 (quoting *Hazel-Atlas Glass v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944)).

For her part, the Examiner was not persuaded by Mr. Teja's remarks, as the Patent Office response was another rejection.  (*See* Ex. R.)  This means that the arguments that S&N is pointing to did not result in allowance of the claims.  Instead, the claims were allowed only after they were further amended to specifically recite the use of a "physical locate mark applied to the ground" and a "digital representation of the at least one physical locate mark applied to the ground."  (*See* Ex. S, at 2-3.)  As the examiner recognized, Tucker and Sawyer did not show this because they were recording the location of the *actual utilities*.  In the Notice of Allowance, the Examiner cited the "physical locate mark applied to the ground" and the "at least one digital representation of the at least one physical locate mark applied to the ground" as distinguishing the invention over Sawyer and Tucker.  (*See* Ex. T, at 2-3.)

In short, the Examiner expressly (and correctly) determined that these references do not show digital representations of locate marks and, for that reason, that the claims are patentable. S&N's focus on a single sentence in a response, that was not relied on to allow the patent, concerning a reference the Examiner was looking at, is wrong in every sense of that word.

S&N's discussion of Mr. Tucker's deposition is also completely irrelevant. His view of the matter is clearly improper lay opinion and, in any event, the deposition was a pre-arranged stunt in which Mr. Tucker offered answers to leading questions about the prosecution of the patents despite later admitting that he had not even read the patent application or the prosecution history and that he was not distinguishing between the prior art document and his own work. (*See* D.I. 259-15, at 101-106.)  The testimony, which would be inadmissible, has no bearing on what Mr. Teja said to the examiner about a document that she had on her desk.

### 2.    There Is No Evidence of Improper Intent

The entirely of S&N's allegations concerning intent regarding Tucker/Sawyer are as follows: "Given that these statements were made with emphasis to the Patent Office, and they were blatantly incorrect, the single most likely inference that can be drawn from the facts alleged is that they were made with specific intent to deceive the Patent Office."  (D.I. 253, at ¶ 104.)

S&N's bare allegation that the statements were not accurate (which is untrue) is insufficient to show intent to deceive.  The more reasonable (and correct) inference is that the comments were made (to an examiner who already had the prior art) because Mr. Teja believed they were true and Mr. Teja was doing his job.  With at least one reasonable and innocent inference to be drawn, "intent to deceive cannot be found."  *Therasense,* 649 F.3d  at 1290-91.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, CertusView respectfully requests that its Motion be GRANTED.

Dated:  July 22, 2015                       Respectfully submitted,


           /s/ Lori A. Rubin
Michael J. Lockerby (VSB No. 24003)
Lori A. Rubin (VSB No. 80883)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
mlockerby@foley.com
larubin@foley.com

Matthew B. Lowrie (admitted *pro hac vice*)
Aaron W. Moore (admitted *pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: (617) 342-4000
Facsimile:  (617) 342-4001

*Counsel for Plaintiff CertusView Technologies, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2014, I filed with the Clerk of Court the foregoing

document using the CM/ECF system, which will send a notice of electronic filing to all counsel

of record, including the following counsel for Defendant:

Brian L. Whisler, Esq.
Baker & McKenzie LLP (DC)
815 Connecticut Avenue, N.W.
Washington, DC 20006
Email: brian.whisler@bakermckenzie.com

Daniel Joseph O'Connor, Esq.
Baker & McKenzie LLP (IL-NA)
300 E. Randolph St
Suite 5000
Chicago, Illinois 60601
Email: daniel.oconnor@bakermckenzie.co

John Giuseppe Flaim, esq.
Baker & McKenzie
2001 Ross Avenue
Suite 2300
Dallas, Texas 75201
Email: john.flaim@bakermckenzie.com

Mackenzie Marie DeWerff , Esq.
Baker & McKenzie
2001 Ross Avenue
Suite 2300
Dallas, Texas 75201
Email: mackenzie.DeWerff@bakermckenzie.com

Michael Anthony Duffy, Esq.
Baker & McKenzie
300 East Randolph St
Suite 5000
Chicago, Illinois 60601
Email: Michael.Duffy@bakermckenzie.com

Weldon Barton Rankin, Esq.
Baker & McKenzie
2001 Ross Avenue
Suite 2300
Dallas, Texas 75201
Email: w.Rankin@bakermckenzie.com

/s/ Lori A. Rubin
Michael J. Lockerby (VSB No. 24003)
Lori A. Rubin (VSB No. 80883)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
mlockerby@foley.com
larubin@foley.com

Matthew B. Lowrie (*pro hac vice*)
Aaron W. Moore (*pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: (617) 342-4000
Facsimile: (617) 342-4001
mlowrie@foley.com
amoore@foley.com
rrodrigues@foley.com

*Counsel for Plaintiff CertusView Technologies, LLC*