**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| CERTUSVIEW TECHNOLOGIES, LLC, | |
| PLAINTIFF | |
| vs. | Case No. 2:13-cv-00346-MSD-TEM |
| S&N LOCATING SERVICES, LLC and S&N COMMUNICATIONS, INC., | Jury Trial Demanded |
| DEFENDANTS | |

**CERTUSVIEW TECHNOLOGIES, LLC'S BRIEF IN SUPPORT OF MOTION FOR
PARTIAL RECONSIDERATION OF JUDGMENT OF PATENT INELIGIBILITY
UNDER 35 U.S.C. § 101**

**Table of Contents**

**Page**

I.      Introduction ................................................................................................. 1

II.     Legal Standards .......................................................................................... 2

        1.      Reconsideration of interlocutory orders ...................................... 2

        2.      Patent eligibility under 35 U.S.C. § 101 ..................................... 3

III.    Argument .................................................................................................... 4

        A.      Reconsideration of the 101 Order is warranted ......................... 4

                a.      The Federal Circuit has since made a decision of law
                        applicable to step one of Mayo/Alice test that is contrary to
                        the Court's 101 Order ...................................................... 4

                b.      The inequitable conduct trial produced substantially
                        different evidence from that considered in the § 101 Order .......... 6

        B.      Claim 1 of the '359 patent is patent eligible under § 101 ..................... 8

        1.      Mayo/Alice Step One: In light of the *Enfish* decision, Claim 1 is
                not directed to an abstract idea .................................................. 8

                a.      Claim 1 is directed to a technological invention that solved
                        an industry problem ....................................................... 9

        2.      Mayo/Alice Step Two: The geographic coordinate limitations in
                Claim 1 transform the claim into a patent-eligible application ............... 19

                a.      Claim 1 solved problems unique to the utility locating
                        industry .......................................................................... 19

IV.     Conclusion ............................................................................................... 25

## Table of Authorities

**Page(s)**

**Cases**

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*,
99 F.R.D. 99 (E.D. Va. 1983) ........................................................................................8

*Accenture Global Servs., GMBH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013).................................................................................4, 6

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)........................................................................................ *passim*

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
326 F.3d 505 (4th Cir. 2003) ...............................................................................2, 3, 8

*Art+Com Innovationpool GmbH v. Google Inc.*,
No. 14-cv-217-RGA, 2016 U.S. LEXIS 56498 (D. Del. April 28, 2016) ...................20, 24, 25

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012).....................................................................................2

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1339 (2003)..............................................................................................18, 19

*Colley & Colley Coal Co. v. Breeding*,
59 F. App'x 563 (4th Cir. 2003) ..........................................................................3, 6, 7

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245, 1257-58 (Fed. Cir. 2014) ..............................................................20, 24, 25

*Deepsouth Packing Co. v. Laitram Corp.*,
406 U.S. 518 (1972)........................................................................................................14

*Diamond v. Diehr*,
450 U.S. 175 (1981)............................................................................................ *passim*

*EEOC v. Int'l Longshoremen's Assoc.*,
623 F.2d 1054 (5th Cir. 1980) ...................................................................................3

*Enfish, LLC v. Microsoft Corp.*,
--- F.3d ---, 2016 WL 2756255 (Fed. Cir. May 12, 2016) ............................................ *passim*

*Fayetteville Inv'rs v. Commercial Builders, Inc.*,
936 F.2d 1462 (4th Cir. 1991) ...................................................................................3

## Table of Authorities
### (continued)

**Page(s)**

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)............................................................................................1, 3, 4

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)........................................................................................................3

*Sejman v. Warner-Lambert Co.*,
845 F.2d 66 (4th Cir. 1988) ................................................................................1, 3, 6

*Sophos Inc. v. RPOST Holdings, Inc.*,
No. 13-12856-DJC, 2016 U.S. Dist. LEXIS 72699 (D. Mass. Jun. 3, 2016) ..............15, 16, 21

*In re: TLI Communications LLC Patent Litig.*,
No. 2015-1372, 2016 WL 2865693 (Fed. Cir. May 17, 2016)................................................15

*Vizio, Inc. v. Int'l Trade Comm'n*,
605 F.3d 1330 (2010)...............................................................................................18

**Statutes**

35 U.S.C. § 101............................................................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 54(b).....................................................................2, 3

## I.      INTRODUCTION

CertusView Technologies, LLC moves for partial reconsideration of the Court's judgment of patent ineligibility as to Claim 1 of U.S. Patent No. 8,340,359 ("the '359 patent"). Reconsideration is warranted for two reasons:

First, after judgment, the Federal Circuit published a controlling decision in *Enfish, LLC v. Microsoft Corp.*, --- F.3d ---, 2016 WL 2756255 (Fed. Cir. May 12, 2016). *Enfish* is the first controlling authority to offer guidance to lower courts regarding step 1 of the patent eligibility test established by *Mayo* and *Alice*. In *Enfish*, the Federal Circuit indicated that patent claims that "improv[e] an existing technological process" satisfy step 1 and are therefore patent eligible. *Id*. at *4. Reconsideration of the Court's judgment is warranted in light of this new authority. *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (holding that a court's earlier decisions must generally be followed unless: "(2) controlling authority has since made a contrary decision of law applicable to the issue . . . ."). According to *Enfish*, Claim 1 of the '359 patent satisfies step 1 of the *Mayo/Alice* test and is eligible for patenting because it is "directed to a specific implementation of a solution to a problem in the [utility industry]" that "improv[ed] an existing technological process." *Enfish*, 2016 WL 2756255 at *4, *8 (quoting *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358–59 (2014)).

Second, the recent bench trial produced evidence not available when the Court entered judgment on the pleadings. The trial evidence showed how CertusView's e-Sketch product, which embodies Claim 1 of the '359 patent, both offered a solution to a problem in the utility industry and improved an existing technological process. The e-Sketch product enables a technician in the field to accurately document, to-scale, where utility locate marks were applied to ground using geographical coordinates (such as GPS coordinates) overlaid on a high-resolution aerial image. The inventions embodied by the e-Sketch product were new and

advanced public safety. Reconsideration is warranted because the trial evidence concerning the problems faced by the utility industry and the nature of CertusView's solution to those problems provides a "full[er] understanding of the basic character of the claimed subject matter" that (1) was not available at the time of the 101 Order, and (2) is substantially different than the information that was available to the Court at that time. *See Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1272-73 (Fed. Cir. 2012). The trial evidence shows that Claim 1 does not claim an abstract idea because it recites a specific solution to a longstanding industry problem that improved a preexisting technological process. It also shows that, when the claim is considered under step 2 of the *Mayo/Alice* test, its geographical coordinate and aerial image limitations "transform the nature of the claim" into a patent-eligible application. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014.)

For each of these reasons, CertusView respectfully requests that the Court reconsider its judgment of patent ineligibility and find that Claim 1 of the '359 patent is patent-eligible.[1, 2]

## II.   LEGAL STANDARDS

### 1.   Reconsideration of interlocutory orders

Under Federal Rule of Civil Procedure 54(b), "a district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003) (holding that district court erred in denying reconsideration where defendants presented evidence that had not been previously considered).

---

[1] CertusView respectfully reserves the right to appeal all aspects of the Court's judgment of patent ineligibility as to all affected patent claims.

[2] If the Court grants this motion and finds Claim 1 of the '359 patent patent-eligible under § 101, CertusView withdraws its § 101 estoppel arguments in its post-trial brief solely concerning Claim 1 of the '359 patent.

The Court's Opinion and Order granting judgment on the pleadings under 35 U.S.C. § 101 (ECF No. 250 "the 101 Order") was an interlocutory order, so it is "not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe*, 326 F.3d at 514. Accordingly, the 101 Order is "subject to reopening at the discretion of the district judge." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983); *see also Am. Canoe*, 326 F.3d at 515.

In the Fourth Circuit, Rule 54(b) reconsideration is not subject to the restrictions on motions seeking relief from judgment. *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1470 (4th Cir. 1991). District courts frequently cite the three part test for relief from a judgment, however, noting that reconsideration is appropriate where "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (quoting *EEOC v. Int'l Longshoremen's Assoc.*, 623 F.2d 1054, 1058 (5th Cir. 1980)). Even when a mixed question of law and fact is at issue, the Court is entitled to "take new evidence and make new findings." *Colley & Colley Coal Co. v. Breeding*, 59 F. App'x 563, 566-567 (4th Cir. 2003) (citing *Sejman*, 845 F.2d at 69).

### 2. Patent eligibility under 35 U.S.C. § 101

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "[L]aws of nature, natural phenomena, and abstract ideas are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). Section 101 eligibility is an issue of law

that may contain underlying factual issues. *Accenture Global Servs., GMBH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013).

In *Alice*, the Court summarized the *Mayo* test for the subject matter eligibility of claims under 35 U.S.C. § 101:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, 'what else is there in the claims before us?' To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.

134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297-98). But the *Alice* Court gave no guidance on "the precise contours of the 'abstract ideas' category." *Alice*, 134 S. Ct. at 2355, 2357.

## III.    ARGUMENT

### A.    Reconsideration of the 101 Order is warranted

Reconsideration of the 101 Order regarding Claim 1 of the '359 patent is appropriate because of changes in the law and the introduction of new facts since the Court addressed patent eligibility 18 months ago.

#### a.    The Federal Circuit has since made a decision of law applicable to step one of *Mayo/Alice* test that is contrary to the Court's 101 Order

Supreme Court precedents establish a two-step inquiry to determine whether a patent is ineligible for claiming "laws of nature, natural phenomena, [or] abstract ideas." *Alice*, 134 S. Ct. at 2355 (2014); *Mayo*, 132 S. Ct. at 1293. But the Supreme Court has not yet "established a definitive rule to determine what constitutes an 'abstract idea'" under the first step of the *Mayo/Alice* test. *Enfish*, 2016 WL 2756255, at *4. In *Alice*, the Court did not offer any guidance for determining whether patent claims fall into the abstract idea exception to patentability. *See Alice*, 134 S. Ct. at 2357; *Enfish*, 2016 WL 2756255, at *4.

The Federal Circuit's decision in *Enfish* is the first precedential decision that offers guidance on step one of the *Mayo/Alice* test. *Enfish* determined that *Alice* did <u>not</u> indicate that "all improvements in computer-related technology" or "claims directed to software" are "inherently abstract" and therefore must be analyzed in the second step of the *Alice* analysis. *Enfish*, 2016 WL 2756255, at *4. The Federal Circuit clarified that the first step of the *Mayo/Alice* test is a "meaningful one," and that the inquiry "cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* a law of nature." *Enfish*, 2016 WL 2756255, at *4 (emphasis in original). The Federal Circuit also explained that "the 'directed to' inquiry" filters claims, considered in light of the specification, based on whether "their character as a whole is directed to excluded subject matter." *Id.*

*Enfish* explained "the first step in the *Alice* inquiry … asks whether the focus of the claims is on the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at *5. *Enfish* offered guidance on how to perform this analysis:

- "Describing the claims at … a high level of abstraction and untethered from the language of the claims" is inappropriate because it "all but ensures that the exceptions to § 101 swallow the rule." *Id*. at *6.

- District courts should not oversimplify the claimed invention or downplay the invention's benefits. *Id*. at *7 (criticizing district court because it "oversimplified the self-referential component of the claims and downplayed the invention's benefits.").

- "Both this court and the Supreme Court have found it sufficient to compare claims at issue to those already found to be directed to an abstract idea in previous cases." *Id*. at *4.

After examining the specification and claims, the Federal Circuit held that Enfish's claims are not directed to an abstract idea because they are "directed to a specific implementation

5

of a solution to a problem in the software arts." *Id*. at \*8. In reaching this holding, the court contrasted *Enfish's* claims with other cases involving patent ineligible claims where "general purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation." *Id*. at \*8.

The Court decided the 101 Order without the benefit of this new controlling case law, which clarifies for the first time step one of the *Mayo/Alice* test for patent eligibility. Accordingly, reconsideration of the 101 Order is justified.

<blockquote>

**b.**      **The inequitable conduct trial produced substantially different evidence from that considered in the § 101 Order**

</blockquote>

This case appears to be the first in which a trial concerning the patents occurred after all of the claims of the patents at issue were deemed patent ineligible. (*See* Tr. 1154:2-20.) During the inequitable conduct case, many facts relevant to patent eligibility were established. Although patent eligibility is a question of law, it "may contain underlying factual issues," *Accenture Global Servs.*, 728 F.3d at 1340-41, and reconsideration of the 101 Order is appropriate based on the new evidence presented at the inequitable conduct trial. *See Colley*, 59 F. App'x at 566-67 (holding reconsideration based on new evidence was appropriate where the previous finding was a mixed question of law and fact) (citing *Sejman*, 845 F.2d at 69).

The Court issued its 101 Order based solely on the pleadings, (ECF No. 250 at 28-30), but the 101 Order rests on underlying factual findings, including findings about aerial images and geographical coordinates. For example, in addressing the second step of its *Mayo/Alice* analysis for Claim 1 of the '359, the Court "recognize[d] that some of the information, for example, the geographical coordinates corresponding to physical locate marks, included in element C in the data set stored in the computer-readable file contains greater detail than, or might otherwise be absent from, paper manifests created during the conventional method of

6

documenting a locate operation." Yet the Court reasoned the geographical coordinates did not "transform the method in Claim 1 from an attempt to claim the abstract idea of creating a computer-readable file to store information," because "such information is the same sort of information that ordinarily would be included in a paper manifest." (ECF No. 250 at 76.) The Court did not have access to a paper manifest when it made this fact finding. (*Id.*)

The evidence presented at trial conflicts with the Court's pleadings-only findings. Trial evidence showed that it was novel to combine a high-resolution aerial image with geographical coordinates corresponding to physical locate marks, and that it was unheard-of to include geographical coordinate data for locate marks in a paper manifest. A paper manifest was introduced into evidence during trial. (PX-95.0005.) It included a ticket number, date, and a primitive drawing with lines indicating where locate marks were applied. No geographical coordinate data of any kind was included in the paper manifest, much less geographical coordinates associated with each paint mark applied to the ground:



(PX-95.0005.)

The trial evidence demonstrated that geographical coordinate data associated with individual paint marks on the ground was *not* the "sort of information that ordinarily would be included in a paper manifest." (*Cf.* ECF No. 250 at 76 and Tr. 744:23-745:2 ("Q. . . . So it says, "Where's your paint?" What are you trying to communicate here? A. Communicating that the work product of the locator, the paint on the ground traditionally was not something that was tracked to a level of specificity.").) The Court did not have the opportunity to consider this information when it decided the 101 Order. Nor did it possess the trial evidence regarding the problems solved by CertusView's inventions, why geographical coordinate data was a key point of novelty in CertusView's inventions, or what practices were conventional in the industry when the Court determined the 101 Order.

Considering the trial evidence does not require the Court to simply "rethink what the Court had already thought." *Cf. Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983); *see also Am. Canoe*, 326 F.3d at 516. Rather, we ask the Court to evaluate Claim 1 of the '359 patent on the trial record to determine if the evidence "might [] tip[] the balance of the analysis" in favor of patent eligibility. *See Am. Canoe*, 326 F.3d at 516.

**B.       Claim 1 of the '359 patent is patent eligible under § 101**

**1.        *Mayo/Alice* Step One: In light of the *Enfish* decision, Claim 1 is not directed to an abstract idea**

*Enfish* holds that claims "directed to a specific implementation of a solution to a problem in the software arts" are "not directed to an abstract idea." *Enfish*, 2016 WL 2756255, at *8. The Federal Circuit's holding echoes the Supreme Court's explanation in *Alice* of why the patent claims in *Diamond v. Diehr* were patent eligible: they "solve[d] a technological problem", or, "[i]n other words, the claims in *Diehr* were patent eligible because they improved an existing technological process". *Alice*, 134 S. Ct. at 2358. The *Alice* decision's use of "in other words"

8

indicates that "solv[ing] a technological problem" inherently involves "improv[ing] an existing technological process". *Alice*, 134 S. Ct. at 2358. These characterizations (which appear in *Alice* and in *Enfish*) are different ways of describing the same ultimate question of law; they are not separate tests for patent eligibility under *Mayo/Alice* step one. *See Enfish*, 2016 WL 2756255 at *4 and *8 and *Alice*, 134 S. Ct. at 2358.[3] Claim 1 of the '359 patent satisfies the first step of the *Mayo/Alice* test regardless how it is characterized because (1) the claim is "directed to a specific implementation of a solution to a problem in the [utility industry]" and (2) it "improve[s] an existing technological process." *Id*. at *4 (citing *Alice*, 134 S. Ct. at 2358-59) and *8.

### a.   Claim 1 is directed to a technological invention that solved an industry problem

Claim 1 is "not simply directed to" "the abstract idea of creating a computer-readable file to store information, as applied in the particular technological environment of conducting a locate operation." *Cf. Enfish*, 2016 WL 2756255, at *6; ECF No. 250 at 71. Distillation of Claim 1 to its "simplest form" improperly oversimplified the invention and downplayed its benefits. *See Enfish*, 2016 WL 2756255, at *6 (criticizing district court's characterization of the *Enfish* claims as an oversimplification that was untethered from the claim language, and for inappropriately downplaying the invention's benefits).

Claim 1 is patent eligible because it is narrowly focused on a combination that CertusView invented to overcome the industry's problems with locate documentation that improved a preexisting technological process. Claim 1 recites a method for generating a searchable electronic record of a locate operation by combining (1) a geocoded aerial image of a

---

[3] As in *Alice* and *Enfish*, CertusView refers to both characterizations in this brief (i.e., "solv[ing] a technological problem" and "improv[ing] an existing technological process"). A finding by the Court that Claim 1 satisfies either characterization of the *Mayo/Alice* step one test warrants finding Claim 1 patent eligible pursuant to the Federal Circuit's guidance in *Enfish*.

dig area with (2) digital representations of physical locate marks applied to the ground, to create

a marked-up digital image and an accompanying data set:

> 1. A method for generating a searchable electronic record of a locate operation performed by a locate technician, the locate operation comprising identifying, using at least one physical locate mark, a presence or an absence of at least one underground facility within a dig area, wherein at least a portion of the dig area may be excavated or disturbed during excavation activities, the method comprising:
>
> A) electronically receiving an **aerial image of a geographic area comprising the dig area**, at least a portion of the received aerial image being displayed on a display device;
>
> B) **adding to the displayed aerial image at least one digital representation of the at least one physical locate mark**, applied to ground, pavement or other surface by the locate technician during the locate operation, so as to generate a marked-up digital image including the at least one digital representation of the at least one physical locate mark; and
>
> C) electronically transmitting and/or electronically storing the searchable electronic record of the locate operation, **wherein the searchable electronic record comprises the marked-up digital image and a data set, and wherein the data set comprises**:
>
> > **a set of geographic points along a marking path of the at least one underground facility, the set of geographic points including geographical coordinates corresponding to the at least one physical locate mark**; . . . .

(PX-03, Claim 1 (emphasis added).)

The recited data set comprises "a set of geographic points along a marking path of the at

least one underground facility including geographical coordinates corresponding to the at least

one physical locate mark." (PX-03, Claim 1; *see also id.* at Fig. 6-7; DX-233-01144-47, 1174-

80.) As explained by the patent specification, the claimed geographic coordinate data set is

generated two ways: (1) superimposing coordinate data from a GPS-enabled marking wand on a

geocoded high-resolution aerial image, or (2) drawing digital representations of physical locate

marks on a high resolution geocoded aerial image and associating the underlying pixels' GPS coordinate data with the hand-drawn digital representations. (PX-03, col. 6:14-26, 10:34-64, 12:19-27, 13:14-21; *see also* (Tr. 732:10-733:5 (explaining functionality of GPS-enabled paint wand), 746:21-747:11 (discussing PX-95.009 which shows "the marking device with its sensors collecting data and communicating that data to e-Sketch as a documentation of the work performed"), 754:19-22 ("as you collect things in your marking device, these things become available in e-Sketch to actually render").)

> **(1)    Trial evidence showed that the invention of Claim 1 is embodied by the e-Sketch product and that e-Sketch improved preexisting technological processes**

Claim 1 is eligible for patenting because it is "directed to a specific implementation of a solution to a problem in the [utility industry]" that "improve[s] an existing technological process." *See Enfish*, 2016 WL 2756255 at *4, *8. Trial evidence established that conventional systems for documenting the application of paint on the ground in locate operations were inadequate. (*E.g.* Tr. 745:7-16, 799:24-801; 826:25-827:4; PX-59.08-09, 011, 013; PX-95.0004-05.) The witnesses explained the rudimentary state of the art and why the documentation process for locate operations was problematic:

- "A lot of cases that meant that you got Leonardo DaVinci, who would take 30 minutes to draw out a sketch, and other times you would have somebody who would spend 30 seconds on it and it was incomprehensible." (Tr. 179:17-21.) Locators were not "draftspeople . . . engineers . . . [or] artists," but to properly document a locate operation, they needed to be "something" artists. (Tr. 820:4-821:17.) As a result, drawings were often of poor quality. (*See id.*)

- Sketches were of limited use to prove where the locator painted because they were not drawn to scale and were difficult to interpret, particularly when the dig site was in a rural location with few landmarks (Tr. 178:23-179:21) or where the locator painted on top of snow that was later plowed. (Tr. 826:1-9, 745:17-746:6.)

- When excavations led to "bad outcomes," excavating companies reflexively blamed the locators, and liability disputes often turned into a "documentation game," in which Dycom needed to have, at its fingertips, clear proof of exactly

11

where the marks had been placed. (Tr. 826:10-827:7.) Even when hand drawings were readily accessible, disputes would arise as to whether the marks were sufficiently "precise within the tolerance zone" for the jurisdiction. (*Id.*)

- States have regulations regarding dig tolerance. In the State of Virginia, that tolerance "is two feet on either side of the painted line." (Tr. 799:24-801:22.) Dycom CEO Mr. Nielsen explained that, "if your documentation is not precise within the tolerance zone in a particular state, it's as if you had none, because you're judged to be at fault if the facilities are mismarked." (Tr. 826:25-827:4.)

CertusView solved these problems by developing a software tool that precisely identifies the location of utility locate marks by showing them in a high-resolution aerial image of the dig area, and by associating each locate mark with geographical coordinates such as GPS coordinates. (*See, e.g.*, PX-59.08-09, 013.)

Trial testimony explained why combining a high resolution aerial image with geographical coordinate data corresponding to locate marks on the ground improved the industry's preexisting paper-based process and solved the industry's problems.

First, CertusView used a high resolution aerial image of the dig area to provide context and scale by depicting various landmarks such as each building, sidewalk, street, fire hydrant, telephone pole, manhole cover, or other permanent artifact located in the dig area. Using an aerial image was innovative because it solved the longstanding problem that a person standing in a field with a blank sketch pad cannot accurately capture all of the salient information about a dig area that is required to depict the locations of paint marks on a job site, much less the spatial relationships between objects. (Tr. 820:14-821:2 ("We got to turn them into -- and I won't use the full term—but 'something' artists, right? We have to make them into artists. And because we had been working on the paint wand, this idea of aerial imagery came to mind.").)

Second, CertusView achieved permanence, reproducibility and precision by assigning a "geospatial location" to each mark applied to the ground during a locate operation. (Tr. 757:9-13; *see also* Tr. 258:8-17.) Everything needed to "recreate the [paint] line digitally" is captured—

12

"the color," "the width," and "the latitude and longitude of every point along that line." (Tr. 758:16-22.) The GPS coordinate data allows a locate operation to be recreated even if paint marks, landmarks, or even the entire job site are altered. (Tr. 258:19-259:3 (Claim 1 of the '359 patent is "the idea of any time there is activity in the field, that we would capture not only the coordinates of where it happened, but when it happened.")).

CertusView's improvements to the industry's preexisting process are vividly illustrated by comparing prior art locate documentation with documentation created using the invention. The table below shows a prior art hand-drawn sketch in the left column, and the inventive improvement covered by the '359 patent in the right column:



| (PX-95.0005.) | (PX-59.0013.) |

The improvements to the preexisting locate documentation process that CertusView invented and claimed in the '359 patent do not result from merely "computerizing" a conventional locate operation. Merely "computerizing" conventional locate operations would be akin to documenting a locate operation using an electronic sketching tool that provided a locate technician a blank sheet of "electronic" paper for sketching. The output would be electronic, but

13

the results would bear no resemblance to the patented locate documentation in the right-hand column above and would be no more accurate than prior art documentation.

CertusView's patented improvements to the utility locate process solved the industry's problems by improving public safety and reducing liability risk for utility locators. (Tr. 809:19-22 ("So we're using the technologies that we patented internally. We're licensing them out internally. And that's helped improve the quality and safety and performance of our business.").) The Court acknowledged these benefits during trial. (Tr. 1151:9-13 ("It's all very interesting and in no way does it fail to recognize the effort of CertusView, and even if it's not patentable subject matter, it's obviously, from a liability standpoint, and other standpoints something that is beneficial at the very least.").) It would be anomalous for the Court to find that a new technology that reduced liability and enhanced public safety is not an "improvement" under § 101 of the Patent Act.

Claim 1 satisfies step 1 of the *Mayo*/*Alice* test and is eligible for patenting because it is "directed to a specific implementation of a solution to a problem in the [utility industry]" that "improv[ed] an existing technological process." *Enfish*, 2016 WL 2756255 at *4, *8.

Claim 1 is patent-eligible notwithstanding the fact that, in isolation, each recited claim element was known in the art. *See Diamond v. Diehr*, 450 U.S. 175 (1981). In *Diamond v. Diehr*, the Supreme Court held that patent claims on a process for curing rubber with greater accuracy was patent-eligible. The Court found the claims patent eligible despite the fact that the inventors had not discovered anything new about the process for curing synthetic rubber. *Diamond*, 450 U.S. at 188, 193 n.15, and 206. "The patents were warranted not by the novelty of their elements but by the novelty of the combination they represented." *Id.* at 193 n.15 (quoting *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 521-22 (1972)). The Supreme Court's observation

14

in *Diamond v. Diehr* were reiterated in *Alice*, where the Court noted that the claims in *Diehr* were patent-eligible because they "solve[d] a technological problem in 'conventional industry practice'" and "because they improved an existing technological process." *Alice*, 134 S. Ct. at 2358. The Supreme Court's rationales for finding claims patent-eligible in *Diehr* are equally applicable to Claim 1.

Claim 1 contrasts favorably with the claims that were at issue in another recent Federal Circuit decision on patent eligibility. *In re: TLI Communications LLC Patent Litigation* was decided shortly after *Enfish*. *In re: TLI Commc'ns LLC Patent Litig.*, No. 2015-1372, 2016 WL 2865693 (Fed. Cir. May 17, 2016). In *TLI*, the Federal Circuit affirmed a judgment of patent ineligibility under § 101 for claims directed to "a method for recording and administering digital images" using a cellular telephone, computer network, and server. *Id.* at *2. The Federal Circuit concluded that the claims were ineligible for patenting under § 101 because the patent specification lacked "any claim that the invention reflects an inventive solution to any problem . . . ." *Id.* at *3. "Rather, the inventor sought to 'provid[e] for recording, administration and archiving of digital images simply, fast and in such a way that the information therefore may be easily tracked." *Id.*  The Federal Circuit concluded that the claims were ineligible for patenting because "the claims are not directed to a solution to a 'technological problem' as was the case in *Diamond v. Diehr*, 450 U.S. 175 (1981)." *Id.* at *4. In contrast to the claims at issue in *TLI*, Claim 1 of the '359 patent is directed to an improvement to a preexisting technological process. And unlike *TLI*, CertusView's claimed invention solved longstanding industry problems that arose from inaccurate documentation of utility locate operations.

Claim 1 also compares favorably to claims that a court in the District of Massachusetts recently found patent-eligible. In *Sophos Inc. v. RPOST Holdings, Inc.*, No. 13-12856-DJC, 2016

U.S. Dist. LEXIS 72699, at \*32-36 (D. Mass. Jun. 3, 2016), the district court held that patent claims directed to "sending certified electronic mail" did not claim the abstract idea of "certified mail" because the claims "do more than provide proof of mailing, they also provide proof of delivery and content." *Id.* at \*35. In reaching this holding, the court noted that "verifying the content of messages" is a non-conventional task that the United States Postal Service cannot do. *Id.* at \*35-36. Like the patent claims in *Sophos*, Claim 1 of the '359 patent recites elements as part of the claimed invention that were not conventionally used in locate operations, including a high-resolution aerial image and digital representations of physical locate marks defined by geographical coordinate data. These elements are essential to overcoming the problems that plagued conventional locate documentation. *See Sophos*, U.S. Dist. LEXIS 72699, at \*35-36. Accordingly, Claim 1 does not claim an abstract idea. *See id.*

Under *Alice*'s 2-step test, if the first step is not met, the claim satisfies § 101. *Enfish*, 2016 WL 2756255 at \*8. Since the first step of the *Alice* inquiry is not met, the claim is not invalid under § 101. The evidence from trial evaluated under the new *Enfish* standard refutes any claim to subject matter invalidity.

> **(2)** **There is no risk of being deceived by the "draftsman's art" as the limitations meaningfully limit the claimed invention**

The Federal Circuit recognized in *Enfish* that courts must guard against being "deceived by the 'draftsman's art'" by patent claims that merely add "general-purpose computer components … post-hoc to a fundamental economic practice or mathematic equation." *Enfish*, 2016 WL 2756255 at \*8 (citing *Alice*, 134 S. Ct. at 2360). Narrowing amendments during prosecution of Claim 1 and the limiting language in the preamble ensure that Claim 1 appropriately focuses on the invention and nothing more.

16

**(a)     Amendments during prosecution expressly limited the claimed invention to a method for creating an electronic manifest in which geographical coordinates correspond to each paint mark on the ground**

During prosecution, the applicants amended what is now Claim 1 to clarify the nature of the "geographical coordinates corresponding to the at least one physical locate mark" forming a portion of the "data set" of the searchable electronic record. (DX-233-01174, 1180.) The applicants added that the data set comprised "a set of geographic points along a marking path of at least one underground facility, the geographic points including geographical coordinates corresponding to the at least one physical locate mark." (DX-233-01174.) This amendment was made in response to a Final Office Action on March 19, 2012, and was critical to allowance. The amendment required that the geographical coordinate data associated with the locate operation capture the exact location of the "paint marks on the ground." Generalized geographic coordinate data included in a locate ticket, the street address of the job site, or even coordinates describing the excavation area are insufficient and not claimed. The recited geographical coordinates must correspond to the points along the marking path where paint marks were applied to the ground.

**(b)     The preamble of Claim 1 also limits the claimed invention**

In addition to the prosecution history, the preamble of Claim 1 also limits scope; describing the essence of the invention—creating a searchable electronic record that captures the locations of physical locate marks applied to the ground. It provides antecedent basis for two critical claim terms: (1) "a searchable electronic record of a locate operation performed by a locate technician" and (2) "at least one physical locate mark." The preamble (with claim terms shown in bold typeface) states:

> 1. A method for generating **a searchable electronic record of a locate operation performed by a locate technician**, the locate operation comprising identifying,

17

using **at least one physical locate mark**, a presence or an absence of at least one underground facility within a dig area, wherein at least a portion of the dig area may be excavated or disturbed during excavation activities, the method comprising:

The preamble of Claim 1 is similar to a method claim preamble that the Federal Circuit considered in *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330 (2010), holding that a preamble that describes the essence of an invention is limiting:

> In *Griffin v. Bertina*, we construed language in the preamble of the claim describing "[a] method for diagnosing an increased risk for thrombosis," and concluded that "[d]iagnosis is ... the essence of this invention; its appearance in the count gives 'life and meaning' to the manipulative steps." We noted that without the invention's intended purpose of diagnosis, "obtaining nucleic acid and assaying for a point mutation alone are merely academic exercises." Similarly, here the apparatus of Claim 1 and the method of claim 23 would have little meaning without the intended objective of decoding.

*Vizio*, 605 F.3d at 1341 (internal citations omitted).

In *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (2003), the Federal Circuit observed that the principle that "preamble language will limit the claim if it recites not merely a context in which the invention may be used, but the essence of the invention" frequently applies to method claims because the words used in many method claim preambles are not "merely circumstances in which the method may be useful, but instead are the *raison d'être* of the claimed method itself."

*Vizio* and *Boehringer* directly apply to this case. The essence of CertusView's claimed invention is creating a searchable electronic record that uses geographic coordinate data to capture the geographic locations of physical locate marks applied to the ground. Characterizing Claim 1 as directed to "creating a computer-readable file to store information, as applied in the particular technological environment of conducting a locate operation" inappropriately oversimplified the claimed invention. (ECF No. 250 at 71.) As the Federal Circuit held in *Enfish*,

18

a court's characterization of a claimed invention must be tethered to the claims. *Enfish*, 2016 WL 2756255, at *6.

In addition, the preamble of Claim 1 is limiting for the additional reason that it provides antecedent basis for terms used in the claim itself. *Boehringer*, 320 F.3d at 1345 ("Boehringer is correct in that a preamble simply stating the intended use or purpose of the invention will usually not limit the scope of the claim, unless the preamble provides antecedents for ensuing claim terms and limits the claim accordingly."). The preamble provides antecedent basis for: (1) "a searchable electronic record of a locate operation performed by a locate technician" and (2) "at least one physical locate mark." Each of these terms limits the claimed method to creating a searchable electronic record of a locate operation; the limitations are not field of use restrictions.

### 2.    *Mayo/Alice* Step Two: The geographic coordinate limitations in Claim 1 transform the claim into a patent-eligible application

If the Court proceeds to step two of the *Mayo/Alice* test, the trial evidence shows that the geographical coordinate and aerial image limitations recited in the claim recite "concrete improvements" to the preexisting technological processes used for documenting locate operations that transform the nature of the claim into a patent-eligible application. *Enfish*, 2016 WL 2756255 at *8.

#### a.    Claim 1 solved problems unique to the utility locating industry

An invention is not ineligible simply because it involves abstract concepts. *Alice*, 134 S. Ct. at 2354. "Applications of such concepts to a new and useful end" remain patent-eligible. *Id.* Claim 1 combined known components in new ways to solve industry problems resulting from inadequate documentation of locate operations. Claim 1 therefore "improve[d] an existing technological process," and such improvements are patent-eligible, even if the Court finds that the solution involved abstract concepts. *Alice*, 134 S. Ct. at 2354, 2358 (discussing patent-

19

eligible claims at issue in *Diehr*, 450 U.S. 175-79).

The invention also overcame problems uniquely faced by locate technicians working remotely in the field by offering a new technological solution. *See id.* at *14-15 ("*DDR Holdings* is best understood as a clue that when a solution 'overcome[s] a problem specifically arising in' a particular technological realm, that solution—though it may implement an abstract idea—may likely contain an inventive concept."); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014).

Citing *DDR Holdings*, courts have held patent-eligible claims that recite "a specific way of overcoming a problem." *Art+Com Innovationpool GmbH v. Google Inc.*, No. 14-cv-217-RGA, 2016 U.S. LEXIS 56498, at *17 (D. Del. April 28, 2016). Although the court in *Art+Com* found the claim was directed to an abstract idea, *id.* at *9, the court determined that because the elements of the claimed method were "a specific procedure that is done by a computer," the claimed invention "did more than 'recite a commonplace business method,'" *id.* at *13, *17, and apply it to the Internet or using generic computer functions, *id.* at *17 (citing *DDR Holdings*, 773 F.3d at 1259).

Similar to the iterative process in the *Art+Com* claims, the "ordered combination" claimed in the '359 patent allows a locate technician who is standing in a field—not sitting at a desk—to document a locate operation accurately with resolution not possible under the prior art. *Id.* at *16. Geographic location data associated with each digital representation of each physical locate mark permits a user to depict precisely the location where a paint mark was applied; moreover, the geographic location is "permanent," allowing recreation of the locate operation even after the paint marks are gone, for example, due to an explosion. The "specific solution" claimed in the patent therefore demonstrates a "sufficient inventive concept." *See id.* at *17.

20

The findings by the court in *Sophos Inc.* reinforce the conclusion that Claim 1 of the '359 patent is eligible for patenting under *Mayo/Alice* step two. *Sophos*, 2016 U.S. Dist. LEXIS 72699, at \*36-37. In *Sophos*, the court held that "the patents-in-suit aim to solve a technical problem of electronic messages" by placing "an intermediate server between the sender and receiver of an electronic message to address the problem of providing reliable proof of the content and delivery of electronic messages." *Id*. at \*37. The court concluded that the use of an intermediate server constituted a technical solution that satisfied step two of the *Mayo/Alice* analysis. *Id.* CertusView's technical solution recited in Claim 1 also satisfies step two of the *Mayo/Alice* test because the recited high-resolution aerial image and geographical coordinate limitations also recite components of a technical solution.

### (1) Trial evidence established that coordinate data was not conventionally used to document paint on the ground

S&N claimed that "there was only one company out there" in the industry "who had a product that would allow somebody to mark up a digital image to draw lines on a digital image" in a manner similar to the claimed invention—TelDig. (Tr. 291:12-18.) But the TelDig products offered functionality for creating "notification polygons" at very low resolution, which is different than what is claimed in the '359 patent and useless to precisely document locates. (*See id*.) Moreover, TelDig's products neither documented locate operations nor tracked digital representations of physical locate marks using geographical coordinates. When Mr. Zatkovich was asked "how specifically could the GPS data be reflected on the locate mark" using TelDig's product, he responded that it could not, and that the locate operator would have to identify location information by "plac[ing] notes" on the map using landmarks as reference points. (Tr. 855:1-17.) Mr. Zatkovich could not identify any use by the prior art TelDig system of GPS

coordinates to document or display digital representations of physical locate marks. (*See* Tr. 853:20-854:1, 855:4-17.)

Nor did the use of GPS coordinate data in Tucker and Sawyer show that it was conventional to use geographical coordinates to precisely identify the location of paint marks applied to the ground. In fact, Tucker and Sawyer showed the opposite. *Diamond*, 450 U.S. 189-90 n.12 ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."). As the Supreme Court has recognized, patent claims—like the ones here—may be patent eligible even if individual steps of the claimed process were well known, "employ[ed] a well-known mathematical equation," and used a "digital computer." *Diehr*, 450 U.S. at 187. While GPS coordinates are used in the systems disclosed in Tucker and Sawyer, (Tr. 382:10-383:22), the disclosed systems used geographical coordinate data to obviate the need for locate operations. (Tr. 340:10-16, 360:4-13, 404:4-9.) Just as the claimed process in *Diehr* used well-known components to constantly record temperature measurements inside a mold to solve the industry problem of obtaining uniform rubber cures, *id.* at 178 n.3-4, the claimed method in the '359 patent combined known components in new ways to solve industry problems resulting from the use of low-technology tools that led to inaccurate documentation of locate operations.

                    **(2)    Conventional locate operation documentation did not utilize high-resolution aerial images, and did not have the resolution required by the '359 patent**

Claim 1 requires "sufficient resolution" of the image, at an optimal scale, to accurately document a locate operation and record a digital representation of a physical locate mark. (PX-03 col. 2:35-44, 6:23-26, 7:54-60, 9:16-25, 12:19-27, Claim 1.) Claim 1 requires high resolution by reciting an "aerial image" that depicts the dig area, including each building, tree, and geographic

22

feature, and the size and relative location of each building, sidewalk, street, and other permanent artifact located in the dig area. (PX-59.0013, PX-66.0007, 012-014.)

The evidence at trial showed that the "conventional method" of documenting a locate operation using paper manifests did not have sufficient resolution or scale to usefully record the location of paint markings. Every witness who testified at trial, including S&N's expert Mr. Zatkovich, agreed that the claims of the patents-in-suit require high resolution so that a locate operation is documented usefully. (*E.g.* Tr. 783:11-784:4 ("[O]ur imagery is at six inches per pixel or better . . . any line drawn on the map would have an accuracy within six inches"); Tr. 289:25-290:8 (goal for e-Sketch was "to place marks showing what was going on at the site with associated information" at "a high level of specificity"); Tr. 203:7-18 (explaining e-Sketch geolocates by storing GPS coordinates); Tr. 1042:18-1043:3 (explaining an "accurate representation of a digital representation needs to have coordinates" and depends on resolution).)

Dr. Dymond testified: "the term digital representation of a physical locate mark in itself indicates to me that the mark, which is a line, needs to be reproducible, which means that the vertices of the line need to carry coordinates." (Tr. 1041:5-9.) Mr. Zatkovich agreed the inventions required sufficient resolution, recognizing that a person of ordinary skill in the art would know that a sufficient resolution was essential. (*See* Tr. 856:6-858:2; *see also* Tr. 927:12-17.) Mr. Zatkovich repeatedly testified that the claimed digital representation of the physical locate mark inherently required (1) a system that "provide[s] some relative information as to the other landmarks on the dig site"; and (2) a "reasonable" accuracy within two to four feet. (Tr. 857:2-6; 926:7-927:17; *see also* Tr. 858:6-8.)

Mr. Zatkovich also agreed that the patents-in-suit require high resolution because marking a digital representation of the physical locate mark without sufficient resolution would

23

be "useless" as it would not "provide sufficient detail" to document the locate operation. (Tr. 929:12-15.) Mr. Zatkovich further explained that digital representations of physical locate marks must be "proportionate to the location and the size of the utilities" that were marked. (*See* Tr. 935:10-15.) As Mr. Zatkovich explained, a line drawn on a zoomed-out map, such that the line is 20-40 feet wide relative to objects in the map, "would not provide the level of clarity necessary to accurately identify utilities." (Tr. 930:18-931:2; PX-03 Abstract, col. 2:35-44 (noting sketches by hand are "not to scale" and "prone to human error").) A more "granular view" is needed to identify a utility with precision, using a locate mark. (*See* Tr. 875:2-8.)

The evidence at trial showed that no prior art system offered the resolution achieved using the aerial images recited in Claim 1, and that such resolution was necessary to CertusView's claimed invention.

### (3)   Claim 1 is not merely "computerizing" an abstract idea

Claims are not patent ineligible simply because they involve a computer or the Internet. *Diehr*, 450 U.S. at 187 ("a claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a mathematical formula, computer program, or digital computer"); *see also DDR Holdings*, 773 F.3d at 1257. Trial evidence showed that Claim 1 "do[es] not merely recite the performance of some business practice" known before computers with the requirement to computerize it. *See DDR Holdings*, 773 F.3d at 1257. Instead, the claimed solution overcame a "problem specifically arising in" a particular technological realm, *id.*— documenting a utility locate operation with enough resolution such that the locate operation could be recreated even after excavation (*see, e.g.*, PX-59.08-09; PX-66.0007, 012-014; Tr. 745:17-746:6, 809:14-24, 826:1-9).

The method of Claim 1 "[is] not merely what a computer does"; rather, it is "a specific procedure that is done by a computer." *See Art+Com*, 2016 U.S. LEXIS 56498, at *17. The

24

claim is not a "bare recitation" of "receiv[ing] and send[ing] . . . information over a network," *id.* (alterations in original), or the simple use of a computer to "obtain data, adjust account balances, [or] issue automated instructions," *Alice*, 134 S. Ct. at 2359.

Just as the claims in *DDR Holdings* "d[id] not broadly and generically claim 'use of the Internet' to perform an abstract business practice," 773 F.3d at 1258, Claim 1 does not broadly claim using "a computer" to "document locate operations". Claim 1 requires much more, including the use of geocoded, high-resolution aerial images and geographical coordinate data for each digital representation of each physical locate mark. Claim 1 "recites a specific way of overcoming a problem which plagued prior art systems"—to digitally represent physical locate marks with sufficient resolution. *See Art+Com*, 2016 U.S. Dist. LEXIS at *17; *see* also *DDR Holdings*, 773 F.3d at 1259.

> **(4)    Claim 1 does not preempt every application of the idea of creating a computer-readable file to store information regarding a locate operation**

Even if Claim 1 claims an abstract idea—a finding CertusView disputes—there is no "risk [of] disproportionately tying up the use of" creating searchable electronic manifests of locate operations. *See Alice*, 134 S. Ct. at 2354-55; ECF No. 250 at 72. By reciting that a locate operation must be documented on an aerial image, and by requiring that geographical coordinate data must be captured that identifies the location of locate marks applied to the ground, Claim 1 "seek[s] only to foreclose from others the use of that [idea] in conjunction with all of the other steps in their claimed process." *See Diehr*, 450 U.S. at 187.

## IV.    CONCLUSION

Reconsideration of the 101 Order regarding Claim 1 of the '359 patent is warranted in light of the Federal Circuit's recent *Enfish* decision and in light of the new evidence that was introduced during the inequitable conduct bench trial. CertusView respectfully requests the Court

25

to find that Claim 1 of the '359 patent is not drawn to an abstract idea and is patent eligible under 35 U.S.C. § 101 because CertusView's claimed invention solved the utility industry's longstanding problems with locate documentation with a new technological invention that is embodied in CertusView's e-Sketch product.

Date: June 15, 2016

Respectfully submitted,

/s/      *Christopher C. Campbell*

Christopher C. Campbell (VBN 36244)
Cooley LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100
E-mail: ccampbell@cooley.com

Thomas J. Friel, Jr.
Cooley LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
E-mail: tfriel@cooley.com

Orion Armon (*pro hac vice*)
Wayne O. Stacy (*pro hac vice*)
James P. Brogan (*pro hac vice*)
COOLEY LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO 80021
Telephone: (720) 566-4000
Facsimile: (720) 566-4099
Email: oarmon@cooley.com
jbrogan@cooley.com
wstacy@cooley.com

*Counsel for Plaintiff CertusView Technologies, LLC*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2016, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will send a notification of such filing

via electronic mail to all counsel of record:

Brian L. Whisler
Matt Dushek
Baker & McKenzie LLP (DC)
815 Connecticut Ave NW
Washington, DC 20006
Email: brian.whisler@bakermckenzie.com
Email: matt.dushek@bakermckenzie.com

Daniel Joseph O'Connor
Michael Anthony Duffy
Baker & McKenzie LLP (IL-NA)
300 E. Randolph St, Suite 5000
Chicago, IL 60601
Email: daniel.oconnor@bakermckenzie.com
Email: Michael.Duffy@bakermckenzie.com

John Giuseppe Flaim
Mackenzie Marie DeWerff
Weldon Barton Rankin
Erin M. Choi
Benjamin B. Kelly
Baker & McKenzie
2300 Trammell Crow Center
2001 Ross Ave
Dallas, TX 75201
Email: john.flaim@bakermckenzie.com
Email:mackenzie.DeWerff@bakermckenzie.com
Email: w.Rankin@bakermckenzie.com
Email: erin.choi@bakermckenzie.com
Email: ben.kelly@bakermckenzie.com


_/s/       Christopher C. Campbell_

Christopher C. Campbell (VBN 36244)
Cooley LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100
E-mail: ccampbell@cooley.com

27